## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 02-23309-CIV-MORENO

Magistrate Judge Garber

BURGER KING CORPORATION,

      Plaintiff,

vs.

RESTAURANT CORPORATION OF
AMERICA, INC., a California Corporation and
MUMTAZ HASHIM a/k/a MIKE HASHIM,

      Defendants.

_____/

**NIGHT BOX**
FILED

JUN - 2 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

### PLAINTIFF BURGER KING CORPORATION'S MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Burger King Corporation ("BKC"), pursuant to S. D. L. R. 7.1 and this Court's May

21, 2003 Order, submits this Memorandum in Opposition to Defendants' Motion for Summary

Judgment and Incorporated Memorandum of Law.

## I. INTRODUCTION

This is the third lawsuit brought by BKC against franchisees controlled by Defendant Mike

Hashim ("Hashim") for failure to make payment in accordance with the parties' Franchise

Agreements. In this action, BKC sued Defendants for, among other things, breach of contract

following their undisputed failure to cure their default within the time provided by BKC's default

notice and the controlling Franchise Agreements. Defendants, Restaurant Corporation of America,

Inc. and Hashim, failed to timely pay the amounts due under those agreements, which constitute

material breaches thereof. (See App. Ex. "A" at ¶ 8; App. Ex. "B").[1] Indeed, Defendants do not

---

[1]     The supporting exhibits to this memorandum of law are attached hereto, with
reference as App. Ex. "_____."

dispute that they failed to timely pay the sums due. (Hashim Dep., pp. 26-27, DE 43).

As a result of Defendants' material breaches, BKC terminated the Franchise Agreements. Defendants have asserted several affirmative defenses and a counterclaim, in which they attempt to justify their admitted failure to timely pay by claiming that the parties modified the Franchise Agreements by their course of dealings, that BKC is equitably estopped from requiring strict compliance with the terms of the Franchise Agreements, and that BKC has waived the breach by its acceptance of royalty and advertising payments. Defendants' affirmative defenses fail as a matter of law, and thus, summary judgment on BKC's complaint is inappropriate.

BKC has never waived the grounds by which Defendants defaulted under their Franchise Agreements. Moreover, the Franchise Agreements contain a non-waiver provision, which as a matter of law, defeats Defendants' defenses that the terms of the parties' Franchise Agreements have somehow been modified or waived and that BKC is estopped from requiring strict compliance with the Franchise Agreements. See e.g., Burger King Corp. v. Hinton, Inc., 203 F. Supp. 2d 1357, 1365 (S.D. Fla 2002) (inclusion of non-waiver clause in Franchise Agreements precludes affirmative defenses of waiver and estoppel); Rybovich Boat Works, Inc. v. Atkins, 587 So. 2d 519, 522 (Fla. Dist. Ct. App. 1991) (because contract was unambiguous, buyer's affirmative defenses of waiver and estoppel were defeated as a matter of law by contracts provisions, including anti-waiver provision); see also MCA Television Ltd. v. Public Interest Corp., 171 F.3d 1265, 1270-71 (11th Cir. 1999) (defendant's claims of estoppel and waiver, which were based on plaintiff's acceptance of late payments for a two-year period without objection, failed where contract contained anti-waiver provision).

In addition, after notice and an opportunity to cure, the failure to pay **when due** any royalty or advertising and sales promotion contribution required to be paid under the Franchise Agreements

2

is grounds for termination.  (App. Ex. "A").  In a franchise dispute, this is so even if Defendants thereafter made payment to BKC.  Dunkin' Donuts, Inc. v. Liu, Nos. CIV.A. 99-3344, CIV.A. 00-3666, 2000 WL 1868386, *3 (E.D. Pa. Dec. 21, 2000) (App. Ex. "C") (payments received in lockbox after cure period expired and accepted by franchisor did not bar termination of franchise agreement); Truglia v. KFC Corp., 692 F. Supp. 271, 276-77 (S.D.N.Y. 1988) (tendering payment after cure period expired materially breached franchise agreement such that termination was appropriate); see also Gergora v. Flynn, 486 So. 2d 5, 6 (Fla. Dist. Ct. App. 1986) (lessor did not waive right to rescind lease by accepting rent payments after material breach occurred).

Plainly, Defendants' affirmative defenses do not defeat BKC's claims set forth in its Complaint, and therefore, this Court should deny Defendants' motion for summary judgment.

## II.   STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The following facts are material to Defendants' motion for summary judgment and compel denial of Defendants' motion:[2]

Restaurant Corporation of America, Inc. (the "Company") owned and operated seven restaurants as franchised Burger King® restaurants (together, the "Restaurants") in accordance with the terms and conditions of seven separate Burger King® Restaurant Franchise Agreements (together, the "Franchise Agreements").[3] The Restaurant numbers, locations, and dates of the

---

[2]  While BKC agrees that many facts are not in dispute in this case, BKC disagrees with certain facts and legal characterizations as set forth in Defendants' statement of material facts not in dispute.  Thus, BKC sets forth this statement of material facts in opposition to Defendants' motion for summary judgment.

[3]  A copy of one of the Franchise Agreements is attached hereto as App. Ex. "A."  BKC attaches only one of the Franchise Agreements as they are substantially similar in their terms and conditions.

Franchise Agreements are set forth below:

| Restaurant Number | Restaurant Location | Date of Franchise Agreement | Date of Lease, if any |
|---|---|---|---|
| BK #608 | 9475 East Firestone Blvd. Downey, California 90241 | December 1, 1988 | |
| BK #690 | 1520 West Valley Blvd. Alhambra, California 91803 | May 1, 1988 | |
| BK #3744 | 14305 Lakewood Blvd. Downey, California 90242 | September 27, 1993 | September 24, 1993 |
| BK #4577 | 5401 East Washington Blvd. Commerce, California 90040 | June 12, 1985 | |
| BK #5244 | 8063 Alondra Blvd. Paramount, California 90723 | December 29, 1986 | |
| BK #7320 | 290 Fox Hill Mall Culver City, California | December 12, 1994 | |
| BK #10463 | 6820 Reseda Blvd. Reseda, California 91335 | April 7, 1997 | |

Franchisees may negotiate with BKC regarding the terms of the Franchise Agreements. (T. Archer dep., at pp. 16-17, DE 45).

Pursuant to written assignments, Hashim, the Guarantor, unconditionally and irrevocably personally guarantied to BKC the performance of each and every obligation of the Company under the Franchise Agreements and other agreements with BKC (the "Assignments"). (App. Ex. "C"; App. Ex. "B" ¶ 3).[4] Mike Hashim has also been the franchisee of at least forty-two other Burger King® restaurants located throughout Texas. (App. Ex. "E" at ¶ 5).

According to the terms of the Franchise Agreements with BKC, Defendants expressly agreed

---

[4] A copy of one of the Assignments is attached hereto as App. Ex. "C." BKC attaches only one of the Assignments as they are substantially similar in their terms and conditions.

4

"to pay to BKC a royalty of 3.5% of gross sales for the use of the Burger King System and the Burger King Marks" and to "pay to BKC an amount equal to 4% of [their] monthly gross sales [. . . to be . . .] used for advertising, sales promotion and public relations." (See, e.g., App. Ex. "A" at ¶ 8).   These sums were due to BKC monthly on or before the tenth day of the month. Id.  The Franchise Agreements provide that the failure to timely pay any royalty or advertising and sales promotion contribution constitutes an act of material default under the Franchise Agreements. (App. Ex. "A" at ¶ 17).  All such royalty and advertising payments are required to be made to BKC in Miami, Florida or at such addresses as BKC may designate.  (App. Ex. "A" at ¶ 8E).  Likewise, under the Guarantees, Hashim guaranteed to BKC the Company's payment and performance under the Franchise Agreements and all other obligations to BKC.  (See App. Ex. "B" at ¶ 3).

Each Franchise Agreement also provides that it "may only be modified or amended by a written document executed by BKC and FRANCHISEE."  (App. Ex. "A" at ¶ 19G).  They also contain non-waiver clauses which provide:

> **B.     Non-Waiver**
>
> The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by FRANCHISEE with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement.

(App. Ex. "A" at ¶ 19B).  To further enforce that BKC's actions do not constitute a waiver, the Franchise Agreements also provide that

> The failure of BKC to terminate this Agreement upon the occurrence of one or more events of default will not constitute a waiver or otherwise affect the right of BKC to terminate this Agreement because of a continuing or subsequent failure to cure one or more of the aforesaid events of default or any other default.

5

(App. Ex. "A" at ¶ 17A).

The document Defendants rely upon as having modified their Franchise Agreements is a memorandum to all United States franchisees from the Director of Franchise Financial Analysis, dated September 1, 1994, and titled "Worldwide Credit Policy." The memorandum is not signed by Defendants, as required to modify or amend their Franchise Agreements. (See App. Ex. "F").

Moreover, as indicated by its title, this Credit Policy Memorandum does not purport to modify due dates for royalty, advertising or other payments under franchise agreements. Rather, the Credit Policy deals exclusively with the issue of whether a franchisee who breaches a franchise agreement by failing to make payments in a timely fashion will automatically become ineligible to apply for additional franchises ("expansion") or for renewal of his/her existing franchise agreement upon its expiration ("successor"). In order to ensure that the Credit Policy is not misinterpreted to modify payment due dates under the franchise agreement, the very first paragraph proclaims in bold font that payments continue to be due according to the terms of the franchise agreement:

> **I.** **Payments are due and payable according to the terms outlined in your franchise agreement, lease agreement, note and any other agreement between you and Burger King Corporation.**

(App. Ex. "F" at 1) (emphasis in original).

Having made it clear that the memorandum does not modify the due date for royalty and advertising payments, the next paragraph explains the Credit Policy – which is that franchisees who pay within 15 days of the due date under their franchise agreements will not automatically become ineligible to receive credit approval for future expansion and renewal requests. (Id.). To preclude franchisees from misinterpreting the Credit Policy as extending the due date under franchise agreements for payments, the very next sentence reconfirms that the intent of the grace period is

6

limited to providing flexibility in the credit approval process for expansion and renewal requests; that it does not sanction late payments; and that payments made within the grace period, but after the due date set forth in the franchise agreement are still "late payments":

> II.     The fifteen (15) day grace period for royalty, advertising and percentage rent payments, will remain in effect. **The intent of the grace period is to provide some flexibility in the credit approval process (for expansion and successor requests), and not to sanction late payments. Repeated late payments within the grace period may result in credit disapproval at the discretion of BKC.**
>
> . . . .
>
> IV.    Once a payment is made outside the terms of the new policy, the franchisee shall be credit disapproved.  The credit approved status shall be reinstated after the franchisee has paid within the policy terms for six (6) consecutive months.

(Id.) (emphasis added).

On the next page of the memorandum, in an abundance of caution, BKC reiterates yet again the fact that payments continue to be due as set forth in the franchise agreement; that royalty and advertising payments are due on the 10th of each month; and that this Credit Policy "does not serve to amend or modify any franchise, lease or other agreements to which BKC is a party":

> Typically, payments are due as set forth below and on the attached schedule.  You should, however, consult your own agreements for specific payment terms.
>
> Rent is due on the 1st of each month payable in advance. **Royalty, advertising** and monthly percentage rent **is due on the 10th of each month** based upon the gross sales of the preceding month.
>
> . . . .
>
> **This policy** can be revised at any time by BKC and **does not serve to amend or modify any franchise, lease, or other agreements to which BKC is a party.**

(<u>Id.</u> at 2) (emphasis added).

Finally, a third page in the form of a schedule is attached.  The schedule contains categories, followed by the due date under the relevant contract, followed by "Payment Criteria for Credit Approval for Expansion or Successor."  (<u>Id.</u> at 3).  Next to the "Royalty" and "Advertising" categories, the schedule states that as required by the franchise agreement, <u>payments continue to be "Due on the 10th of the following month</u>," and for credit approval for expansion or successor purposes only, payment must be made "No later than 25th of the following month."  (<u>Id.</u>).

To hammer home yet again that the 10-day payment deadline in the franchise agreements is not being modified, the bottom of the schedule contains 4 bullet points.  <u>The second bullet reiterates that payments continue to be due and payable according to the terms outlined in the franchise agreement.</u>  (<u>Id.</u>).  <u>The next bullet reiterates that payments made outside the ten-day deadline set forth in the franchise agreement are "late".</u>  (<u>Id.</u>).   And the final bullet reiterates that the 15-day grace period is for credit approval purposes only:

> • **Payments are due and payable according to the terms outlined in your franchise,   lease, note  and other agreements executed with Burger King Corporation.**
>
> • **Payments made outside the terms outlined in the specific agreements executed with BKC are late.**
>
> • The fifteen (15) day grace period for royalty, advertising and percentage rents, has been established for credit approval purposes only.  Franchisees who chronically pay late within the grace period are subject to credit disapproval at the discretion of BKC.

(<u>Id.</u> at 3) (emphasis added).

Finally, the Credit Policy was preceded and followed by other Credit Policies, all of which present the same information, contain the same cautionary language, and preclude franchisees from

8

relying upon them as modifying the payment due dates set forth in their franchise agreements. (See Composite App. Ex. "G").

Despite these clear and unequivocal obligations, Defendants failed to timely pay royalties and advertising contributions. Defendants failed to timely pay royalty and advertising payments for August through December 2002 as well as January 2003. (App. Exs. "H" & "I"; Hashim Decl. at 7, DE 40). Significantly, Defendants acknowledge that they failed to timely make royalty and advertising payments for these months. (Hashim dep. at 13-14, 76-77, DE 43; Hashim Decl. at 7, DE 40). Moreover, Defendants admit that they did not even comply with their own alleged grace period for those months. (Hashim Decl. at ¶ 7, DE 40).[5]

As a result of Defendants' failure to timely pay BKC, BKC provided Defendants with notice of their defaults and the opportunity to cure the defaults in accordance with Defendants' right to cure under the Franchise Agreements. (See App. Exs. "H" & "I"). Even if any credence is given to Defendants' argument that they believed they had more time, Defendants have been on notice from at least October 25, 2002 that BKC required strict compliance with the payment provisions of the Franchise Agreements. (App. Ex. "H"). Defendants admittedly failed to pay BKC the amounts due before the expiration of the ten-day cure period. (Hashim Decl. at ¶ 7 & ex. C, DE 40; App. Ex. "E" at ¶ 11). The Franchise Agreements therefore terminated effective February 25, 2001. (App. Ex. "J").

When BKC issued the default notice on February 11, 2003, BKC's legal department confirmed that payments had not been received by BKC with its finance department and obtained

---

[5] Defendants payments for August through February, 2003 were received by BKC beyond alleged grace period they claim exists as a result of the 1994 Credit Policy Memorandum.

a statement of past due accounts receivable from the finance department. (App. Ex. "E" at ¶ 12). At that time, Defendants were already 32 days late on their December payment, in addition to being late on their January payment (due on February 10). (Id.) The default notice, as permitted by the Franchise Agreements, required full payment to be received by BKC headquarters no later than 11:59 p.m., February 24, 2003 to avoid immediate automatic termination of the Franchise Agreements, and included wiring instructions for payment. (App. Ex. "I").

After Hashim received the February 11, 2003 Notice of Default, BKC and Hashim had a number of conversations regarding the Notice of Default. (T. Archer dep. at 47, DE 45; App. Ex. "E" at ¶ 13). Specifically, BKC told Defendants that they would need to comply with the Notice of Default within the cure period. (Id.) It is undisputed that Defendants failed to make the February payments within the next 13 days (by February 24) as required. Indeed, Defendants admit that they deliberately ignored the default notice. (Hashim dep., at pp. 31-32, DE 43).[6] Defendants did not make their January payments until March 14, 18 days after the cure period had expired and the Franchise Agreements had automatically terminated, and a full 28 days after payment was due under the Franchise Agreements. (App. Ex. "E" at ¶ 13). In addition, Defendants failed to pay their

---

[6] Specifically, when asked about the February 11, 2003 Notice of Default, Hashim testified that he ignored the notice:

> Q.  So what I am asking you, if it says in there for you to send your payment directly to Burger King Corporation for the January 2003 royalty and advertising, why didn't you send it to Mr. Archer?
> A.  I sent it the way that normally all the advertising royalties have been sent all along. As far as this notice is concerned, it was a defective notice. It was not a good, valid notice as far as I am concerned.
> Q.  So you ignored the notice?
> A.  Exactly.

(Hashim dep., at p. 26, DE 43).

August 2002 royalty and advertising payments until November 26, 2002 and failed to make their September 2002 payment until November 26, 2002. (App. Ex. "E" at ¶ 14). Moreover, despite BKC's instruction in the default notices that payment must be sent to BKC headquarters to in-house counsel's attention, Defendants sent their untimely payments to BKC's lock box. (App. Ex. "J"; DE 43, ex. C at ¶ 9).

Defendants also rely on the January 30, 2003 and March 17, 2003 memoranda from BKC to its franchisees regarding the Burger King Financial Restructuring Program (the "Program") to support their argument that BKC has somehow waived or is estopped from terminating Defendants' Franchise Agreements. However, Defendants did not even apply to the Program. (Hashim dep., at pp. 41-42, DE 43). In addition, each of these memorandum makes clear that franchisees must continue to comply with the terms of their franchise agreements. For example, the January 30, 2003 memorandum states that the Program is not an amnesty program from obligations under the franchise agreements. (App. Ex. "K"). The March 13, 2003 memorandum states that BKC expects franchisees to pay the full amount of all royalty and advertising fund contributions when they are due. (App. Ex. "L"). Defendants were also aware that they were not eligible to participate in the Program, as set forth in the information attached to the January 30, 2003 memorandum, because they were in litigation with BKC. (App. Ex. "K").

BKC has not accepted Defendants untimely royalty and advertising payments, which were improperly sent to the lockbox, as curing Defendants' defaults. (App. Ex. "E" at ¶ 15). Indeed, Defendants were advised, as set forth in both the November 12, 2002 and March 7, 2003 Confirmations of Termination and Demands for Compliance, that if BKC received any post-termination payments from Defendants, BKC would hold the payments for application in accordance with the final disposition of BKC's damage claims arising from Defendants breach of the

11

Agreements and any continued operation of the Restaurants in violation of BKC's rights. (App. Ex. ""M"; App. Ex. "J"). Further, the confirmation letters provided that Defendants should not construe BKC's receipt of said funds as a waiver of Defendants' default, BKC's termination of the Agreements, or BKC's claim for damages. (Id.). Plainly, therefore, Defendants were on notice of this policy no later than November 2002. (App. Ex. "M"). As for the purported March and April payments which were forwarded to BKC in Miami, those checks have not been accepted or cashed. (App. Ex. "E" at ¶ 16).

In addition to this matter, Defendant Mike Hashim has engaged in at least two other lawsuits with BKC, which both involved his failure to make payments pursuant to the very same provisions of the Franchise Agreements as are at issue in this case. (T. Archer dep., at pp. 29-30, DE 45). In BKC v. H&H Rests., LLC, No. 99-2855 -CIV-JORDAN (S.D. Fla. May 21, 2002), BKC obtained a Final Judgment against the defendants in that case, including Mike Hashim, in the amount of $306,504.13 for their failure to make payments pursuant to the Franchise Agreements. (App. Ex. "N"). Similarly, in BKC v. H&H Rests., LLC, No. 02-20907-CIV-JORDAN (S.D. Fla.), BKC was forced to sue Mike Hashim, among others, for $750,219.04 again for their failure to make royalty and advertising payments pursuant to the Franchise Agreements. (App. Ex. "O"). That case is still pending. (App. Ex. "E" at ¶ 17).

In an attempt to settle these cases, amongst other things, Defendants, Mike Hashim, Herbert Hakimianpour, Robert Hakimianpour and H&H Restaurants, LLC, were required to execute promissory notes in the amount of $200,000. (App. Ex. "E" at ¶ 18). Mike Hashim signed a promissory note in the amount of $100,000.00, which he immediately defaulted under by failing to

make payments. (Id.)[7] As a result, BKC was forced to issue another notice of default to Mr. Hashim (App. Ex. "E" at ¶ 18; App. Ex. "P").  Mr. Hashim and the other H&H Defendants  have yet to comply with all of the terms of the settlement agreement. (App. Ex. "E" at ¶ 18).

## III.  ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is only appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," show that there is "no genuine issue as to any material fact," and that the moving party is "entitled to judgment as a matter of law." The moving party bears the burden of meeting this exacting standard. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Summary judgment should not be granted unless it is clear that a trial is unnecessary. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Any doubt as to the existence of a genuine issue for trial should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  If the record presents factual issues, the court must deny summary judgment and proceed to trial.   Adickes, 398 U.S. at 157; Anderson, 477 U.S. at 255.   As demonstrated below, genuine issues remain to be resolved by the trier of fact in this case precluding final summary judgment.  Moreover, the undisputed factors demonstrate that Defendants' claims fail as a matter of law.

### B.    Defendants' Summary Judgment Motion Fails as a Matter of Law Pursuant to the Anti-Waiver Provisions in the Parties' Franchise Agreements.

Specifically, Defendants argue that BKC is estopped from or waived its contractual right to

---

[7]  While Mike Hashim signed a promissory note with BKC in the amount of $100,000.00, none of the defendants have signed a promissory note regarding the other $100,000.00.  (App. Ex. "E" at ¶ 18).  Mike Hashim is still obligated to BKC for that amount as well.  (Id.)

13

issue a default notice and enforce the Franchise Agreements by accepting late payments in the past, and by accepting Defendants' late payments for purported advertising and royalties after Defendants' Franchise Agreements had terminated under the terms of the Franchise Agreements and Default Notice.  Defendants' argument is at odds with the plain language of the Franchise Agreements because of the non-waiver clause contained in the parties' franchise agreements.

It is well-settled under Florida law that "non- waiver" clauses are valid.  Burger King Corp. v. Hinton, 203 F. Supp. 2d 1357, 1365 (S.D. Fla. 2002); Burger King Corp. v. Lee, 766 F. Supp. 1149, 1156 (S.D. Fla. 1991); Philpot v. Bouchelle, 411 So. 2d 1341 (Fla. Dist. Ct. App. 1982); see MCA Television Ltd. v. Public Interest Corp., 171 F.3d 1265, 1270 (11th Cir. 1999); see also Dunkin' Donuts, Inc. v. Liu, Nos. Civ.A. 99-3344, Civ.A. 00-3666, 2000 WL 1868386, **3-4 (E.D. Pa. Dec. 21, 2000) (App. Ex. "C"); Dunkin' Donuts Inc. v. NJS, Inc., 889 F. Supp. 1074, 1078 (N.D. Ill. 1995); McDonald's Corp. v. C.B. Mgmt. Co., 13 F. Supp. 2d 705, 712 (N.D. Ill. 1998); Little Caesar Enters., Inc. v. R-J-L Foods, Inc., 796 F. Supp. 1026, 1031 (E.D. Mich. 1992).

In Philpot, a lease agreement provided for the payment of monthly rental with the option to purchase the property.  The lease contained a provision stating: ". . .the failure on the part of the lessor to exercise properly any rights given hereunder shall not operate to forfeit any of the said rights."  411 So. 2d at 1342.  During the term of the lease, in contravention of the lease, the lessee made several late payments which the lessor accepted.  When the lessee sought to exercise its option to purchase the property, the lessor replied that due to the late payments, the lessee had not satisfied the terms of the agreement and the option was void.

The lessee argued that by accepting the late payments, the lessor was estopped from enforcing or had implicitly waived its right to enforce the terms of the lease.  Id. at 1344.  The court disagreed, finding that the "parties contractually modified the common law rules of **waiver and**

14

estoppel." Id. (emphasis added).  Thus, the court held that due to the non-waiver provision of the lease, the lessor could not be estopped from asserting that the conditions of the option to purchase had not been satisfied or be deemed to have waived the lessee's failure to perform.  Id.

Similarly, this Court most recently stated in rejecting another BKC franchisee's waiver and estoppel argument where the same non-waiver clause was present:

> Defendants' assertion that BKC has waived its rights to obtain damages under the Agreements is contrary to law and the Agreements entered into by the parties.  See Exhibit A, Section 19.  It is well-established that non-waiver clauses of the type used in the Franchise Agreements are valid and enforceable under Florida law.  The inclusion of a non-waiver clause in the Franchise Agreements precludes Defendants' defenses of **waiver and estoppel**.

Hinton, 203 F. Supp. 2d at 1365 (emphasis added); see Burger King Corp. v. Lee, 766 F. Supp. at 1156 (provision of food to franchisee after termination did not waive termination under franchise agreement where BKC did not mislead Defendants to believe that franchise was not terminated and where agreement contained non-waiver provision); see also MCA Television Ltd. v. Public Interest Corp., 171 F.3d 1265, 1270-71 (11th Cir. 1999) (defendant's claims of estoppel and waiver, which were based on plaintiff's acceptance of late payments for a two year period without objection, failed where contract contained anti-waiver provision).[8]

---

[8]The cases relied on by Defendants to support their position that a BKC is estopped from terminating Defendants or that waiver occurred are distinguishable because they all involve cases where notice was not provided.  CJ Rest. Enters., Inc. v. FMS Mgmt. Sys., Inc., 699 So. 2d 252, 253 (Fla. Dist. Ct. App. 1997)(after licensor accepted late payments on stipulation agreement until last of 28 payments received, then, without notice to licensee, defaulted the licensee for being behind in weekly payments, licensor was required to give notice of default prior to seeking ex parte final judgment pursuant to the terms of the stipulation); Protean Investors, Inc. v. Travel, Etc., Inc., 499 So. 2d 49 (Fla. Dist. Ct. App. 1986)(lessor accepted all late rental payments and never gave notice to lessee that it was in default of the lease and that the right of first refusal had thus been forfeited); Ford Motor Credit Co. v. Waters, 273 So. 2d 96, 97 (Fla. Dist. Ct. App. 1973)(after creditor established pattern of accepting late payments, creditor repossessed car without notice where final payment on loan was late); Montgomery Enters., Inc. v. Atlantic Nat'l

The non-waiver provision in the parties' Franchise Agreements similarly applies to bar Defendants' claim that the parties' course of dealings modified their agreements.  Rybovich Boat Works, Inc. v. Atkins, 587 So. 2d 519, 522 (Fla. Dist. Ct. App. 1991).  In Rybovich Boat Works, the court addressed the issue of whether through the course of dealings between the parties regarding a purchase and sale option and the numerous extensions thereunder, the seller waived or was estopped from enforcing the terms of the agreement.  The purchase and sale agreement contained an anti-waiver provision which stated that "no waiver of any right shall be deemed a waiver of any subsequent right or obligation."  Id. at 520.  The court found that the lower court erred by failing to give effect to the anti-waiver provision in the purchase and sale option.  Id. at 522.  Thus the court held that "[b]ecause the contract was unambiguous, the buyer's affirmative defenses of waiver and estoppel were defeated as a matter of law by the provisions of the contract itself."

Here, the non-waiver provision of the Franchise Agreements expressly provides that BKC does not waive any of its rights under the agreements.  Thus, the plain language of the Franchise Agreements makes clear that BKC could not be deemed to be estopped to require strict compliance with the terms of the parties' agreements or have modified or waived the terms of the agreements.  Additionally, BKC gave Defendants notice of their defaults and that BKC was requiring Defendants to comply with the payment provisions of the agreements.  (App. Exs. "H" & "I").  Thus, the

---

Bank of Jacksonville, 338 So. 2d 1078, 1081 (Fla. Dist. Ct. App. 1976) (non-waiver clause did not bar affirmative defense of estoppel where lessee tendered all arrearage prior to receiving notice of lease being declared in default).  Plainly, as Defendants admit, BKC gave Defendants notice that they were in default under the agreement, and that BKC was requiring Defendants to comply with the strict terms of the agreements.  (App. Exs. "H," "I," & "P").  Additionally, LaGuardia Assocs. v. Holiday Hospitality Franchising, Inc., 92 F. Supp. 2d 119, 130 (E.D.N.Y. 2000), is also distinguishable because it was decided under New York waiver law; and the franchisor did not seek to terminate the franchisee for ten months, thus abandoning right to rely on that default as basis for termination.

16

Franchise Agreements were validly terminated.

### C. The Parties Did Not Amend the Franchise Agreements Through Their Course of Dealings

Even if this Court were to find that the anti-waiver provision in the parties' Franchise Agreements does not require denial of Defendants' motion for summary judgment, Florida law plainly provides that the parties have not modified their agreements pursuant to their course of dealings. Defendants argue that the Franchise Agreements were amended to allow for a grace period by BKC's acceptance of late payments over a three-year period. It is well-settled under Florida law that while course of dealing may be used to explain a contract, "it cannot operate to contravene express instructions or to contradict an express contract to the contrary." Indian Harbor Citrus, Inc. v. Poppell, 658 So. 2d 605, 606 (Fla. Dist. Ct. App. 1995)(reversing trial court's use of custom and usage to alter terms of unambiguous contract); see also, Rybovich Boat Works, Inc. v. Atkins, 587 So. 2d 516, 521 (Fla. Dist. Ct. App. 1991)(holding trial court erred in using parties' course of dealings to vary terms of written contract where contract was unambiguous and contained an anti-waiver clause); Flagship Nat'l Bank v. Gray Distrib. Sys., Inc., 485 So. 2d 1336, 1340 (Fla. Dist. Ct. App. 1986)(holding express terms of a contract override any inconsistent course of conduct by the parties).

The Franchise Agreements here are crystal clear, royalties "shall be paid monthly by the Tenth (10th) day of each month based upon gross sales for the preceding month." (App. Ex. "A" at ¶ 8.A). Similarly, advertising, sales promotion and public relations are due "by the Tenth (10th) day of each month." (Id. at ¶ 8.B). Accordingly, because these provisions are unambiguous, any alleged course of dealings by the parties may not be used to alter the terms of the Franchise Agreements.

17

Thus, Defendants are not entitled to summary judgment on BKC's complaint.[9]

### D.   BKC Is not Equitably Estopped from Declaring a Default and Termination Defendants the Franchise Agreements

Defendants assert that the facts in this case show that BKC is equitably estopped from defaulting Defendants and terminating the Franchise Agreements because Defendants reasonably relied on the parties course of dealings when they failed to comply with the payment provisions of the Franchise Agreements.   To the contrary, even if this Court does not apply the non-waiver provision in the parties' agreements, the undisputed facts in this case show that BKC was not equitably estopped from defaulting Defendants and terminating the Franchise Agreements.

Under Florida law, equitable estoppel must be applied with great caution.   Watson Clinic, LLP v. Verzosa, 816 So. 2d 832, 834 (Fla. Dist. Ct. App. 2002).   Further, estoppel does not arise merely from silence or acquiescence; rather, there must be special circumstances requiring the one sought to be estopped to speak.   Ennis v. Warm Mineral Springs, Inc., 203 So. 2d 514, 520 (Fla. Dist. Ct. App. 1967).   The party against whom estoppel is being sought must have, by virtue of his silence, caused the other party to change his position to his detriment.   Id.   Specifically, the party asserting estoppel must have been ignorant of the truth and have been misled into doing that which he would not have done without said silence.   Id. (quoting 31 C.J.S. Estoppel § 87).   Additionally, estoppel based on silence cannot exist where the parties have equal knowledge of the facts or the same means of ascertaining that knowledge.   Mizell v. Deal, 654 So. 2d 659, 663 (Fla. Dist. Ct. App. 1995).

---

[9]   The case cited by Defendants is inapposite since it dealt with an alleged oral modification of an indemnity agreement, not a modification of the agreement pursuant to the parties course of dealings.   Fidelity & Deposit Co. of Maryland v. Tom Murphy Const. Co., Inc., 674 F.2d 880, 884 (11th Cir. 1982)(lower court erred in preventing jury from considering whether parties orally terminated indemnity agreement).

18

Mizell is a case on point. In that case, the Deals purchased a farm from Mizell, and placed a single-wide trailer on the property and lived there for three and one-half years. Id. at 661. Thereafter, the Deals replaced the single-wide with a double-wide mobile home. Id. A restrictive covenant existed which permitted mobile homes for a period of two years only. Id. Mizell sued to enforce the restrictive covenant. Id. The Deals asserted, among other things, the defense of equitable estoppel because Mizell had acquiesced in the placement of the mobile home on the property. Id. at 663.

The appellate court held that the evidence could not support the defense of equitable estoppel. Id. This was so because the Deals were unable to establish that they relied to their detriment on any representation that they would be able to maintain a mobile home on the property permanently. Id. The court also found that "even if the evidence supports a finding that Mizell was silent for a period of time concerning the alleged breach of the covenants, estoppel based upon silence cannot exist where the parties have equal knowledge of the facts or the same means of ascertaining that knowledge." Id. (citation omitted). The court found that equitable estoppel could not exist because the record showed that the Deals knew about the covenant and there was no evidence that the Deals relied to their detriment on statements made by Mizell after the double-wide was installed that she would take no action concerning the mobile home. Id.

Similarly, Watson Clinic is analogous. In that case, Versoza worked for Watson Clinic pursuant to a series of employment contracts, which provided for a fixed salary. Watson Clinic, 816 So. 2d at 833. Watson Clinic installed a new payroll system and mistakenly began paying Versoza twice a month, which had the effect of doubling his salary. Id. He asked Watson Clinic employees to research the payroll issue and was told that the bi-monthly check was correct and sent him additional checks for "missing" compensation. Id. at 834. Again, Versoza asked Watson Clinic to

19

check on his pay, but was told that it was accurate.  Id.

When Watson Clinic discovered the overpayments to Versoza, it sued for recovery of the overpay.  Id.  Versoza asserted the affirmative defense of equitable estoppel and the trial court found in his favor finding that the clinic had been notified of the error and that Versoza spent the funds to his detriment.  Id.  The appellate court reversed finding that Versoza had failed to prove reliance and a detrimental change in position.  Id.[10]  The Court held that Versoza knew his employment contract entitled him to fixed salary of $145,000, and he knew that he was receiving twice that amount.  Id.  He also knew that the agreement could only have been amended by a subsequent writing signed by him and the clinic, which never occurred.  Id.  Thus, Versoza could not claim reliance.  Id.  In addition, the court held that there was no evidence of a detrimental change in his position.  Id.  Thus, Versoza's defense of equitable estoppel failed.

In this case, the evidence shows that Defendants' equitable estoppel claim fails.  First, BKC never told Defendants that they could make payments at any other time except as set forth in the parties' agreements.  (T. Archer dep., at p. 17, DE 45).  Even assuming however that some misrepresentation was made by BKC, Defendants equitable estoppel claim fails because Defendants did not rely on the misrepresentation.  Defendants admit that they knew about the payment terms in the agreements.  (Hashim Decl. at ¶ 7, DE 40; Hashim dep., at pp. 20-21, DE 43).  Further, as in Watson Clinic, there can be no reasonable reliance where the parties Franchise Agreements provided that they could only be amended by a writing signed by BKC and Franchisee and where the

---

[10]  The elements of equitable estoppel are: (1) the party against whom estoppel is sought must have made a representation about a material fact that is contrary to a position that it later asserts; (2) the party claiming estoppel must have relied on that representation; and (3) the party seeking estoppel must have changed his position to his detriment based on the representation and his reliance on it.  Id. (citation omitted).  The Court assumed *arguendo* that the statements of the clinic's employees were sufficient to meet the first element of equitable estoppel.  Id.

20

agreements contain a non-waiver provision.  Moreover, Defendants should be estopped from raising the defense of equitable estoppel where they failed to make payment within the very grace period which they claimed to operate under.   Florida Land Inv. Co. v. Williams, 116 So. 642 (Fla. 1928)(one estoppel neutralizes the other, leaving the matter as if neither estoppel had been asserted).Thus, Defendants' equitable estoppel argument fails for this reason as well.

### E. BKC Has Not Waived Its Termination of the Franchise Agreements for Failure to Timely Pay Royalty and Advertising by Its Purported Acceptance of Funds after Termination

BKC properly terminated Defendants' Franchise Agreements.   It is undisputed that Defendants' failed to pay amounts due until after the cure period provided in the Franchise Agreements and the Notice of Default.  The Franchise Agreements clearly provide that the failure to pay **when due** any royalty or advertising and sales promotion contribution required to be paid under the Franchise Agreements after notice and an opportunity to cure required is grounds for termination.  (App. Ex. "A" at ¶ 17(7)).  In a franchise dispute, this is so even if the franchisee thereafter makes payments to the franchisor.  Dunkin' Donuts, Inc. v. Liu, Nos. CIV.A. 99-3344, CIV.A. 00-3666, 2000 WL 1868386, *3  (E.D. Pa. Dec. 21, 2000) (App. Ex. "C") (payments received in lockbox after cure period expired and accepted by franchisor did not bar termination of franchise agreement); Truglia v. KFC Corp., 692 F. Supp. 271, 276-77 (S.D.N.Y. 1988) (tendering payment after cure period expired materially breached franchise agreement such that termination was appropriate); see also Gergora v. Flynn, 486 So. 2d 5, 6 (Fla. Dist. Ct. App. 1986) (lessor did not waive right to rescind lease by accepting rent payments after material breach occurred).

In this case, Defendants have been on notice since November 12, 2002, that payments made after termination would be held for application in accordance with the final disposition of BKC's damage claims arising from Defendants breach of the agreements and any continued operation of

21

the Restaurants in violation of BKC's rights.   (App. Ex. "M").   Further, the Confirmation of

Termination letters provide that Defendants should not construe BKC's receipt of said funds as a

waiver of Defendants' default, BKC's termination of the Agreements, or BKC's claim for damages.

(Id.).  Plainly, therefore, Defendants were on notice of this policy no later than November 2002 and

none of the payments made by Hashim to BKC may constitute a waiver of BKC's termination of the

Franchise Agreements.[11]  As for the purported March and April payments which were forwarded to

BKC in Miami, those checks have not been accepted or cashed.[12]

## IV.    CONCLUSION

For all of the foregoing reasons, this Court should deny Defendants' motion for summary

judgment on BKC's complaint.

---

[11]  Further, because the payments were sent to the lockbox as opposed to Thomas G.
Archer, Esq. at BKC's headquarters, tender was improper because it was not made to the
appropriate person.  See Maryland Cas. Co. v. Hanson Dredging, Inc., 393 So. 2d 595, 596 (Fla.
Dist. Ct. App. 1981).

[12]  The cases cited by Defendants are inapposite because they are non-franchise cases.
Rood Co. v. Board of Public Instruction of Dade County, 102 So. 2d 139 (Fla. 1958)(suit for
rescission of contract for sale of land); Jones v. Highway Inn, Inc., 424 So. 2d 944 (Fla. Dist. Ct.
App. 1983)(minority shareholder suit to have corporation dissolved; court did not rule on
question whether minority shareholder waived right to challenge sale by acceptance of funds);
United States v. Maryland Cas. Co., 146 F.2d 379 (5th Cir. 1944)(action to recover leased
equipment; decided under Texas law).  Further, while Stewart v. Stewart, 581 So. 2d 246 (Fla.
Dist. Ct. App. 1991), is distinguishable because it is a suit involving an agreement to purchase a
marina without a non-waiver provision, it actually supports BKC because the court found the
tender invalid where it was sent to the wrong person.

22

GENOVESE JOBLOVE & BATTISTA
Attorneys for Burger King Corporation
100 Southeast Second Street, 36th Floor
Miami, Florida  33131
Telephone (305) 349-2300
Facsimile (305) 349-2310

By _____
     Michael D. Joblove
     Florida Bar Number 354147
     Nina Greene Kersh
     Florida Bar Number 072079

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via hand delivery this 2nd day of June, 2003 to Jared Gelles, Esq., Rafferty Gutierez et al., 1101 Brickell Avenue, Suite 1400, Miami, FL 33131.

_____
Of Counsel

X:\Documents\Work\A to D\BK\Hashim\Pleadings\Opposition to Summ Judg.wpd

23

**BURGER KING RESTAURANT #7320**
**ADDRESS: Fox Hill Mall**
**Culver City, California**



PLAINTIFF'S
EXHIBIT
13
56    4/23/03

MICROFILMED
DATE_____

APP. EX. "A"

# BURGER KING® RESTAURANT
# FRANCHISE AGREEMENT

THIS AGREEMENT is made as of the _____ day of
_____, 1994, by and between **BURGER KING CORPORATION**,
a Florida corporation ("BKC") and **MUNTAZ HASHIM** ("FRANCHISEE").

## INTRODUCTION

A.    BKC is the exclusive licensee of certain trademarks and service marks, including BURGER KING and HOME OF THE WHOPPER, which are registered or pending with the United States Patent and Trademark Office, and is the owner or exclusive licensee of other marks authorized for use in Burger King Restaurants (the "Burger King Marks").

B.    BKC has developed a comprehensive restaurant format and operating system, including the Burger King Marks, a recognized design, equipment system, color scheme and style of building, signs, uniform standards, specifications and procedures of operation, quality and uniformity of products and services offered, and procedures for inventory control and management (the "Burger King System") and is engaged in the business of operating and granting franchises to operate Burger King Restaurants using the Burger King System and the Burger King Marks.

C.    BKC has established a high reputation and a positive image with the public as to the quality of products and services available at Burger King Restaurants, which reputation and image have been and continue to be unique benefits to BKC and its Franchisees.

D.    FRANCHISEE recognizes the benefits to be derived from being identified with and receiving a Franchise from BKC and being able to utilize the Burger King System and the Burger King Marks which BKC makes available to its Franchisees.

E.    FRANCHISEE desires to acquire a franchise to operate a Burger King Restaurant at the location for the entire Term specified in this Agreement. FRANCHISEE acknowledges that he has received a copy of the Uniform Franchise Offering Circular of BKC and has had a full and adequate opportunity to be

1

## APP. EX. "A"

thoroughly advised of the terms and conditions of this Agreement by counsel of his own choosing at least Ten (10) business days, excluding weekends and Federal holidays ("Business Days") prior to its execution, and is entering into this Agreement after having made an independent investigation of BKC's operations and not upon any representation as to profits and/or sales volume which FRANCHISEE might be expected to realize, nor upon any representations or promises by BKC which are not contained in this Agreement.

In consideration of the mutual covenants contained in this Agreement, the parties agree as follows:

## 1. FRANCHISE GRANT: TERM AND LOCATION (SEE ADDENDUM)

BKC grants to FRANCHISEE and FRANCHISEE accepts a franchise for a period of ~~Twenty (20)~~ years to use the Burger King System and the Burger King Marks only in the operation of a Burger King Restaurant at Fox Hill Mall, Culver City, California 90230 more fully described in Exhibit "A" (the "Franchised Restaurant"), (the term "Franchised Restaurant" includes the real estate described on Exhibit "A" (the "Premises") and all "Improvements" constructed thereon wherever the context permits or requires). The term of this Agreement commences on the date the Franchised Restaurant opens for business (the "Commencement Date") and shall expire ~~Twenty (20)~~ years thereafter (the "Term") unless sooner terminated in accordance with the provisions of this Agreement. FRANCHISEE agrees to operate the Franchised Restaurant at the specified location for the entire ~~Twenty (20)~~ year Term. FRANCHISEE accepts this franchise with the full and complete understanding that the franchise grant contains no promise or assurance of renewal. The sole and entire conditions under which FRANCHISEE will have the opportunity of obtaining a Successor Burger King Franchise Agreement at expiration are those set forth herein in Paragraph 16. This franchise is for the specified location only and does not in any way grant or imply any area, market or territorial rights proprietary to FRANCHISEE.

## 2. FRANCHISE FEE (SEE ADDENDUM)

FRANCHISEE acknowledges that the grant of this franchise constitutes the consideration for the payment by FRANCHISEE to BKC of ~~Forty Thousand ($40,000.00) Dollars~~, and that this sum shall be fully earned by BKC upon the execution and delivery of this Agreement.

## 3. FRANCHISEE REPRESENTATIONS

FRANCHISEE acknowledges his/their understanding of BKC's franchising policy of requiring all individuals who have any interest in the Franchised



**APP. EX. "A"**



Restaurant, whether directly, beneficially or contingently, to be named in and be a party to the Franchise Agreement.  If FRANCHISEE consists of more than one individual, the group must include an Operating Partner who, throughout the Term of the Agreement, lives in the locality of the Franchised Restaurant.  The Operating Partner must have a minimum Fifty (50%) percent unencumbered equity ownership (including profits) and a minimum Fifty (50%) percent controlling interest through any voting apparatus in the Franchised Restaurant and must devote his full time and best efforts to the day-to-day operation of the Franchised Restaurant with no operational or management commitments in other businesses (except other Burger King Restaurants operated under franchises granted to such person by BKC).  FRANCHISEE agrees that it has not and will not hereafter, directly or indirectly, avoid the financial interest requirements and the direct operation requirements set forth above through entry into a management agreement, consulting agreement or any other such artificial device or arrangement.  FRANCHISEE agrees to furnish BKC with such evidence as BKC may request from time to time for the purpose of assuring BKC that FRANCHISEE's efforts and equity interest remain as represented in this Agreement.

## 4.  STANDARDS AND UNIFORMITY OF OPERATION

The Burger King System is a comprehensive restaurant format and operating system for the sale of uniform and quality food products, emphasizing prompt and courteous service in a pleasant atmosphere.  The establishment and maintenance of a close personal relationship between BKC and FRANCHISEE in the operation of the Franchised Restaurant and adherence to the principles of the Burger King System constitute the basic underlying substance of this franchise.

Suggestions from FRANCHISEE for improving elements of the Burger King System, such as products, equipment, uniforms, restaurant facilities, service format and advertising, are encouraged and may or may not be considered by BKC when adopting or modifying standards, specifications and procedures for the Burger King System.  FRANCHISEE acknowledges that any such suggestions made by FRANCHISEE hereunder shall become the exclusive property of BKC.  BKC shall have no obligation to utilize suggestions and no obligation to provide compensation for any suggestion.  FRANCHISEE may not utilize any such suggestions in the Franchised Restaurant without the prior written consent of BKC.

### A.  M.O.D. Manual

FRANCHISEE acknowledges and agrees that prompt adoption of and adherence to BKC's comprehensive restaurant format and operating system, including a standardized design, decor, equipment system, color scheme and style

# APP. EX. "A"

of building and signage, uniform standards, specifications and procedures of operation, quality and uniformity of product and services offered and the provisions of the Manual of Operating Data (the "MOD Manual"), as amended from time to time, are reasonable, necessary and essential to the image and success of all Burger King Restaurants (the "Burger King Restaurant System"). The MOD Manual contains the official mandatory restaurant operating standards, specifications and procedures prescribed from time to time by BKC for the operation of a Burger King Restaurant. The MOD Manual shall be kept at the Franchised Restaurant at all times and all changes or additions made by BKC shall be inserted upon receipt. In the event of any conflict between the MOD Manual kept at the Franchised Restaurant and the master copy maintained by BKC in Miami, Florida (or such other place as may be designated by BKC) the master copy shall control.

FRANCHISEE agrees that changes in the standards, specifications and procedures may become necessary and desirable from time to time and agrees to accept and comply with such modifications, revisions and additions to the MOD Manual which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary. The material and information set forth in the MOD Manual is confidential and proprietary to BKC and is to be used by FRANCHISEE only in connection with the operation of the Franchised Restaurant and other franchised Burger King Restaurants. The MOD Manual and other specifications, standards and operating procedures communicated in writing to FRANCHISEE shall be deemed a part of this Agreement.

### B. Building and Premises

The Franchised Restaurant will be constructed and improved in the manner authorized and approved by BKC, and the appearance of the Franchised Restaurant will not thereafter be altered except as may be approved in writing by BKC. Further, FRANCHISEE shall at its expense maintain the Franchised Restaurant in good condition and make all improvements, alterations and remodelings as may be determined by BKC to be reasonably necessary to reflect the current Burger King Restaurant image as reasonably changed and defined from time to time by BKC ("Current Image"). FRANCHISEE shall undertake repairs requested by BKC within the reasonable time as may be specified by BKC.

### C. Signs

The Burger King Marks will only be erected and displayed in the manner and at such locations as are approved and authorized by BKC, in writing. FRANCHISEE agrees to maintain and display signs reflecting the Current Image of Burger King Restaurants and shall not place additional signs or posters on the

## APP. EX. "A"

Premises without the prior written consent of BKC. Only signs from sources approved by BKC may be utilized at the Premises. FRANCHISEE shall discontinue the use of and destroy such signs as are declared obsolete by BKC within the reasonable time specified by BKC. Such signs are fundamental to the Burger King Restaurant System and FRANCHISEE hereby grants to BKC the right to enter the Franchised Restaurant to remove and destroy unapproved or obsolete signs in the event that FRANCHISEE has failed to do so within thirty (30) days after the written request of BKC.

### D. Equipment

Only equipment approved by BKC which meets the criteria and performance standards of the Burger King Restaurant System may be used in the Franchised Restaurant. The equipment shall be maintained in a condition that meets operational standards specified in the MOD Manual and, as equipment becomes obsolete or inoperable, FRANCHISEE will replace the equipment with the types and kinds of equipment as are then approved for use in Burger King Restaurants. If BKC determines that additional or replacement equipment is needed because of a change in menu items or method of preparation and service or because of health or safety considerations, FRANCHISEE will install the additional equipment or replacement equipment within the reasonable time specified by BKC.

### E. Vending Machines, Etc.

Public telephones, newspaper racks, juke boxes, cigarette, gum and candy machines, rides, lottery ticket terminals, video games or any other games, or vending or amusement machines will not be installed on the Premises without the prior written approval of BKC. If such items are installed on the Premises, then all sums received by FRANCHISEE in connection with these items shall be included within "gross sales" as defined herein.

### F. Menu and Service

All menu items which BKC may deem appropriate to take full advantage of the potential market and achieve standardization in the Burger King Restaurant System will be served, and no items which are not set forth in the MOD Manual or otherwise authorized and approved by BKC in writing will be served. FRANCHISEE shall only sell the approved menu items at retail to consumers from and through the Franchised Restaurant and shall not sell such items for redistribution or resale. FRANCHISEE shall adhere to all specifications contained in the MOD Manual or as otherwise prescribed by BKC as to ingredients, methods of preparation and service, weight and dimensions of products served, and standards of cleanliness, health and sanitation. All food, drink and other items will



# APP. EX. "A"

be served and sold in packaging that meets BKC's specifications.   Only food, supplies, paper products and packaging from sources approved by BKC shall be used in the Franchised Restaurant.

### G.  Hours of Operation

The Franchised Restaurant shall be open for business at a minimum from 7:00 A.M. to 11:00 P.M., Seven (7) days a week, Fifty-Two (52) weeks a year, unless otherwise authorized or directed by BKC.  The Franchised Restaurant may be closed on Thanksgiving Day and/or Christmas Day if a majority of the Burger King Restaurants in the market area (A.D.I.) in which the Franchised Restaurant is located elect to close on the holiday.

### H.  Uniforms

All employees shall only wear uniforms of such design and color as are from time to time specified by BKC.

### I.  Advertising and Promotional Materials

Only those advertising and promotional materials or items which are authorized by BKC in writing prior to use shall be used, sold or distributed, and no display or use of the Burger King Marks shall be made without the prior written approval of BKC.  All materials on which the Burger King Marks are used must include the designation ® or such other designation as BKC may specify.

### J.  Right of Entry and Inspection

To ensure compliance with this Agreement, BKC shall have the unrestricted right to enter the Franchised Restaurant to conduct such activities as it deems necessary to ascertain compliance with this Agreement.  The inspections may be conducted without prior notice at any time when FRANCHISEE or one of his employees is at the Franchised Restaurant.  The inspections will be performed in a manner which minimizes interference with the operation of the Franchised Restaurant.

### K.    Interference with Employment Relations of Others

Neither BKC nor FRANCHISEE will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within Six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

Fran121.MST
12/93  /cp #7320



## APP. EX. "A"

## 5. SERVICES AVAILABLE TO FRANCHISEE

BKC agrees to periodically advise and consult with FRANCHISEE in connection with the operation of the Franchised Restaurant and to provide to FRANCHISEE:

A. A reproducible copy of either (i) the standard architectural building plans and specifications for current approved free-standing buildings or double drive-thru buildings, or (ii) such other standard approved restaurant facility, whichever is applicable. Any modifications of the standard plans and specifications, whether requested or required by planning and zoning boards, building codes or otherwise, must be approved in writing by BKC and are to be paid for by FRANCHISEE.

B. A pre-opening training program conducted at BKC training facilities and Burger King Restaurants.

C. Pre-opening and opening supervision and assistance by personnel of BKC at the Franchised Restaurant for a period of time as BKC, in its discretion, deems appropriate.

D. Opening promotion program. A portion of FRANCHISEE's advertising and sales promotion payment shall be available to implement grand opening promotions conducted after the Franchised Restaurant opens, in accordance with company policy at the time of opening (Exhibit "B"). Any additional costs incurred in implementing the program shall be FRANCHISEE's responsibility.

E. BKC's MOD Manual, a copy of which will be loaned to FRANCHISEE for the Term of this Agreement.

F. Such merchandising, marketing and advertising research data and advice as may be developed from time to time by BKC and deemed by it to be helpful in the operation of a Burger King Restaurant.

G. Standardized accounting, cost control and inventory control systems.

H. Communication of new developments, techniques and improvements of BKC in food preparation, equipment, food products, packaging, service and restaurant management which are relevant to the operation of a Burger King Restaurant.



# APP. EX. "A"

## 6.  FRANCHISED RESTAURANT

During the Term of this Agreement the Premises shall be used exclusively for the purpose of operating a franchised Burger King Restaurant.

In the event the Franchised Restaurant shall be damaged or destroyed by fire or other casualty, or be required to be repaired or reconstructed by any governmental authority, FRANCHISEE shall, at its own expense, repair or reconstruct the Franchised Restaurant within a reasonable time under the circumstances. The minimum acceptable appearance for the restored Franchised Restaurant will be that which existed just prior to the casualty; however, every effort should be made to have the restored Franchised Restaurant reflect the then Current Image, design and specifications of Burger King restaurants.   If the Franchised Restaurant is substantially destroyed by fire or other casualty, FRAN-CHISEE may, with BKC agreement, terminate this agreement in lieu of FRANCHISEE reconstructing the Franchised Restaurant.

## 7.  TRAINING

As a condition precedent to the Franchised Restaurant opening, the Operating Partner and, if BKC requests it, a designated restaurant manager, must have successfully completed BKC's training program in Miami, Florida or at such other locations as may be specified by BKC.

There shall be no charge for participation in the training program; however, FRANCHISEE shall be responsible for all travel and living expenses, compensation of and worker's compensation insurance for the Operating Partner and the manager while enrolled in the training program and any other personal expenses.

The Operating Partner shall undertake and complete continuing training programs from time to time as may be directed by BKC in order to implement current operational standards. Such programs may be in Miami, Florida, or at such other locations as may be specified by BKC.

FRANCHISEE shall implement a training program for Franchised Restaurant employees in accordance with training standards and procedures prescribed by BKC and shall staff the Franchised Restaurant at all times during the Term of this Agreement with a sufficient number of trained employees including at least One (1) manager who has, within Six (6) months after becoming manager, successfully completed BKC's training program for restaurant managers at an accredited location to ensure that the Burger King operational standards are met. Requests for exemption from the manager training requirement will be considered on an individual basis and will be granted only in those situations where the employees



APP. EX. "A"

have prior operational management experience in a Burger King Restaurant and demonstrate to BKC a thorough knowledge and understanding of the Burger King System.

## 8. ROYALTY AND ADVERTISING CONTRIBUTION

### A. Royalty

FRANCHISEE agrees to pay to BKC a royalty of 3.5% of gross sales for the use of the Burger King System and the Burger King Marks.  Royalties shall be paid monthly by the Tenth (10th) day of each month based upon gross sales for the preceding month.

### B. Advertising, Sales Promotion and Public Relations

In addition, FRANCHISEE shall pay to BKC or BKC's designee an amount equal to 4% of FRANCHISEE's monthly gross sales by the Tenth (10th) day of each month based upon FRANCHISEE's gross sales for the preceding month.  This sum, less direct administrative expenses, will be used for advertising, sales promotion and public relations both in the market area (A.D.I.) in which the Franchised Restaurant is located and on a national basis including creative, production, media and clearance costs of advertising and sales promotion materials and those market research expenditures directly related to the development and evaluation of the effectiveness of advertising and sales promotion.   All such expenditures shall be at the discretion of BKC or its designee.  Certain advertising funds shall be allocated for approved grand opening promotions in accordance with current company policy, a copy of which is attached as Exhibit "B".

### C. Gross Sales

The term "gross sales" as used in this Agreement includes all sums charged by FRANCHISEE for goods, merchandise or services sold at or from the Franchised Restaurant, including all premiums unless exempted by BKC. The sale of Burger King products away from the Franchised Restaurant is not authorized; however, should any such sales be approved in the future, they will be included within the definition of gross sales. Gross sales excludes any federal, state, county or city tax, excise tax, or other similar taxes collected by FRANCHISEE from customers based upon sales, and cash received as payment in credit transactions where the extension of credit itself has already been included in the figure upon which the royalty and advertising contribution is computed.



# APP. EX. "A"

 

### D. Late Charge

Any royalty and advertising and sales promotion contribution not paid when due shall bear a late charge at the maximum rate allowed by Florida law or, if no maximum rate relating to this transaction is in effect in the State of Florida, 18% per annum. Nothing in this Agreement shall be construed to mean that FRANCHISEE is to pay, or has contracted to pay, any sum in excess of that which may lawfully be charged or contracted for under any applicable law. The intention of the parties is to conform strictly to applicable usury laws and it is agreed that if an excess is inadvertently collected it shall be applied to reduce the amount owed under Paragraphs 8.A. and 8.B. above.

### E. Payment

All payments required to be made to BKC under this Agreement shall be made in Miami, Florida, or at such addresses and to such parties as BKC may designate in writing from time to time.

## 9. ACCOUNTING PROCEDURES: RIGHT OF AUDIT

### A. Accounting

FRANCHISEE agrees to keep true, accurate and complete records of his business in such form as BKC now or hereafter may require and to furnish BKC with a monthly and fiscal year to date profit and loss statement in the format prescribed by BKC. FRANCHISEE shall also submit to BKC quarterly balance sheets, the first of which shall be for the period ending Three (3) months after the Franchised Restaurant opens. All profit and loss statements and balance sheets should be prepared in accordance with generally accepted accounting principles and shall be submitted to BKC within Twenty-Five (25) days after the end of the period covered by the report. In addition, FRANCHISEE shall retain for a period of at least Twenty-Four (24) months and upon request submit to BKC copies of all state sales tax returns and all supporting data and records relating to sales made at or from the Franchised Restaurant and such other records as BKC may reasonably request from time to time.

### B. Annual Financial Statements

Within One Hundred Twenty (120) days after the close of each fiscal year, FRANCHISEE shall submit a full disclosure of all persons with any interest in the Franchised Restaurant and a complete annual financial statement for the Franchised Restaurant, which statement, if requested by BKC, shall be certified by a Certified Public Accountant.



## APP. EX. "A"

### C. Audits

FRANCHISEE agrees that BKC or its representatives, at BKC's expense, shall, at all reasonable times, have the right to examine or audit the books, records, state sales tax returns or accounts of FRANCHISEE. BKC shall similarly have the right to examine or audit the books, records, state sales tax returns or accounts of any and all persons or entities who are guarantors, who have personal liability, or who have joint and severable liability under this Agreement in those instances in which FRANCHISEE has failed to make payments of the royalty or advertising fees in a timely fashion or has otherwise defaulted under this Agreement. In the event the audit discloses an understatement of gross sales which exceeds Five (5%) percent for any period or periods, FRANCHISEE shall, within Fifteen (15) days after the receipt of the audit report, pay BKC the royalty of Three and one-half percent (3.5%) and the advertising fee of Four percent (4%) of the amount of each understatement plus the late charge identified in Paragraph 8.D. of this Agreement from the date such payments were originally due, plus FRANCHISEE shall reimburse BKC for all costs of the audit including travel, lodging and wages, reasonably incurred.

### D. Release of Financial Information

FRANCHISEE gives permission to BKC to release to FRANCHISEE's landlord, lenders or prospective landlord or lenders financial and operational information relating to FRANCHISEE and/or the Franchised Restaurant.

## 10. LIMITATIONS OF FRANCHISE

### A. Trademarks, Trade Names, Service Marks and Trade Secrets

(1)   FRANCHISEE acknowledges that ownership of all right, title and interest to the Burger King System and the Burger King Marks are and shall remain vested solely in BKC and/or Burger King Brands, Inc. ("BKB"), and FRANCHISEE disclaims any right or interest therein or the good will derived therefrom. FRANCHISEE agrees that all materials loaned or otherwise made available to him and all disclosures made to FRANCHISEE and not to the general public by or at the direction of BKC at any time before or during the Term of this Agreement relating to the Burger King System, including, without limitation, the MOD Manual in its entirety, financial information, marketing strategy and marketing programs are to be considered trade secrets of BKC for purposes of this Agreement and shall be kept confidential and used by FRANCHISEE only in connection with the operation of the Franchised Restaurant and other franchised Burger King Restaurants. FRANCHISEE agrees not to divulge any of the trade secrets to any person other than his employees and then only to the extent necessary for the operation of the



## APP. EX. "A"

Franchised Restaurant and, specifically, that FRANCHISEE will not, nor permit anyone to, reproduce, copy or exhibit any portion of the MOD Manual or any other trade secrets of BKC.

(2)   FRANCHISEE will not, directly or indirectly, at any time during the Term of this Agreement or thereafter, do or cause to be done any act or thing disputing, attacking or in any way impairing or tending to impair BKC's or BKB's right, title or interest in the Burger King Marks or the Burger King System. FRAN-CHISEE shall immediately notify BKC of all infringements or limitations of the Burger King Marks which come to his attention or challenges to FRANCHISEE's use of any of the Burger King Marks, and BKC shall exercise absolute discretion in deciding what action, if any, should be taken.   FRANCHISEE agrees to cooperate in the prosecution of any action to prevent the infringement, limitation, illegal use or misuse of the Burger King Marks and agrees to be named as a party in any such action if so requested by BKC. BKC agrees to bear the legal expenses incident to FRANCHISEE's participation in such action, except for fees, expenses and other costs of FRANCHISEE'S personal legal counsel if FRANCHISEE elects to be represented by counsel of his own choosing.

(3)   In the adoption of a corporate or partnership name, FRANCHISEE shall not use any of the Burger King Marks, any variations or abbreviations, or any words confusingly similar to the Burger King Marks.

## B.  Independent Contractor

FRANCHISEE is an independent contractor and is not an agent, partner, joint venturer or employee of BKC, and no fiduciary relationship between the parties exists.  FRANCHISEE shall have no right to bind or obligate BKC in any way nor shall he represent that he has any right to do so.  BKC shall have no control over the terms and conditions of employment of FRANCHISEE's employees.

In all public records and in FRANCHISEE's relationship with other persons, on stationery, business forms and checks FRANCHISEE shall indicate independent ownership of the Franchised Restaurant and that it is operated under a Franchise granted by BKC.

FRANCHISEE shall exhibit on the Premises, in such places as may be designated by BKC, a notification that the Franchised Restaurant is operated by an independent operator and not by BKC.

## 11.  UNFAIR COMPETITION

FRANCHISEE acknowledges the uniqueness of the Burger King System and



**APP. EX. "A"**

that BKC is making its knowledge, know-how and expertise available to him for the purpose of operating the Franchised Restaurant. FRANCHISEE agrees that it would be an unfair method of competition for FRANCHISEE to use or duplicate or to allow others to use or duplicate any of the knowledge, know-how and expertise received from BKC for any use other than for the operation of franchised Burger King Restaurants. FRANCHISEE, therefore, warrants that during the Term of this Agreement, he will utilize his best and continuing efforts to promote and develop the business at the Franchised Restaurant and during the Term hereof and at all times thereafter will not directly or indirectly engage in the operation of any restaurant, other than the Franchised Restaurant and other Burger King Restaurants franchised from BKC, which utilizes or duplicates the Burger King System, any trade secrets of BKC, the Burger King Marks or the present or any former Burger King Current Image.

## 12. INSURANCE: INDEMNIFICATION

A. FRANCHISEE agrees to carry at his expense during the Term of this Agreement Comprehensive General Liability insurance, including Products Liability and Broad Form Contractual Liability, in an amount of not less than ONE MILLION ($1,000,000.00) DOLLARS per occurrence for bodily injury and FIVE HUNDRED THOUSAND ($500,000.00) DOLLARS per occurrence for property damage, or in such increased amounts as BKC may reasonably request from time to time during the Term of this Agreement. Each policy will name BKC and its subsidiaries, its affiliated and parent companies as additional insureds, will provide that the policy cannot be cancelled without Thirty (30) days prior written notice to BKC, and shall insure the contractual liability of FRANCHISEE under Paragraph 12 C. Prior to the Commencement Date, FRANCHISEE shall furnish to BKC a Certificate of Insurance reflecting that the insurance coverage is in effect. All policies shall be renewed, and a renewal Certificate of Insurance mailed to BKC in Miami, Florida, or at such other location as may be specified by BKC prior to the expiration date of the policies.

B. FRANCHISEE agrees to secure and pay premiums on a Worker's Compensation policy covering himself and all his employees, as required by law.

C. FRANCHISEE is responsible for all losses or damages and contractual liabilities to third persons arising out of or in connection with possession, ownership or operation of the Franchised Restaurant, and for all claims or demands for damages to property or for injury, illness or death of persons directly or indirectly resulting therefrom. FRANCHISEE agrees to defend, indemnify and save BKC and its subsidiaries, its affiliated and parent companies harmless of, from and with respect to any such claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages unless resulting from the negligence of BKC. BKC

Fran121.MST
12/93  /cp #7320

**APP. EX. "A"**



shall notify FRANCHISEE of any claims, and FRANCHISEE shall be given the opportunity to assume the defense of the matter. If FRANCHISEE fails to assume the defense, BKC may defend the action in the manner it deems appropriate, and FRANCHISEE shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense, in addition to any sum which BKC may pay by reason of any settlement or judgment against BKC. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law.

## 13. TAXES

FRANCHISEE shall pay when due all taxes levied or assessed in connection with the possession, ownership or operation of the Franchised Restaurant or in connection with amounts paid or received under this Agreement, including without limitation any sales, use or other ad valorem taxes (other than any tax that is measured by or related to the net income of BKC or to its corporate status in a state). If any such tax shall be paid by BKC, FRANCHISEE shall promptly reimburse BKC the amount paid. In the event of any bona fide dispute as to the liability for a tax assessed against FRANCHISEE, FRANCHISEE may contest the validity or the amount of the tax in accordance with procedures of the taxing authority. FRANCHISEE shall not permit a tax sale or seizure against the Premises or equipment.

## 14. ASSIGNMENT: CONDITIONS AND LIMITATIONS

A. This Agreement and the franchise grant are personal to FRANCHISEE, and FRANCHISEE shall not sell, assign or transfer this Agreement or any right of ownership interest in the franchise granted, nor permit any such assignment or transfer to occur directly, indirectly or contingently by agreement or operation of law without the prior written consent of an officer of BKC. FRANCHISEE understands that this Agreement and the franchise granted may not be pledged, mortgaged, hypothecated, given as security for an obligation or in any manner encumbered. The assignment of any interest, except as provided in Paragraphs 14 and 15, shall constitute a material breach of this Agreement.

B. In the event of the death of FRANCHISEE or, if this Agreement has been assigned to a Corporation, the death of an owner of Voting Common Stock, BKC shall consent to a transfer of decedent's interest to his heirs subject to the following conditions:

(1) The heir must complete and be approved through BKC's standard franchisee selection process including satisfactorily demonstrating to BKC that the

**APP. EX. "A"**



heir meets the financial, character, and managerial criteria, as well as equity ownership and such other criteria and conditions as BKC shall then be applying in considering applications for new franchises.

(2) The heir shall have successfully completed BKC's training for new Franchisees.

(3) The heir shall agree, in writing, to assume liability for and to perform all the terms and conditions of this Agreement to the same extent as the original franchisee.

(4) If the heir is not approved or there is no heir, the estate of the deceased shall use its best efforts to sell the Franchised Restaurant to an acceptable party within Twelve (12) months from the date of FRANCHISEE's death, and BKC shall have an option, but not the obligation, to operate and/or manage the Franchised Restaurant for the account of FRANCHISEE's estate until the deceased FRANCHISEE's interest is transferred to another party acceptable to BKC. Should BKC elect to operate and/or manage the Franchised Restaurant, BKC shall make a complete accounting and shall forward the net income from the operation to FRANCHISEE's estate, less expenses and a reasonable management fee. If the conveyance of the Franchised Restaurant to a party acceptable to BKC has not taken place within the Twelve (12) month period, BKC shall have the option to purchase the Franchised Restaurant at fair market value.

C. With the prior written consent of BKC, FRANCHISEE may assign this Agreement to a corporation (the "Corporation"). BKC may impose reasonable conditions on the assignment, including without limitation:

(1) The assignment to the Corporation will not relieve FRANCHISEE of personal liability to BKC for the performance of all obligations under this Franchise Agreement.

(2) For the purpose of determining compliance with this Agreement, BKC shall have the right at any time to examine and approve the form and content of the articles or certificate of incorporation and by-laws of the Corporation (the "Governing Instruments").

(3) The Corporation shall issue Voting Common Stock and may issue either Non-Voting Common Stock or Non-Voting Preferred Stock. The Corporation may not issue both Non-Voting Common Stock and Non-Voting Preferred Stock. As used herein, the term "Non-Voting Stock" refers to the Non-Voting Common Stock or the Non-Voting Preferred Stock and the term "Stock" refers collectively to Voting Common Stock and Non-Voting Stock.

# APP. EX. "A"



(4) FRANCHISEE shall own One Hundred (100%) percent of the outstanding shares of Voting Common Stock. The Operating Partner must remain the owner of not less than Fifty (50%) percent of the outstanding shares of Voting Common Stock after any transfer or issuance of shares of the Corporation.

(5) Shares of Non-Voting Stock may be issued to, owned and held only by the spouse and/or children of the FRANCHISEE ("immediate family") and key employees of FRANCHISEE's franchised Burger King Restaurant(s). Prior to the issuance of any and all Stock, FRANCHISEE shall take all steps reasonably necessary to comply with applicable state and federal laws and regulations including any applicable disclosure requirements.

(6) A Corporation issuing Non-Voting Stock shall adopt and use the provisions set forth in BKC's "Guidelines For The Preparation Of Corporate Governing Instruments" (the "Guidelines"), receipt of a copy of which is hereby acknowledged by FRANCHISEE.

(7) Neither the governing instruments nor any other agreement shall grant to owners of shares of Non-Voting Stock the ability to prevent the approval of an action otherwise approved by the owners of all the shares of Voting Common Stock.

(8) The FRANCHISEE shall cause the Corporation to comply with the provisions of this Agreement, including the Guidelines and the governing instruments. If the Corporation fails or is unable to comply with these provisions, including but not limited to the provisions limiting the voting rights of owners of shares of Stock, the provisions limiting the number of owners of Voting Common Stock, the provisions limiting the payment of dividends and the provisions requiring redemption or repurchase of shares of Stock, then the FRANCHISEE shall take action to cause substantial compliance, which action may include the purchase by FRANCHISEE of shares of Non-Voting Stock and, if FRANCHISEE fails or is unable to cause substantial compliance, then BKC may declare FRANCHISEE and the Corporation in default under this Franchise Agreement and any other Franchise Agreement similarly affected by FRANCHISEE's failure or inability.

(9) Immediate family members and key employees shall not be required to become personally liable for the performance of the terms and conditions of the Franchise Agreement as a result of their ownership of shares of Non-Voting Stock.

(10) Under the provisions set forth in the Guidelines, the governing instruments shall require that the Corporation shall redeem Non-Voting Stock at such time as the holder ceases to be a key employee or a member of the immediate family.

Fran121.MST
12/93  /cp  #7320

16

**APP. EX. "A"**



(11)  No shares of Stock may be pledged, mortgaged, hypothecated, given as security for an obligation or in any manner encumbered.

(12)  Any sale, transfer, assignment or issuance of shares of Voting Common Stock shall be subject to BKC's approval.  In the case of an acquisition of additional shares by the Operating Partner, this requirement shall be satisfied by BKC being given written notice describing the transaction within seven (7) days following the transfer or issuance.  At no time shall the Corporation have more than five (5) holders of shares of Voting Common Stock unless otherwise authorized in writing by the Chief Executive Officer of BKC.

(13)  The Corporation shall not engage in any business activity other than that which is directly related to the ownership and operation of FRANCHISEE's franchised Burger King Restaurant(s).

(14)  The governing instruments of the Corporation shall reflect the limitation in the number of shareholders of Voting Common Stock and that the issuance and transfers of shares of Voting Common Stock are restricted and may be issued or transferred only with the written consent of BKC.

(15)  All Stock certificates shall include the following legend:

THE OWNERSHIP AND TRANSFER OF THIS STOCK IS SUBJECT TO THE TERMS AND CONDITIONS OF THE ARTICLES OF INCORPORATION, THE BY-LAWS OF THIS CORPORATION AND OF A FRANCHISE AGREEMENT WITH BURGER KING CORPORATION.  REFERENCE IS MADE TO SUCH FRANCHISE AGREEMENT AND THE PROVISIONS OF THE ARTICLES OF INCORPORATION AND BY-LAWS OF THIS CORPORATION, COPIES OF WHICH ARE ON FILE WITH THE RECORDS OF THE CORPORATION.

(16) FRANCHISEE shall comply with the requirements of Paragraph 10.A.(3) of this Agreement in the adoption of any corporate name.

D.    If more than one (1) individual comprises the FRANCHISEE, the assignment, in whole or in part, by any such individual (the "Individual Seller") of his ownership interest in the Franchised Restaurant (or if this Agreement has been assigned to a Corporation or other entity pursuant to Paragraph 14 C herein, the assignment of his stock or other security of the Corporation or other entity) shall be subject to the prior written consent of BKC, which consent will not be unreasonably withheld upon compliance with the conditions required by BKC on the assignment. Conditions on the assignment, may include but are not limited to the following:

(1)    For the purpose of determining compliance with this Agreement, BKC



shall have the right at any time to examine and approve the form and content of the governing instruments.

(2) All obligations of FRANCHISEE to BKC, whether arising under this Agreement or otherwise, must be satisfied at the time of transfer.

(3) Prospective purchaser must complete and be approved through BKC's standard franchisee selection process including satisfactorily demonstrating to BKC that he meets the financial, character, managerial, equity ownership and such other criteria and conditions as BKC shall then be applying in considering applications for new franchises.

(4) Prospective purchaser shall have satisfactorily completed BKC's training for new franchisees.

(5) Approval by BKC of the terms of the contract of sale which impact the sufficiency of cash flow from the business after payment of debt service to provide for, among other things, any needed remodeling of the Franchised Restaurant.

(6) The Individual Seller shall remain personally liable to BKC for royalty and advertising payments for the longer of (a) Twelve (12) months from the date of assignment, or (b) if the contract of sale provides that installment payments of the purchase price to the Individual Seller after the assignment, the Individual Seller will be released from personal liability at the end of the period, including any extensions, in which the assignee is making any payments to the Individual Seller under an obligation incurred in connection with the sale provided that (i) the assignee, Corporation and FRANCHISEE remain current in all financial obligations to BKC throughout the period and that (ii) any contract of sale which provides for installment payments of the purchase price provides that such payments are subordinate to the payment of royalty and advertising payments called for in this Agreement and that the note or other evidence of the obligation shall not be assignable by the holder or payee.

(7) Individual Seller shall pay BKC an assignment fee of Two Thousand ($2,000.00) Dollars for the costs and expenses incurred by BKC in connection with the transfer of the first Burger King Restaurant involved in the transaction and Five Hundred ($500.00) Dollars for each additional Burger King Restaurant involved in the same transaction.

(8) Execution by Individual Seller of a general release of BKC in a form satisfactory to BKC.

**APP. EX. "A"**

## 15. RIGHT OF FIRST REFUSAL

A. In the event FRANCHISEE receives an acceptable bona fide offer from a third party to purchase the Franchised Restaurant or any portion thereof or interest therein, FRANCHISEE shall give BKC written notice setting forth the name and address of the prospective purchaser, the price and terms of the offer together with a franchisee application completed by the prospective purchaser, a copy of the Purchase and Sale Agreement, executed by both FRANCHISEE and purchaser, and all exhibits, copies of any real estate purchase agreement or agreements, proposed security agreements and related promissory notes, assignment documents, title insurance commitment and any other information that BKC may request in order to evaluate the offer. BKC, its subsidiary or affiliated company (herein collectively "BKC") shall then have the prior option to purchase FRANCHISEE's interest covered by the offer at the price and upon the same terms of the offer. If the consideration is not money, the purchase price shall be cash equal to the fair market value of the consideration. BKC shall have Twenty (20) Business Days after receipt of FRANCHISEE's notice of offer and the furnishing of all reasonably requested information within which to notify FRANCHISEE of its intent to accept or reject the offer. Silence on the part of BKC shall constitute rejection. If the proposed sale includes assets of FRANCHISEE not related to the operation of franchised Burger King Restaurants, BKC may, at its option, elect to purchase only the assets related to the operation of franchised Burger King Restaurants and an equitable purchase price shall be allocated to each asset included in the proposed sale. This right of first refusal shall apply to any transfer, conveyance, assignment, consolidation, merger or any other transaction in which legal or beneficial ownership of the franchise granted by this Agreement is vested in other than the individual FRANCHISEE. If this Agreement has been assigned to a Corporation in accordance with Paragraph 14 of this Agreement, then this right of first refusal shall also apply if Voting Common Stock in the Corporation is sold, assigned or transferred to individuals or entities other than those approved by BKC as owners of the Voting Common Stock.

B. The election by BKC not to exercise its right of first refusal as to any offer shall not affect its right of first refusal as to any subsequent offer.

C. Any sale, attempted sale, assignment or other transfer of the franchise grant effected without first giving BKC the right of first refusal described above shall be void and of no force and effect. If this Agreement has been assigned to a Corporation in accordance with Paragraph 14 of this Agreement, any sale, attempted sale, assignment or other transfer of Voting Common Stock in the Corporation to individuals or entities other than those approved by BKC as owners of Voting Common Stock of such Corporation without first giving BKC the right of first refusal described above shall be void and of no force and effect.

Fran121.MST
12/93  /cp  #7320

19

**APP. EX. "A"**





D. If BKC does not accept the offer to purchase the Franchised Restaurant, FRANCHISEE may conclude the sale to the purchaser who made the offer provided BKC's consent to the assignment be first obtained, which consent will not be unreasonably withheld upon compliance with the conditions imposed by BKC on the assignment. Conditions on assignment may include, but are not limited to, the following:

(1) All obligations of FRANCHISEE to BKC, whether arising under this Agreement or otherwise, must be satisfied at the time of transfer.

(2) Prospective purchaser must complete and be approved through BKC's standard franchisee selection process including satisfactorily demonstrating to BKC that he meets the financial, character, managerial, equity ownership and such other criteria and conditions as BKC shall then be applying in considering applications for new franchises.

(3) Prospective purchaser shall have satisfactorily completed BKC's training for new franchisees.

(4) Approval by BKC of the terms of the contract of sale which may impact the sufficiency of cash flow from the business after payment of debt service to provide for, among other things, any needed remodeling of the Franchised Restaurant.

(5) FRANCHISEE seller shall remain personally liable to BKC for royalty and advertising payments for the longer of (a) Twelve (12) months from the date of assignment, or (b) if the contract of sale provides that installment payments of the purchase price to the FRANCHISEE seller after the assignment, the FRANCHI-SEE seller will be released from personal liability at the end of the period, including any extensions, in which the assignee is making any payments to the FRANCHI-SEE seller under an obligation incurred in connection with the sale provided that (i) the assignee, Corporation and FRANCHISEE remain current in all financial obligations to BKC throughout the period and (ii) any contract of sale which provides for installment payments of the purchase price provides that such payments are subordinate to the payment of royalty and advertising payments called for in this Agreement and that the note or other evidence of the obligation shall not be assignable by the holder or payee.

(6) FRANCHISEE seller shall pay BKC an assignment fee of Two Thousand ($2,000.00) Dollars for the costs and expenses incurred by BKC in connection with the transfer of the first Burger King Restaurant involved in the transaction and Five

MICROFILMED
DATE_____

Hundred ($500.00) Dollars for each additional Burger King Restaurant involved in the same transaction.

(7)  Execution by FRANCHISEE seller of a general release of BKC in a form satisfactory to BKC.

E.   In addition, FRANCHISEE agrees that, prior to acquiring any other Burger King Restaurant franchise which may be offered to him for sale or which he may offer to purchase, such franchise will first be offered to BKC on the same terms, conditions and price.

## 16. OPTION TO OBTAIN SUCCESSOR FRANCHISE AGREEMENT

FRANCHISEE shall have, exercisable on the expiration date of the Term of this Agreement, an option to obtain a Successor Burger King Restaurant Franchise Agreement ("Successor Franchise Agreement") for a term of Twenty (20) years, provided that:

A.   FRANCHISEE has given BKC written notice ("Notice") of its intention to exercise its Option to Obtain a Successor Franchise Agreement during the fourth year prior to the expiration of the Term of this Agreement.

B.   FRANCHISEE, at the time of the Notice and at the time of the expiration of the Term of this Agreement, is not in default of and has substantially complied with the terms and conditions of this Agreement consistently and throughout its Term, including but not limited to the following:

(1)  FRANCHISEE has operated the Franchised Restaurant in accordance with the terms and conditions of this Agreement, including, but not limited to, operating the Franchised Restaurant in compliance with the operating standards and specifications established from time to time by BKC as to quality of service, cleanliness, health and sanitation;

(2)  FRANCHISEE has satisfied, in a timely fashion, all financial obligations in accordance with the terms and conditions of this Agreement;

(3)  FRANCHISEE has maintained, improved, altered and remodeled the restaurant building, Premises, signs and equipment throughout the Term of this Agreement in accordance with the terms and conditions of this Agreement.

C.   Within One Hundred and Twenty (120) days after receipt of the Notice, BKC shall advise FRANCHISEE in writing if FRANCHISEE is not eligible to obtain



**APP. EX. "A"**



a Successor Franchise Agreement, specifying the reasons for such ineligibility and identifying whether such deficiencies are capable of cure. Between the date of the Notice and the expiration date of the Term of this Agreement, if any act, circumstance or omission causes FRANCHISEE to become ineligible to obtain a Successor Franchise Agreement then BKC shall advise FRANCHISEE in writing thereof, specifying the deficiency and identifying a cure period if applicable.

D.    FRANCHISEE has the right to remain in possession of the Premises for the term of the Successor Franchise Agreement.

E.    FRANCHISEE shall execute the then current form of Successor Franchise Agreement, which may differ as to royalty and advertising contributions, as well as other terms and conditions. FRANCHISEE shall, upon execution of the Successor Franchise Agreement, pay to BKC the then current Franchise Fee.

## 17. DEFAULT AND EFFECT OF TERMINATION

### A. Default

If an act of default hereunder is committed by FRANCHISEE, and FRANCHISEE fails to cure the default after any required notice and within the cure period applicable, BKC may, at its option and without prejudice to any other rights or remedies provided for hereunder or by law, terminate the Franchise Agreement by written notice or otherwise. The applicable cure period shall be as described below but, if a cure period is not specifically mentioned, it shall be Thirty (30) days. In some cases, as identified below, no cure period is allowed and no notice may be required. If any applicable law or rule requires a longer notice period or a longer cure period than that provided herein, then the period required under the law or rule shall be substituted for the requirements herein. The following are material acts of default and shall be good cause for termination:

(1) FRANCHISEE fails to operate the Franchised Restaurant in accordance with the operating standards and specifications established from time to time by BKC as to service, cleanliness, health and sanitation. FRANCHISEE shall have Five (5) days after notification to cure the default.

(2) FRANCHISEE sells any product which does not conform to BKC's specifications. FRANCHISEE shall have Five (5) days after notification to cure the default.

(3) FRANCHISEE fails to sell products designated by BKC. FRANCHISEE shall have Five (5) days after notification to cure the default.





(4)  FRANCHISEE sells products not approved by BKC.  FRANCHISEE shall have Five (5) days after notification to cure the default.

(5)  FRANCHISEE uses equipment, uniforms or decor not approved by BKC.

(6)  FRANCHISEE fails to maintain the Franchised Restaurant in conformance with the Current Image.

(7)  FRANCHISEE fails to pay when due any royalty or advertising and sales promotion contribution required to be paid under this Agreement.  FRANCHISEE shall have Ten (10) days after notification to cure the delinquency.

(8)  FRANCHISEE fails to submit any information required by Paragraph 9 above ("Accounting Procedures") or submits a financial statement or other sales report which understates gross sales. If Franchisee knowingly and intentionally submits a financial statement or other sales report which understates gross sales, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee but with no opportunity to cure.

(9)  FRANCHISEE abandons the franchise relationship without the prior consent of BKC at any time during the Term of this Agreement.  The cessation of operation of the Franchised Restaurant on the Premises other than with the consent of BKC, whether the Premises remain vacant or are converted to another use, shall be considered abandonment of the franchise relationship.

(10)  FRANCHISEE ceases to occupy the Premises.   If the loss of possession is the result of governmental exercise of eminent domain, FRANCHISEE may, with BKC's consent and subject to availability, relocate to other Premises in the same market area for the balance of the term of this Agreement.

(11)  FRANCHISEE (if FRANCHISEE consists of more than one person, the Operating Partner or the partnership, and if the franchise has been assigned to a Corporation, the Corporation) files a petition or application seeking any type of relief under the Bankruptcy Code or any state insolvency or similar law, or someone files a petition or application seeking to have FRANCHISEE adjudicated a bankrupt, or seeking other relief against FRANCHISEE under the Bankruptcy Code or any state insolvency or similar law and the petitioner application is not dismissed within Ninety (90) days after it is filed.  Subject to the applicable law, the Franchise shall terminate without notice or cure period upon the occurrence of this act of default as if that date were the expiration date and FRANCHISEE expressly and knowingly waives any rights that he may have under the provisions of the Bankruptcy Code and consents to the termination of this Agreement or any other relief which may be sought in a Complaint filed by BKC to lift the provisions of the automatic stay of the



## APP. EX. "A"

Bankruptcy Code.  Additionally, FRANCHISEE agrees not to seek an Injunctive Order from any court in any jurisdiction relating to insolvency, reorganization or arrangement proceedings which would have the effect of staying or enjoining this provision.

(12)  FRANCHISEE admits in writing his inability to pay his debts as they mature or makes an assignment for the benefit of creditors, or a receiver (permanent or temporary) for any part of his property is appointed by a court of competent authority.  If this act of default shall occur, BKC shall have the right to immediately terminate this Agreement without notice or cure period.

(13)  A final judgment against FRANCHISEE remains unsatisfied of record for Thirty (30) days (unless a supersedeas or other appeal bond has been filed) or if a levy of execution is made upon the franchise granted by this Agreement or upon any property used in the Franchised Restaurant, and it is not discharged within Five (5) days of said levying.

(14)  Conviction of FRANCHISEE or, if this Agreement has been assigned to a Corporation, conviction of the Corporation or an officer, director or shareholder of the Corporation in a court of competent jurisdiction of an indictable offense punishable by a term of imprisonment in excess of One (1) year.  If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to FRANCHISEE but with no opportunity to cure.

(15)  FRANCHISEE uses or duplicates the Burger King System or engages in unfair competition in violation of Paragraph 11 or discloses any trade secrets of BKC in violation of Paragraph 10A(1).  If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to FRANCHISEE but with no opportunity to cure.

(16)  FRANCHISEE denies BKC the right to inspect the Franchised Restaurant or to audit the sales and accounting records of the Franchised Restaurant.

(17)  Conduct by FRANCHISEE which is deleterious or reflects unfavorably on FRANCHISEE or the Burger King Restaurant System by exhibiting a reckless disregard for the physical and mental well being of employees, customers, BKC representatives or the public at large including, but not limited to, battery, assault, sexual harassment or other forms of threatening, outrageous or unacceptable behavior.



APP. EX "A"

(18) Failure by FRANCHISEE to maintain a responsible credit rating by failing to make prompt payment of undisputed bills, invoices and statements from suppliers of goods and services to the Franchised Restaurant.

(19) The sale, assignment or transfer of any interest of FRANCHISEE in this Agreement in violation of Paragraphs 3, 14 or 15 and, if this Agreement has been assigned to a Corporation, the creation, sale, assignment, or transfer of the stock of the Corporation, in violation of Paragraphs 3, 14 or 15.

(20) FRANCHISEE, without the written consent of BKC, enters into a management agreement or consulting arrangement relating to the Franchised Restaurant.

(21) Failure to restore the building after damage or destruction as provided in Paragraph 6.

(22) The knowing and intentional submission by FRANCHISEE of a franchise application and/or management commitment form which contains any false or misleading statements or omits any material fact.  If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to FRANCHISEE but with no opportunity to cure.

(23) Repeated breaches of provisions of this Agreement.

(24) The acquisition of an interest in a business in violation of Paragraph 18.

(25) Failure by FRANCHISEE to comply with any other provisions of this Agreement.

The failure of BKC to terminate this Agreement upon the occurrence of one or more events of default will not constitute a waiver or otherwise affect the right of BKC to terminate this Agreement because of a continuing or subsequent failure to cure one or more of the aforesaid events of default or any other default.

### B.  Effect of Termination

(1)  Upon termination or expiration of this Agreement, FRANCHISEE's right to use the Burger King Marks and the Burger King System shall terminate. FRANCHISEE shall not thereafter identify himself as a Burger King franchisee or publicly identify himself as a former Burger King franchisee or use any of BKC's trade secrets, promotional materials, the Burger King Marks or any mark confusingly similar, nor shall FRANCHISEE disclose any of BKC's trade secrets.



## APP. EX. "A"

Upon termination or expiration of this Agreement, FRANCHISEE will immediately return to BKC the MOD Manual loaned to him, together with all other material containing trade secrets.

(2)  FRANCHISEE grants to BKC, upon termination or expiration of this Agreement, the option to purchase all usable paper goods, containers and printed menus bearing the Burger King Marks at FRANCHISEE's cost, and to purchase the restaurant equipment, furniture, fixtures and signs at fair market value.

(3)  If the parties do not enter into a Successor Franchise Agreement, FRANCHISEE agrees to immediately upon termination or expiration of this Agreement, make such removals or changes in signs and the building as BKC shall request, so as to effectively distinguish the building and Premises from its former appearance and from any other Burger King Restaurant.  In the event FRANCHISEE fails to make the changes, FRANCHISEE consents to BKC entering the building and Premises to make non-structural changes at FRANCHISEE's expense.

(4)  In the event of termination for any default of FRANCHISEE, any damage suffered by BKC shall be a lien in favor of BKC against the personal property, machinery, fixtures and equipment owned by FRANCHISEE on the Premises at the time of default.

(5)  The foregoing shall be in addition to any other rights and remedies of BKC that exist under statute, regulation or common law.

## 18.  RESTRICTIVE COVENANT

FRANCHISEE covenants and agrees that during the Term of this Agreement he will not own, operate or have any interest in any hamburger business except other franchised Burger King Restaurants.  FRANCHISEE further covenants and agrees that for a period of One (1) year after any sale, assignment, transfer, termination or expiration of this Agreement, FRANCHISEE will not own, operate or have any interest in any hamburger business, except other franchised Burger King Restaurants, either at or within Two (2) miles of the Premises of the Franchised Restaurant.

## 19.  MISCELLANEOUS: GENERAL CONDITIONS

### A.  Interpretation

The Introduction shall be considered a part of this Agreement.  Paragraph captions are used only for convenience and are in no way to be construed as part of this Agreement or as a limitation of the scope of the particular paragraphs to



# APP. EX. "A"

which they refer.  Words of any gender used in this Agreement shall include any other gender, and words in the singular shall include the plural, where the context requires.

### B.  Non-Waiver

The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by FRANCHISEE with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement.  The rights or remedies set forth in this Agreement are in addition to any other rights or remedies which may be granted by law.

### C.  Governing Law, Forum and Compliance

(1)  This Agreement shall become valid when executed and accepted by BKC.  The parties agree that it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida.

(2)  FRANCHISEE and BKC acknowledge and agree that the U.S. District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Circuit (or its successor) in and for Dade County, Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising, either directly or indirectly, under or in connection with this Franchise Agreement and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

(3)  Anything in this Agreement to the contrary notwithstanding, FRANCHI-SEE shall conduct his business in a lawful manner and faithfully comply with applicable laws or regulations of the United States and state, city or other political subdivision in which the Franchised Restaurant is located.

### D.  Severability

BKC and FRANCHISEE agree that if any provision of this Agreement may be construed in two ways, one of which would render the provision illegal or otherwise voidable or unenforceable and the other of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable.  The language of all provisions of this Agreement



**APP. EX. "A"**

shall be construed according to its fair meaning and not strictly against BKC or FRANCHISEE. It is the desire and intent of BKC and FRANCHISEE that the provisions of this Agreement be enforced to the fullest extent, and should any provision be invalid or unenforceable under Florida law, but valid under the laws of the state where the Franchised Restaurant is located, the provision shall be governed by the law of that state. In the event any court shall determine that any provision in this Agreement is not enforceable as written, BKC and FRANCHISEE agree that the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws of the jurisdiction in which enforcement is sought. The provisions of this Agreement are severable and this Agreement shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained in the Agreement, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable.

### E. Notices

(1) All notices to BKC shall be in writing and shall be delivered or sent by registered or certified mail, postage fully prepaid, addressed to it at its offices at P.O. Box 020783, Miami, Florida 33102-0783, Attention: General Counsel, or at such other address as BKC shall from time to time designate in writing.

(2) All notices to FRANCHISEE shall be in writing and shall be hand delivered or sent by registered or certified mail or telegraph, addressed to FRANCHISEE at the Franchised Restaurant Premises or FRANCHISEE's last designated in writing mailing address.

(3) Notices shall be deemed delivered on the earlier of actual receipt or the Third (3rd) day after being deposited in the U.S. Mail.

### F. Liability of Multiple Franchisees

If FRANCHISEE consists of more than one person, each partner's liability and obligation under this Agreement shall be joint and several.

### G. Modification

This Agreement may only be modified or amended by a written document executed by BKC and FRANCHISEE.



# APP. EX. "A"

### H. Binding Effect

This Agreement shall be binding upon the parties, their heirs, executors, personal representatives, successors or assigns.

### I. Survival

Any provisions of this Agreement which impose an obligation after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and be binding on the parties.

### J. Attorney's Fees

In any litigation to enforce the terms of this Agreement, all costs and all attorney's fees (including those incurred on appeal) incurred as a result of the legal action shall be paid to the prevailing party by the other party.

### K. Entire Agreement

This Agreement, together with the Franchise Application, Management Commitment Form and Capitalization Plan submitted by FRANCHISEE to BKC upon which BKC is relying in granting this franchise, constitute the entire agreement of the parties and supersedes all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.



APP. EX. "A"



This Agreement is hereby executed by the parties effective on the date indicated on the first page of this Agreement.

BURGER KING CORPORATION

By: _John R. Blackshire_

Director, Worldwide
Franchise Administration

Attest: _Marilyn Henders_

Franchise Associate

(Corporate Seal)

WITNESS:

_____

FRANCHISEE:

_Muntaz Hashim_

Muntaz Hashim

**APP. EX. "A"**

## ADDENDUM

## BURGER KING RESTAURANT FRANCHISE AGREEMENT

1.    FRANCHISE GRANT:      TERM AND LOCATION

BKC grants to FRANCHISEE and FRANCHISEE accepts a franchise for a period of TEN (10) years to use the Burger King System and the Burger King Marks only in the operation of a Burger King Restaurant at Fox Hill Mall, Culver City, California 90230 more fully described in Exhibit "A" (the "Franchised Restaurant"), (the term "Franchised Restaurant" includes the real estate described on Exhibit "A" (the "Premises") and the restaurant "Building" and all other "Improvements" constructed thereon wherever the context permits or requires).  The term of this Agreement commences on the date the Franchised Restaurant opens for business (the "Commencement Date"), and shall expire TEN (10) years thereafter (the "Term") unless sooner terminated in accordance with the provisions of this Agreement.  FRANCHISEE agrees to operate the Franchised Restaurant at the Premises for the entire  TEN (10) year Term. FRANCHISEE accepts this franchise with the full and complete understanding that the franchise grant contains no promise of assurance of renewal.  The sole and entire conditions under which FRANCHISEE will have the opportunity of obtaining a Successor Burger King Franchise Agreement at expiration are those set forth herein in Paragraph 16.  This franchise is for the Premises only and does not in any way grant or imply any area, market or territorial rights proprietary to FRANCHISEE.

2.    FRANCHISE FEE

FRANCHISEE acknowledges that the grant of this franchise constitutes the consideration for the payment by FRANCHISEE to BKC of Twenty Thousand and no/00 ($20,000.00) dollars and that this sum shall be fully earned by BKC upon the execution and delivery of this Agreement.

APP. EX. "A"

**BURGER KING CORPORATION**

By: _[signature]_
     Director, Worldwide
     Franchise Administration

Attest: _[signature]_
        Franchise Associate

WITNESSES:

_____          _[signature]_
                                 _____
                                 Muntaz Hashim

MICROFILMED
DATE _____

# APP. EX. "A"

# EXHIBIT "A"

## LEGAL DESCRIPTION
## FRANCHISED RESTAURANT

# APP. EX. "A"

MICROFILMED
DATE_____

# BURGER KING MARKETING ACCOUNT
# NEW RESTAURANT MARKETING ACCOUNT

EFFECTIVE DATE JUNE 1, 1991 FOR NEW RESTAURANT OPENINGS

A new Restaurant Marketing Account will be established for each new restaurant in the Burger King USA system. Its purpose shall be to reimburse the franchisee/manager for advertising and promotion expenses incurred in executing a marketing program for a new restaurant.

Burger King Corporation through its Marketing Account shall contribute $2,500 to the New Restaurant Marketing Account. The $2,500 New Restaurant Marketing Account will be charged to the National Marketing Fund in the quarter in which the restaurant opens.

The Account may not be used to promote another restaurant and expenditures from the Account must be for advertising or promotion. Examples of expenditures which would not qualify for payment from the Account are:

1. Food cost related to redemption of promotion coupons.
2. Hourly or management labor provided by restaurant employees.
3. Permanent decor items.
4. Membership fees.
5. Donations, unless publicity results are documented.
6. WHOPPER cards.

These are examples and not meant to be all inclusive.

The franchisee/manager will submit a new Restaurant Marketing plan for approval by the Franchise Sales & Service Manager. An approved plan must be on file prior to any restaurant activities, since no reimbursements will be made until the approved plan has been received. The New Restaurant Marketing program must be completed within 210 days (seven months) of the restaurant's opening day. If an approved New Restaurant Marketing program is not conducted within the 210 day period, all monies will revert to the National Marketing Fund on the 211th day. Two additional months will be allowed to present reimbursement requests to Marketing Account Administration. The expenses must be for advertising or promotion which occurred during the prescribed seven month period. Any balances remaining at the end of the nine month period will revert to the National Marketing Fund.

EXHIBIT "B"

# APP. EX. "A"



Request for reimbursement along with copies of all invoices must be forwarded on the prescribed form. Marketing Account Administration will reimburse the restaurant for qualifying expenditures. The Franchise Sales & Service Manager shall have the responsibility of screening invoices submitted by the franchisee/manager and rejecting those which do not qualify as advertising or promotion and/or which do not constitute normal New Restaurant Marketing Account expense.

EXHIBIT "B"

APP. EX. "A"



# BURGER KING CORPORATION

# GUIDELINES FOR PREPARATION OF CORPORATE GOVERNING INSTRUMENTS

The Burger King ® Restaurant Franchise Agreement (the "Agreement") provides, at Paragraph 14.c. that the Franchisee may, with the prior written consent of Burger King Corporation ("BKC") assign the Agreement to a corporation (the "Corporation") so long as certain reasonable BKC conditions, including but not limited to those set forth in the Agreement, are met. The 1987 revision of the Agreement provides that the assignee Corporation may be structured to permit either Non-Voting Common Stock or Non-Voting Preferred Stock in addition to Voting Common Stock. The Agreement also provides, at Paragraph 14.c.(6) that if the Corporation wishes to issue either Non-Voting Common Stock or Non-Voting Preferred Stock (it may not issue both), it must ensure that the articles or certificate of incorporation and the by-laws of the Corporation (herein the "governing instruments") contain *at least* the provisions set forth in these Guidelines For Preparation Of Corporate Governing Instruments.

**Before setting forth the required provisions, a note of CAUTION is in order. The issuance of stock to family members and key employees may involve and invoke security registration and sales laws, "blue sky" disclosure laws, wage and hour laws and numerous other federal, state and local laws and regulations. A Franchisee should not, under any circumstances, issue, sell or give away Non-Voting Stock of any sort without first discussing the matter in depth with an attorney and following his or her instructions carefully.**

The required provisions have been divided into those which relate to Non-Voting Common Stock and those which relate to Non-Voting Preferred Stock. Under Paragraph 14.c.(3) of the Agreement, the Corporation may not issue both Non-Voting Common Stock and Non-Voting Preferred Stock.

It should also be noted, as a possible related matter, that Paragraph 10.A.(3) of the Agreement requires that in the adoption of a corporate or partnership name, the Franchisee may not use any of the Burger King Marks, or any variation, abbreviation, or words confusingly similar to the Burger King Marks.

### Provisions Regarding Non-Voting Common Stock

A.     The aggregate number of authorized shares of stock of the Corporation shall be (corporation will insert number) of which (a) (insert number) shall be designated shares of Voting Common Stock of the par value of (insert number) per share (the "Voting Common Stock"), and (b) (insert number) shall be designated



APP. EX. "A"

shares of Non-Voting Common Stock of the par value of (insert number) per share.

B.   So long as the Corporation is the assignee of any Burger King Franchise, the relative rights, preferences and limitations of the Voting Common Stock and the Non-Voting Common Stock are as follows:

## 1. Voting Common Stock

(a)  Voting Common Stock shall only be issued to and held by those natural persons who are approved as franchisees by Burger King Corporation.  No more than five natural persons may hold shares of Voting Common Stock.  If a holder of shares of Voting Common Stock is not a natural person approved as a franchisee by Burger King Corporation, the shares of Voting Common Stock shall be deemed to be shares of Non-Voting Stock until they are repurchased pursuant to Section 3.

(b)  The holders of shares of Voting Common Stock shall be entitled to receive, out of the funds of the Corporation legally available for such purpose, dividends as and when declared by the Board of Directors.

(c)  In the event of any liquidation, dissolution or distribution of the assets of the Corporation the holders of shares of the Voting Common Stock together with holders of the Non-Voting Common Stock (whose rights are limited as set forth in Section 2(d)) shall be entitled to share ratably in the distribution of all remaining assets of the Corporation available for distribution.

## 2. Non-Voting Common Stock

(a)  Non-Voting Common Stock shall only be issued to and held by either (1) a member of the immediate family (which consists of the spouse and children) of the holder of shares of Voting Common Stock, or (2) a "key employee" of the Corporation.

(b)  The aggregate number of outstanding shares of Non-Voting Common Stock shall not exceed 25% of the sum of (a) the aggregate number of outstanding shares of Voting Common Stock and (b) the aggregate number of outstanding shares of Non-Voting Common Stock.

(c)  Except as specifically required by applicable law, holders of Non-Voting Common Stock shall not have the right to vote.  If the holders of shares of Non-Voting Common Stock have the right to vote on an action under applicable law, they shall vote as a single class with the holders of shares of Voting Common Stock.

(d)  In the event of any liquidation, dissolution or distribution of the assets

Fran121.MST
12/93  /cp #7320

# APP. EX. "A"



of the Corporation the holders of shares of Non-Voting Common Stock together with the holders of the shares of Voting Common Stock shall be entitled to share ratably in the distribution of all remaining assets of the Corporation available for distribution, except that no holder of shares of Non-Voting Common Stock may receive, in its capacity as a holder of shares of Non-Voting Common Stock, any interest in the Burger King Franchise other than an interest in the proceeds of any disposition thereof.

(e)  Except as set forth in Section 2(c) and 2(d), the holders of shares of Non-Voting Common Stock shall have all the rights and privileges of holders of shares of Voting Common Stock.

### 3.  Repurchase

To the extent permitted by law, the Corporation shall repurchase shares of Non-Voting Common Stock at such time as the holder thereof ceases to be a key employee of the Corporation or a member of the immediate family of a holder of Voting Common Stock and shall repurchase shares of Voting Common Stock at such time as the holder thereof ceases to be a person meeting the requirements hereunder of a holder of shares of Voting Common Stock, for an amount per share (corporation will insert an applicable pricing mechanism) provided, however, that such amount per share shall not exceed: (i) the aggregate of net income and net losses reported to the Internal Revenue Service less taxes paid or payable, dividends previously paid, declared or accrued and prior redemptions and repurchases of shares of capital stock of the Corporation, divided by (ii) the total number of shares of Voting Common Stock and Non-Voting Common Stock outstanding immediately prior to such proposed repurchase.

### Provisions Regarding Non-Voting Preferred Stock

A.  The aggregate number of shares of all classes of stock which the Corporation shall have authority to issue is (corporation will insert number), to be divided into two classes consisting of (insert number) shares of a class designated "Preferred Stock", of the par value of (insert number) per share, and (insert number) shares of a class designated "Common Stock", of the par value of (insert number) per share.

B.  So long as the Corporation is the assignee of any Burger King Franchise, the relative rights, preferences and limitations of the shares of each class are as follows:

### 1.  Preferred Stock

The Preferred Stock may be issued from time to time in one or more series, with such designation or title, in such number of shares and with the relative rights



**APP. EX. "A"**

and preferences (a) as may be fixed by resolution of the Board of Directors without further action by shareholders, (b) as may be fixed by the shareholders, or (c) as set forth below; provided, however, that in no event will holders of outstanding shares of Preferred Stock have rights more extensive than the following:

(a)  Holders of shares of Preferred Stock shall be either (1) a member of the immediate family (which consists of the spouse and children) of the holders of the shares of Common Stock or (2) a "key employee" of the Corporation.

(b)  Shares of Preferred Stock shall not be convertible into shares of Common Stock.

(c)  Except with respect to amendments to this instrument which adversely affect the relative rights and preferences of holders of shares of Preferred Stock, for any action on which the holders of shares of Preferred Stock are entitled to vote under applicable law, the holders of outstanding shares of Preferred Stock so entitled to vote shall vote, for these purposes only, with the holders of outstanding shares of Common Stock, and the maximum vote which all such holders of shares of Preferred Stock shall have is 25% of the aggregate number of outstanding shares of Preferred Stock and Common Stock, taken as a whole, entitled to vote on such action.

(d)  Upon liquidation, dissolution or distribution of the assets of the Corporation, the holders of all outstanding shares of Preferred Stock shall not be entitled to receive more than 25% of the proceeds upon such liquidation, dissolution or distribution; provided, however, that in no event will the holders of shares of Preferred Stock be entitled to receive upon liquidation, dissolution or distribution of assets any interest in the Burger King Franchise other than an interest in the proceeds from any disposition thereof.

## 2.  Common Stock

(a)  Common Stock shall only be issued to and held by those natural persons who are approved as franchisees by Burger King Corporation.  No more than five natural persons may hold shares of Common Stock.  If a holder of shares of Common Stock is not a natural person approved by Burger King Corporation, the shares of Common Stock so held shall be subject to repurchase pursuant to Section 3.

(b)  Subject to the prior payment or provision therefor of dividends on the Preferred Stock, the holders of shares of Common Stock shall be entitled to receive out of the funds of the Corporation legally available for such purpose dividends as and when declared by the Board of Directors.

(c)  In the event of any liquidation, dissolution or distribution of the assets





**APP. EX. "A"**

of the Corporation and after satisfaction of the preferential requirements of the Preferred Stock, the holders of shares of Common Stock shall be entitled to share ratably in the distribution of all remaining assets of the Corporation available for distribution.

## 3. Redemption and Repurchase

(a)  To the extent permitted by law, the Corporation shall redeem shares of Preferred Stock for (corporation will insert an applicable redemption price or pricing mechanism) at such time as the holder thereof ceases to be a key employee of the Corporation or a member of the immediate family of a holder of Voting Common Stock; provided, however, that the amount per share to be paid upon such redemption shall not exceed 25% times (i) the aggregate of net income and net losses previously reported by the Corporation to the Internal Revenue Service, less taxes paid or payable with respect to such reported net income less the sum of dividends paid, declared or accrued and prior redemption and repurchases of shares of Preferred Stock and Common Stock, divided by (ii) the total number of shares of Preferred Stock outstanding at such time, including the shares to be redeemed.

(b)  To the extent permitted by law, the Corporation shall repurchase shares of Common Stock at such time as the holder thereof ceases to be a person approved by Burger King Corporation as a franchisee, for an amount per share (corporation will insert applicable pricing mechanism); provided, however, that such amount per share shall not exceed: (i) the aggregate of net income and net losses previously reported by the Corporation to the Internal Revenue Service less taxes paid or payable with respect to such reported net income, less the sum of amounts paid or payable for dividends previously paid, declared or accrued and prior redemptions and repurchases of shares of capital stock of the Corporation, and amounts which may be payable preferentially to holders of all outstanding shares of Preferred Stock under Sections 1 and 3(a), divided by (ii) the total number of shares of Common Stock outstanding immediately prior to such proposed repurchase.

**APP. EX. "A"**

 

FILM & FILE: BK# _52YY_


PLAINTIFF'S
EXHIBIT
20
SB 4/23/03

## CONDITIONAL CONSENT TO ASSIGNMENT OF FRANCHISE AGREEMENTS AND LEASES

AGREEMENT made this 12th day of January, 2000 by and between BURGER KING CORPORATION ("BKC"), the individual, individuals, entity, and/or entities whose names and addresses are set forth on Schedule 1 (individually, the "Assignor" and collectively, the "Assignors"), the individual, individuals, entity, and/or entities whose names and addresses are set forth on Schedule 2 (individually, a "Guarantor" and collectively, the "Guarantors"), the individual, individuals, entity, and/or entities whose names and addresses are set forth on Schedule 3 (individually, an "Assignee" and collectively, the "Assignees"), and the individual, individuals, entity, and/or entities, if any, whose names and addresses are set forth on Schedule 4 (individually, an "Owner" and collectively, the "Owners").

### INTRODUCTION

A.      Each Guarantor owns an equity interest in Assignors.

B.      Each Assignor is a party to certain franchise agreements (the "Franchise Agreements") with BKC relating to the operation of Burger King restaurants (the "Restaurants"). A list of the Franchise Agreements and Restaurants is set forth on Schedule 5.

C.      Each Assignor may also be a party to certain lease agreements (the "Leases") with BKC whereby Assignors lease the premises upon which certain of the Restaurants are located. A list of the Leases, if any, is set forth on Schedule 5.

D.      Guarantors have jointly and severally guaranteed all of the obligations of Assignors to BKC.

E.      Each Owner owns an equity interest in Assignees.

F.      Assignors and Guarantors have requested that BKC consent to an assignment of the Franchise Agreements and Leases to Assignees.

### COVENANTS AND AGREEMENTS

In consideration of the foregoing, the parties agree as follows:

1.      Assignment and Assumption. Each Assignor assigns all of its right, title and interest in the Franchise Agreements, Leases and, if applicable, any Investment Spending Contracts relating to the Restaurants to Assignees, and Assignees assume all of Assignors' duties and obligations under those agreements. BKC consents to this assignment and assumption on the terms and conditions set forth in this Agreement.

2.      General Release of BKC. Each of the Owners, Guarantors, Assignors and Assignees jointly and for themselves, their successors, assigns, heirs, personal representatives and affiliates (collectively, the "Releasing Parties") unconditionally and absolutely releases and forever discharges BKC, its successors, predecessors, counsel, insurers, assigns, officers, directors, employees, parent company, affiliates, subsidiaries and agents, past or present (collectively, the "Released Parties") from and against any and all claims, actions, causes of action, demands,

APP. EX. "B"

damages, costs, suits, debts, covenants, controversies, and any other liabilities, whether known or unknown, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable, which the Releasing Parties may have that relate to or arise out of this Agreement, the Franchise Agreements, Leases, the operation of the Restaurants, or any other matter, cause or circumstance whatsoever from the beginning of the world through the date of this Agreement, including without limitation any claim that BKC has made representations regarding any right to exclusive territory or trading areas, the economic viability or profitability of the Restaurants or current or potential sales at the Restaurants.

3.    <u>Unlimited Guaranty by Owners</u>.   Each Owner agrees to jointly, severally, irrevocably and unconditionally guarantee the payment and performance of all debts, obligations and liabilities of the Assignees to BKC arising pursuant to the Franchise Agreements, Leases, Investment Spending Contracts or any other agreement with BKC relating directly or indirectly to the Restaurants, Investment Spending Contracts (the "BKC Agreements"), together with all costs of collection, compromise or enforcement, including reasonable attorneys' fees, incurred with respect to any such debts, obligations or liabilities or with respect to this or any other guaranty thereof or any proceeding under the United States Bankruptcy Code or any other proceeding or action affecting the rights of the Assignee's creditors generally (all of the foregoing being referred to collectively as the "Obligations").   This guaranty by the Owners shall continue in full force and effect until Assignees have fully paid and performed all of the Obligations.

4.    <u>Partial Release of Assignors and Guarantors</u>.   Nothing contained in this Agreement shall (a) release Assignors from continued liability under the Leases or (b) release any Assignor or any Guarantor from its liability for damages for any breach of the Franchise Agreements or Leases prior to the date of this Agreement.   Except as provided below, Assignors and Guarantors are released from all other liability to BKC under the Franchise Agreements, unless an Assignor shall remain a franchisee under the Franchise Agreements, in which case such Assignor shall also be liable to BKC for any breach of the Franchise Agreements after the date of this Agreement.

5.    <u>Limited Guaranty of Assignors and Guarantors</u>.   Each Guarantor and Assignor agrees to jointly, severally, irrevocably and unconditionally guaranty the payment and performance of the Obligations by Assignees.   Provided, however, that the guaranty by each Guarantor and Assignor of the obligations of Assignees under the Franchise Agreements only, and not their guaranty of the Obligations of Assignees under the Leases or any of the other BKC Agreements, shall terminate upon the later of (a)  one year from the date of this Agreement or (b)  the date of payment of the final installment of any purchase money debt owed by Assignees to Assignors, if, and only if, Assignees pay when due all financial obligations to BKC under the BKC Agreements between the date of this Agreement and such termination date, unless an Assignor or Guarantor is also an Owner, in which case this Paragraph shall be inapplicable and Paragraph 3 of this Agreement shall control.

6.    <u>General Terms and Conditions of Guaranties</u>.   In connection with the guaranties set forth above in Paragraphs 3 and 5 (collectively the "Guaranties"), the Owners, the Guarantors, and the Assignors hereby agree as follows:

          (a)   The Guaranties shall not be impaired by any modification, supplement, renewal, extension or amendment of the BKC Agreements or any of the Obligations, nor by any modification, release or other alteration of any of the Obligations hereby guaranteed, nor by any agreements or arrangements whatever with Assignees or any one else, nor by BKC's and any Assignee's execution of new franchise agreements which shall supersede and replace any and all of the Franchise Agreements;

          (b)   The liability of each guarantor hereunder is primary, direct and unconditional and may be enforced without requiring BKC first to resort to any other right, remedy or security;

MICROFILMED
APR 3 0 2001

APP. EX. "B"



(c)     No guarantor hereunder shall have any right of subrogation, reimbursement or indemnity whatsoever, unless and until the Obligations are paid or performed in full;

(d)     If any guarantor hereunder should at any time die, become incapacitated, become insolvent or make a composition, trust mortgage or general assignment for the benefit of creditors, or if a proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally shall be filed or commenced by, against or in respect of any guarantor hereunder, any and all obligation of that guarantor shall, at BKC's option, immediately become due and payable without notice;

(e)     If any payment or transfer to BKC which has been credited against any Obligation, is voided or rescinded or required to be returned by BKC, whether or not in connection with any event or proceeding described in Section 6(d), the Guaranties shall continue in effect or be reinstated as though such payment, transfer or recovery had not been made;

(f)     Except as otherwise provided in this Agreement, each of the Guaranties shall be construed as an absolute, unconditional, continuing and unlimited obligation of the each guarantor hereunder without regard to the regularity, validity or enforceability of any of the Obligations, and without regard to whether any Obligation is limited, modified, voided, released or discharged in any proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally;

(g)     Any termination of the Guaranties shall be applicable only to Obligations accruing after termination or having their inception after the effective date of such termination and shall not affect Obligations having their inception prior to such date;

(h)     The death or incapacity of any guarantor hereunder shall not result in the termination of the Guaranties;

(i)     Any and all present and future debts and obligations of the Assignee to any guarantor hereunder are hereby waived and postponed in favor of and subordinated to the full payment and performance of the Obligations;

(j)     Each guarantor hereunder waives to the greatest extent permitted by law:  notice of acceptance hereof; presentment and protest of any instrument, and notice thereof; notice of default or intent to accelerate; notice of foreclosure; notice of any modification, release or other alteration of any of the Obligations or of any security therefor and all other notices to which any guarantor hereunder might otherwise be entitled; and

(k)     Each guarantor hereunder waives to the greatest extent permitted by law:  any defense arising by virtue of the lack of authority, death or disability of such guarantor or any Assignee; or any defense based upon an election of remedies by BKC which destroys or otherwise impairs the subrogation rights of such guarantor or the right of such guarantor to proceed against the Assignees for reimbursement, or both.

Operating Partner.  The person set forth on Schedule 6 hereto is designated as the Assignees' "Operating Partner" under each of the Franchise Agreements.

No Default.  Each Assignor represents and warrants that the Assignor is not in default under the Franchise Agreements, Leases, or any of the BKC Agreements.

9.     Compliance with Guidelines.  Assignors, Assignees, Guarantors and Owners each represent and warrant that they have complied with the Guidelines for Preparation of Corporate Governing

MICROFILMED APR 3 0 2001

APP. EX. "B"

 

Instruments or Guidelines for Approval of Franchisee Ownership Distribution Plans, if applicable.

10.  <u>Equity Ownership and Transfer Restrictions</u>.

(a)  Assignees and Owners each hereby represent and warrant that the equity ownership of the Assignees is as set forth on <u>Schedule 7</u> and that they shall each comply with all of the provisions of the Franchise Agreements regarding restrictions on the transfer, pledge and encumbrance of equity interests in Assignees.

(b)  Any breach of the provisions of this Paragraph 10 shall constitute a material default under each of the BKC Agreements.

11.  <u>Proprietary Information, Etc</u>.  Assignees, Assignors, Owners, and Guarantors each represent and warrant that they shall comply and continue to comply with all of the provisions of the Franchise Agreements regarding the confidentiality of all proprietary property and information the restriction on the use of such information, and the limitation on competition with BKC. Any breach by any party of its obligations under this Paragraph 11 shall also constitute a material default under each of the BKC Agreements.

12.  <u>Accounts Receivable/Transfer Fee</u>.  Assignees, Assignors, Guarantors, and Owners each acknowledge and agree that the transfer fee and any New Franchisee Training Fee set forth in the Franchise Agreements and all currently due or past due charges payable to BKC must be paid in full upon execution of this Agreement, and that:

(a)  There are certain charges, including royalties, advertising contributions, rent, real estate taxes, investment spending and other charges under the Franchise Agreements and Leases which have accrued, been assessed or otherwise become liabilities under the BKC Agreements, but are not yet due;

(b)  Each Assignee, Assignor, Guarantor, and Owner is jointly and severally liable for such charges;

(c)  BKC currently expects that Assignee shall pay such charges when due;

(d)  Any proration, escrow or prepayment of such charges is the Assignees' sole responsibility;

(e)  The failure to so prorate, escrow or prepay shall not excuse Assignees from paying such charges when due; and

(f)  BKC has made no representation or warranty that such charges do not exist or exist in a specific amount.

13.  <u>Franchise Application</u>.  Assignees and Owners each represent and warrant that the representations set forth in their applications to BKC for approval as a BKC franchisee and for approval of the transaction referenced in Paragraph F above are true and correct as of the date hereof.

MICROFILMED
APR 30 2001

14.  <u>Miscellaneous</u>.

(a)  <u>Choice of Law; Jurisdiction and Venue</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.  The parties hereto acknowledge and agree that the United States District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Court (or its successor) in and for Dade County,

ddm 1/12/00 Assignment from Hashim to Op Corp - Restaurant Corp. of America   A:\FRAN63.SAM LGK:sga  2/09/95 - Rev. 12/27/96

4

APP. EX. "B"

 

Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising, either directly or indirectly, under or in connection with this Agreement, the Franchise Agreements, Leases, related documentation, or any other agreement with BKC, and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement, related documentation or any other agreement between BKC and Assignor, Assignee, Owners, and/or Guarantors in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

(b)     <u>Amendment</u>. This Agreement and the other documents being executed and delivered pursuant hereto constitute the full and entire agreement and understanding between the parties hereto with respect to the subject matter hereof. No amendment hereto shall be effective unless it is in writing and signed by all of the parties hereto.

(c)     <u>Binding Effect</u>. Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, successors, assigns, executors, personal representatives and administrators.

(d)     <u>Headings</u>. The headings of the provisions of this Agreement are for convenience or reference only and are not to be considered in construing this Agreement.

(e)     <u>Severability</u>. If one or more of the provisions contained in this Agreement or in any document contemplated hereby, or any application thereof, shall be invalid, illegal or unenforceable, in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein and therein, and any application thereof, shall not in any way be affected or impaired thereby or under the laws of any other jurisdiction.

(f)     <u>Integration</u>. This Agreement incorporates all prior discussions and negotiations among the parties hereto and constitutes the entire agreement among the parties hereto with respect to the  subject matter of this Agreement. There are no other agreements of any kind whether oral or in writing between BKC and any other party, with respect to the matters covered herein.

(g)     <u>Assignability</u>. The parties each agree that the rights and obligations of BKC under this Agreement and any related agreement shall be freely assignable by BKC without the consent of any other party. The other parties may not assign their rights or obligations under said agreements.


THIS SPACE LEFT INTENTIONALLY BLANK.


**MICROFILMED**

APR 3 0 2001

# APP. EX. "B"

ddm 1/12/00  Assignment from Hashim to Op Corp - Restaurant Corp. of America   A:\FRAN63.SAM LGK:sga  2/09/95 - Rev. 12/27/96

5

 

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as a document under seal dated as of the day and year first written above.

BURGER KING CORPORATION

By: _~Maughew Harders~_
Franchising Systems Supervisor

Attest: _~Carie M Coto~_
Franchise Associate

OWNERS:

_~Mumtaz H Shim~_
Mumtaz Hashim

GUARANTORS:

None

ASSIGNEES:

Restaurant Corp. of America,
a California corporation

By: _~Mumtaz H Shim~_
Mumtaz Hashim, President

Attest: _~Espino~_
Print Name: _Carmen Espinoza_
Title: _Secretary_

ASSIGNORS:

_~Mumtaz H Shim~_
Mumtaz Hashim

MICROFILMED
APR 3 0 2001

# APP. EX. "B"



<u>Assignors</u>

Mumtaz Hashim

<u>SCHEDULE 1</u>
<u>TO CONSENT TO ASSIGNMENT</u>

<u>Address</u>

19098 Brasilia Drive
Northridge, CA  91326

# APP. EX. "B"

**MICROFILMED**

APR 3 0 2001



## SCHEDULE 2
## TO CONSENT TO ASSIGNMENT

Guarantors                                    Address

None

MICROFILMED

APR 3 0 2001

# APP. EX. "B"

 

## SCHEDULE 3
## TO CONSENT TO ASSIGNMENT

<u>Assignees</u>

Restaurant Corp. of America

<u>Address</u>

19098 Brasilia Drive
Northridge, CA  91326

**MICROFILMED**
APR 3 0 2001

# APP. EX. "B"




### SCHEDULE 4
### TO CONSENT TO ASSIGNMENT

Owners                                   Address

Mumtaz Hashim                            19098 Brasilia Drive
                                         Northridge, CA  91326

MICROFILMED

APR 3 0 2001

# APP. EX. "B"



## SCHEDULE 5
## TO CONSENT TO ASSIGNMENT

| BK # | Address | Date of Franchise Agreement | Date of Amendments If Any | Date of Lease If Any | Date of Amendments If Any |
|------|---------|------------------------------|----------------------------|-----------------------|----------------------------|
| 3744 | 14305 Lakewood Blvd. Downey, CA 90242 | 9/27/1993 | n/a | 9/27/1993 | n/a |
| 4577 | 5401 E. Washington Blvd. Commerce, CA 90040 | 6/12/1985 | n/a | n/a | n/a |
| 5244 | 8063 Alondra Blvd. Paramount, CA 90723 | 12/29/1986 | n/a | n/a | n/a |
| 7320 | 290 Fox Hill Mall Culver City, CA 90230 | 12/12/1994 | n/a | n/a | n/a |
| 10463 | 6820 Reseda Blvd. Reseda, CA 91335 | 4/7/1997 | n/a | n/a | n/a |

MICROFILMED

APR 3 0 2001

# APP. EX. "B"

**SCHEDULE 6**
**TO CONSENT ASSIGNMENT**

Operating Partner:                    Mumtaz Hashim

MICROFILMED

APR 3 0 2001

# APP. EX. "B"




## SCHEDULE 7
## TO CONSENT TO ASSIGNMENT

Equity Ownership in Assignee

| Owner | Type of Equity Interest | Percentage Ownership |
|---|---|---|
| Mumtaz Hashim | Common Voting Stock | 100% |

**MICROFILMED**

APR 3 0 2001

# APP. EX. "B"

ddm 1/12/00  Assignment from Hashim to Op Corp - Restaurant Corp. of America   A:\FRAN63.SAM LGK:sga  2/09/95 - Rev. 12/27/96

13

**SCHEDULE 8**
**TO CONSENT TO ASSIGNMENT**

Scopes of Work

n/a

MICROFILMED

APR 3 0 2001

APP. EX. "B"

2000 WL 1868386
(Cite as: 2000 WL 1868386 (E.D.Pa.))
< KeyCite History >

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

DUNKIN' DONUTS, INC., and S Third Dunkin' Donuts Realty, Inc.,
v.
Guang Chyi LIU, Susan Yeh Liu and G.C.S.L. Co., Inc.

Nos. CIV.A. 99-3344, CIV.A. 00-3666.

Dec. 21, 2000.

*MEMORANDUM AND ORDER*

KELLY.

*1 Presently before the Court is a Motion for Preliminary Injunction filed by the Plaintiffs, Dunkin' Donuts, Inc. ("Dunkin' ") and Third Dunkin' Donuts Realty, Inc. ("Dunkin' Realty"). Plaintiffs filed suit against the Defendants, Guang Chyi Liu, Susan Yeh Liu and G.C.S.L. Co., Inc. ("Defendants") alleging breach of contract, trademark infringement and unfair competition. After conducting evidentiary hearings, Magistrate Judge Thomas J. Rueter issued a Report and Recommendation that the Court issue a temporary injunction against Defendants. Defendants filed objections to that Report and Recommendation. For the following reasons, the Court will adopt and approve the Report and Recommendation of Magistrate Judge Rueter and grant Plaintiffs' Motion for a Preliminary Injunction.

## I. BACKGROUND
### A. *Dunkin's Franchise System*

Dunkin', a Delaware corporation with its principal place of business in Massachusetts, grants franchises to independent franchisees who operate Dunkin' Donuts shops throughout the United States and around the world. Dunkin' Realty is a wholly-owned subsidiary of Dunkin' that leases properties to Dunkin's franchisees. Franchisees, of whom there are

3,700 nationally and 4,700 globally, primarily sell doughnuts, pastries, coffee and related products. Franchisees are licensed to utilize trade names, service marks and trademarks of Dunkin' in the operation of these shops. [FN1] Franchisees also use specialty equipment, distinctive interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks and information. The general public knows and recognizes Dunkin' Donuts marks, and associates them exclusively with Dunkin's products and services.

> FN1. Dunkin' Donuts USA, Inc., a wholly-owned subsidiary of Dunkin', owns the trademark, servicemarks, and trade name "Dunkin' Donuts" and related marks. Dunkin' has the exclusive license to use these trade names and marks, and to license others to use them as well. Dunkin' has spent hundreds of millions of dollars to advertise and promote its marks.

### B. *Defendants' Franchise Agreement with Dunkin'*

On March 31, 1995, Defendants obtained a Dunkin' franchise in Philadelphia, Pennsylvania. [FN2] As franchisees, Defendants were granted a license to use the Dunkin' trademark. In return, Defendants were obligated to pay certain fees to Dunkin'. Pursuant to their Franchise Agreement, Defendants were required to pay: (1) weekly franchise fees of 4.9 percent of their gross sales; (2) weekly advertising fees of 5.0 percent of their gross sales; and (3) interest on unpaid fees. Failure to make these payments in a timely manner would constitute a default under the Franchise Agreement. In the case of such a default, Dunkin' was required to give Defendants written notice and a seven day "cure period" within which to cure the default. Failure by Defendants to cure the default before the expiration of the cure period would allow Dunkin', upon written notice, to terminate the Franchise Agreement.

> FN2. The original Franchise Agreement was dated November 27, 1990. Defendants acquired a franchise through an Agreement to Transfer.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**APP. EX. "C"**



Case 1:02-cv-23309-FAM   Document 53   Entered on FLSD Docket 06/03/2003   Page 80 of 164

The Franchise Agreement also contained many provisions relating to the continued use of trademarks after its termination. Specifically, the Franchise Agreement provided that: (1) "Upon any termination or expiration of this Agreement ... Franchisee shall immediately cease to use ... any methods associated with the name "Dunkin' Donuts," any or all of the Proprietary Marks [of Dunkin' Donuts]."); (2) "[A]ny unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm subject to injunctive relief"; and (3) "Continued use by Franchisee of Dunkin' Donuts' trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by Franchisee."

### C. Defendants' Lease

**\*2** On March 31, 1995, Defendants also obtained a lease to the property on which their franchise was located. [FN3] Dunkin' Realty acted as the landlord. Pursuant to the Lease, as amended, Defendants agreed to pay the following amounts to Dunkin' Realty: (1) monthly rent of $7,812.50; annual "percentage rent" in the amount by which twelve percent of the gross annual sales of their shop exceeded a specified annual base rent; [FN4] and (3) all real estate and other taxes relating to the premises, to be paid in monthly installments of 1/12 of the estimated annual real estate tax. If Defendants failed to make a timely payment, Dunkin' Realty could provide them with a written Notice to Cure. Failure to cure the default within ten days of such notice would entitle Dunkin' Realty to terminate the Lease. Dunkin' Realty could also terminate the Lease if the Franchise Agreement were terminated.

FN3. The original lease was entered into on March 6, 1986. Defendants assumed the right, title and interest in that original lease pursuant to their Agreement to Transfer.

FN4. Any outstanding amount of percentage rent was to be paid within fifty days of the end of the lease year.

### D. The Alleged Breach of the Lease and Franchise Agreement

As of June 21, 2000, Defendants owed Dunkin' and Dunkin' Realty total of $43,161.99. Of this total, $13,654.07 was for a year-end percentage rent charge under the Lease. [FN5] On June 22, 2000, Dunkin' promptly served Defendants with a Notice of Default and Notice of Cure letter.

FN5. Despite paying this amount in years past, and receiving an invoice in April, 2000 that explained the calculation of this charge, the Defendants claim that they were confused as to the source of this fee. Defendants also claimed to have serious difficulty speaking English or understanding simple business transactions. At a September 18, 2000 hearing, however, it was revealed that Ms. Liu had been employed as a full time nurse for fourteen years, was certified in oncology, and did not need an interpreter while at work. Moreover, Mr. Liu was a doctoral candidate at the University of Pennsylvania prior to their purchase of the Dunkin' Donuts franchise.

Defendants did not cure these defaults. [FN6] Defendants claimed to have sent checks to Dunkin' in May, 2000. Pursuant to Dunkin's standard business practice, Defendants would always send their checks to a lockbox in North Carolina, from which the checks would be deposited in a bank within twenty-four hours of their receipt. Dunkin's bank did not receive the checks, dated May, 2000, until late in July. Defendants later admitted that they backdated the checks as part of a record keeping procedure. By July 12, 2000, Dunkin' served Defendants with a Notice of Termination of their Franchise Agreement with Dunkin' and their Lease with Dunkin' Realty.

FN6. In fact, by July 10, 2000, Defendants' deficiencies had grown to $46,257.50.

Defendants refused to accept the termination of the Franchise Agreement and Lease, and continue to hold themselves out to the public as Dunkin' franchisees. Dunkin' filed suit in this Court, alleging breach of contract, trademark infringement and unfair competition. On July 20, 2000, Dunkin' filed a

**APP. EX. "C"**



2000 WL 1868386                                                        **Page   3**
(Cite as: 2000 WL 1868386, *2 (E.D.Pa.))

Motion for Preliminary Injunction that sought to enjoin Defendants from further use of the Dunkin' Donuts trademarks and trade names and require them to vacate their franchise property. After conducting hearings on the matter, the Honorable Magistrate Judge Thomas J. Rueter issued a Report and Recommendation on November 20, 2000, to which Defendants objected on December 11, 2000.

## II. *STANDARD OF REVIEW*

Federal Rule of Civil Procedure 72 governs objections to magistrate judges' orders, both dispositive and non-dispositive. In reviewing a magistrate judge's recommendation concerning a motion for preliminary injunction, a district court must "make a de novo determination upon the record ... of any portion of the magistrate judge's disposition to which specific written objection has been in accordance with this rule." Fed.R.Civ.P. 72(b); *see also* 28 U.S.C. 636(b)(1)(C). [FN7]

> FN7. Rule 72(b) requires that a party file its objections with the Court ten days after being served with a copy of the magistrate judge's recommended disposition. Fed.R.Civ.P. 72(b). In computing these ten days, an additional three days are provided if service was made by mail. Fed.R.Civ.P. 6(e). Furthermore, Saturdays, Sundays and legal holidays should be excluded from the computation because the original time for service was less than eleven days. Fed.R.Civ.P. 6(a). Under this standard, Defendants should have served the Court with their objections by December 8. Defendants filed their objections, however, on December 11. The Court will nevertheless overlook this error as it appears that their mistake was caused by their belief that the day following Thanksgiving should be excluded from the calculation as well. Fed.R.Civ.P. 6(b).

## III. *DISCUSSION*
### A. *Objections to The Magistrate's Findings of Fact*

**\*3** Although Defendants make several objections to the Magistrate's Findings of Fact, none of them actually objects to an actual finding of fact or inference drawn therefrom. Instead, Defendants object to the effect of the legal principles applied by

Magistrate Judge Rueter. For example, Defendants object to the finding that the Franchise Agreement contains agreements concerning the continued use of Dunkin's proprietary marks after the termination of the agreement. While it is clear that the Franchise Agreement contains these agreements, Defendants object because they did not understand the language of the contracts and Dunkin' did not explain them to Defendants. Defendants similarly object to the finding that they defaulted on their payments. Defendants concede that the breach occurred, but suggest that the breach be excused because, in their opinion, Dunkin' breached an implied duty of cooperation to them. The merits of these objection aside, they are not objections to findings of fact. Because these objections are more properly characterized as objections to conclusions of law, the Court will adopt the Magistrate's findings of fact and discuss Defendants' objections in its discussion of the merits of Dunkin's motion.

### B. *Objections to the Magistrate's Conclusions of Law*

In order to obtain a preliminary injunction, a plaintiff must prove that: (1) there exists a reasonable probability of eventual success on the merits; and (2) irreparable injury pending litigation will result if relief is not granted. *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir.1994). The Court should also take into account, when relevant: (3) whether there exists a possibility of harm to other interested persons from either the grant or denial of the injunction; and(4) the public interest in general. *Id.*

#### 1. *Likelihood of Success on the Merits*

Dunkin' has established a likelihood of success on its breach of contract, trademark infringement and unfair competition claims. With regard to its trademark infringement claims, Dunkin' must prove that: (1) the marks are valid and legally protectable; (2) it owns the marks; and (3) the defendant's use of the marks is likely to create confusion concerning the origin of the goods or services. *Optician's Ass'n of America v. Independent*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**APP. EX. "C"**



2000 WL 1868386
(Cite as: 2000 WL 1868386, *3 (E.D.Pa.))

Page 4

*Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990). Defendants do not dispute that Dunkin' has standing to assert a claim for trademark infringement or that its marks are valid and legally protectable. [FN8] Moreover, Defendants' continued use of Dunkin's trademarks after Dunkin' terminated the Franchise Agreement will clearly lead to confusion among the shop's customers that its proprietors are still affiliated with Dunkin'. *S & R Corp.,* 968 F.2d at 375.

> FN8. Dunkin' has standing to assert a trademark infringement case because it holds the exclusive license to the marks held by Dunkin' Donuts USA, Inc., its wholly-owned subsidiary.

Dunkin' has also established a likelihood of success on the merits of its claim for breach of contract. The Franchise Agreement between Dunkin' and the Defendants provides that, upon Defendants' failure to pay their financial obligations, Dunkin' could provide them with written notice that they should cure the problem. If the Defendants failed to cure the problem within the applicable period, Dunkin' could consider the Franchise Agreement breached and, upon written notice, terminate it. Defendants failed to make timely payments, Dunkin' gave them an opportunity to cure that default and Dunkin' appropriately terminated the Franchise Agreement.

Defendants posit two reasons why their late payments do not constitute a breach of the Franchise Agreement. First, they assert that Dunkin's acceptance of late payments in the past constitutes a waiver of the provision in the Franchise Agreement that requires timely payment. This argument lacks merit because the Franchise Agreement itself expressly states that Dunkin's acceptance of late payments does not constitute a waiver of Dunkin's rights under the agreement. Defendants contend, however, that the anti-waiver clause is unconscionable in its application to them because they have difficulty speaking English and Dunkin' did not explain the clause to them. Defendants fail to provide the Court with any case law that supports their position. Moreover, the Magistrate Judge had ample opportunity to

observe the Defendants during their testimony. Given his finding that Defendants' claims of difficulty with the language and lack of business savvy were "less than credible," Defendants' argument that the anti-waiver clause is unconscionable as applied to them is unpersuasive.

*4 Second, Defendants assert that their failure to pay was caused by Dunkin's intentional breach of their implied duty of cooperation under the Franchise Agreement. Assuming without deciding that such a duty exists and Dunkin' breached that duty, such a breach by Dunkin' would neither relieve Defendants of their duty to meet their financial obligations nor prevent Dunkin' from terminating the Franchise Agreement. Because a franchisor's right to terminate a franchisee "exists independently of any claims the franchisee might have against the franchisor," *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 375 (3d Cir.1992), Defendants can assert their own claim against Dunkin' but cannot rely on Dunkin's wrongdoing to avoid the consequences of their own non-performance. [FN9]

> FN9. Defendants contend that *S & R Corp.* does not apply in this case because Dunkin's conduct, irrespective of whether that conduct is a breach of the Franchise Agreement, prevented Defendants from performing their financial obligations. Specifically, Defendants claim that Dunkin' instituted the present action in bad faith, in an intentional attempt to divert Defendants' resources to litigation rather than meeting their financial obligations. The Court disagrees. Defendants cite no controlling case law in support of their argument. Moreover, given that the Court finds Dunkin' has a likelihood of success on the merits of its claims, an argument that Dunkin' instituted its action in bad faith is less than persuasive.

### 2. *Irreparable Injury*

Injunctive relief of any kind is an extraordinary remedy that courts should only grant in limited circumstances. *Instant Air Freight v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989). To obtain injunctive relief, a plaintiff must demonstrate potential harm

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

APP. EX. "C"



2000 WL 1868386
(Cite as: 2000 WL 1868386, *4 (E.D.Pa.))

**Page    5**

that a legal or equitable remedy following trial would not adequately remedy. *Id.* at 801. Pecuniary losses, without more, are not irreparable. *Acierno,* 40 F.3d at 653. Although the instant case does involve pecuniary loss, Dunkin' has also established other injuries that would be irreparable. For example, because Defendants continue to use Dunkin's marks after Dunkin' terminated the Franchise Agreement, Dunkin' will lose control of its reputation, trade and goodwill among its customers. *See, e.g., S & R Corp.,* 968 F.2d at 377. These damages are sufficiently irreparable even in the absence of potential health, safety or sanitation concerns raised by Defendants' continued operation using Dunkin's marks. Moreover, the Franchise Agreement itself states that use of Dunkin's marks in such a manner would constitute irreparable injury.

### 3. *Balancing of Harms and the Public Interest*

*5 No other considerations weigh against the issuance of a preliminary injunction in this case. While it is true that Defendants will be harmed if their franchise is terminated, this harm is merely pecuniary, and thus remediable by money damages. *See, e.g., S & R Corp.,* 986 F.2d at 379; *Central Jersey Freightliner, Inc. v. Freightliner Corp.,* 987 F.Supp. 289, 296 (D.N.J.1997). [FN10] These damages do not outweigh the irreparable damages that Dunkin' will suffer if the Court does not issue a temporary injunction. Moreover, any damage to Defendants would stem directly from Defendants' own failure to pay their financial obligations to Dunkin'. *S & R Corp.,* 986 F.2d at 379. Furthermore, issuing an injunction in this case would further the public's interest in avoiding the confusion caused by a former licensee's use of a license without the licensor's permission. *Id.; Opticians Ass'n of America,* 920 F.2d at 197. Accordingly, Dunkin' has established a likelihood of success on the merits and the threat of irreparable injuries, which justifies issuing a preliminary injunction in its favor.

FN10. Defendants cite *LaGuardia Assocs. v. Holiday Hospitality Franschising, Inc.,* 92 F.Supp.2d 119, 131 (E.D.N.Y.2000) for the proposition that the

termination of a franchise can constitute irreparable harm to the franchisee. To the extent that this case is controlling, the Court finds it distinguishable on its facts. For example, the franchisee in *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970), on which *LaGuardia* relies, had been operating his franchise for over twenty years. The Defendants have only had their franchise for five years. *See, e.g., Truglia v. KFC Corp.,* 692 F.Supp. 271, 279 (S.D.N.Y.1988) (holding that life span of eight-month franchise was not enough to give rise to irreparable injury upon its termination).

### *ORDER*

AND NOW, this day of December, 2000, in consideration of the Motion for Preliminary Injunction filed by the Plaintiffs, Dunkin' Donuts, Inc. and Third Dunkin' Donuts Realty, Inc. (Doc. No. 2), the Report and Recommendation of United States Magistrate Judge Thomas J. Rueter, and the Objections to Magistrate Rueter's Report and Recommendation for Preliminary Injunction filed by the Defendants, Guang Chyi Liu, Susan Yeh Liu and G.C.S.L. Co., Inc. (Doc. No. 24), it is ORDERED that:

1. The Report and Recommendation is APPROVED and ADOPTED.

2. Plaintiffs' Motion for Preliminary Injunction is GRANTED.

3. Defendants shall cease all use of Dunkin' Donuts proprietary marks and information and any methods associated with the name "Dunkin' Donuts" no later than twenty (20) days from the date of this Order.

4. Defendants shall deliver possession of the premises 5100 City Line Avenue, Philadelphia, Pennsylvania 19145, to an authorized representative of Plaintiff Third Dunkin' Donuts Realty, Inc., no later than thirty (30) days from the date of this Order.

2000655276

2000 WL 1868386, 2000 WL 1868386 (E.D.Pa.)

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



**APP. EX. "C"**



2000 WL 1868386                                                    **Page   6**
(Cite as: 2000 WL 1868386, *5 (E.D.Pa.))

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



**APP. EX. "C"**





## ASSIGNMENT AND ASSUMPTION OF
## RESTAURANT FRANCHISE AGREEMENT
## AND CONSENT TO ASSIGNMENT

THIS AGREEMENT is made as of this ___ day of _____, 1993, by and between **EDDIE YUAN**, individually ("ASSIGNOR"), **MUMTAZ HASHIM**, individually ("ASSIGNEE") and **BURGER KING CORPORATION**, a Florida corporation ("BKC").

## INTRODUCTION

A.   ASSIGNOR is the present Franchisee of the Burger King Restaurant business ("BK #5244") located at 8063 Alondra, Paramount, California 90723, pursuant to a Burger King Restaurant Franchise Agreement by and between BKC, as Franchisor, and ASSIGNOR, as Franchisee, dated December 29, 1986 ("Franchise Agreement").

B.   ASSIGNOR and ASSIGNEE have requested that BKC (i) approve ASSIGNEE as franchisee of BK #5244, and (ii) consent to the assignment by ASSIGNOR of the Franchise Agreement to ASSIGNEE.

C.   BKC and ASSIGNOR desire to release each other of and from all obligations, claims and causes of action that have or could have existed between them, arising in any and all manners from the Franchise Agreement or the operation of the Restaurant, subject to the terms and conditions hereinafter set forth.

## COVENANTS:

As an inducement to BKC for, and in consideration of BKC consenting to this assignment, and for other good and valuable consideration, which each of the parties acknowledges has been received and is sufficient to create a binding contract, the parties agree as follows:

/lvz
#5244
FTF/IATI/DTL
04/20/93

1

PLAINTIFF'S
EXHIBIT
15
SD   4/29/03

FILMED

APP. EX. "D"



1.    ASSIGNOR hereby assigns to ASSIGNEE all right, title and interest in and to the Franchise Agreement, and ASSIGNEE hereby accepts the assignment of the Franchise Agreement and agrees to be bound by all of the terms, obligations and restrictions applicable to the franchisee under the Franchise Agreement, and further acknowledges receipt of an executed copy of the Franchise Agreement.

2.    BKC and ASSIGNOR hereby mutually release each other, their respective predecessors, successors, assigns, subsidiaries, parent corporations, affiliates, representatives, agents, officers and directors, their heirs, personal representatives, and employees, of and from any and all claims whatsoever, in law or in equity, which they have or may have by reason of any matter, cause, or thing whatsoever arising out of or in connection with the Franchise Agreement, relationships or a course of dealings between BKC and ASSIGNOR as vendor and vendee of any goods, the operation of the Restaurant, or for any other cause or circumstance which existed prior to the date of this Agreement, except (i) monies due and owing to BKC, (ii) those obligations of the Franchise Agreement which are continuing obligations of ASSIGNOR, and (iii) those obligations retained by ASSIGNOR under the terms of this Agreement.

3.    ASSIGNOR and ASSIGNEE, jointly and severally, understand and agree, that not withstanding this Assignment, (i) ASSIGNOR shall remain personally liable for, unconditionally obligated to and bound by each and every term, obligation and restriction applicable to the franchisee under the Franchise Agreement, whether for monies or duties, and for any other obligation of ASSIGNOR to BKC, (ii) BKC shall not be obligated to proceed against ASSIGNEE as a condition to bringing an action against ASSIGNOR, and (iii) ASSIGNOR and ASSIGNEE shall reimburse BKC for all costs, including attorney's fees, incurred as a result of any default by ASSIGNOR or ASSIGNEE under this Agreement, the Franchise Agreement or any other obligation to BKC.

/lvz
#5244
FTF/IATI/DTL
04/20/93

2

**APP. EX. "D"**

FILMED

 

4.     ASSIGNOR's and ASSIGNEE's liability will not be discharged except by complete performance of the terms, obligations and restrictions of this Agreement, the Franchise Agreement and any other agreement between BKC and ASSIGNOR or BKC and ASSIGNEE.

5.     ASSIGNOR agrees that his joint and several liability with ASSIGNEE will not be affected by compromises or settlement agreements between BKC and ASSIGNEE, the assignment or other transfer by the ASSIGNEE of the ASSIGNEE's rights under the Franchise Agreement or any subsequent assignment or other transfer of any of those rights, the waiver or deferral of performance by BKC with respect to any provisions of the Franchise Agreement or any other agreement between BKC and ASSIGNOR or BKC and ASSIGNEE, or by any agreement to: (i) renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to, any indebtedness, (ii) accept partial payment or performance of obligations, or (iii) take and hold security for the payment of any indebtedness, and exchange, enforce, waive and release any such security.

6.     BKC may assign this Agreement in whole or in part.   Neither ASSIGNOR nor ASSIGNEE may assign this Agreement without the prior written consent of BKC.

7.     If ASSIGNOR or ASSIGNEE consists of more than one person, the death of any individual ASSIGNOR or ASSIGNEE shall not terminate this Agreement as to that individual ASSIGNOR's or ASSIGNEE's estate.   Instead, this Agreement shall continue in full force and effect until all of the indebtedness to BKC is fully paid and all obligations are fulfilled.

8.     This Agreement shall be governed by the laws of the State of Florida and, except as otherwise provided herein, and shall be binding upon and inure to the benefit of ASSIGNOR and ASSIGNEE, their successors, heirs and assigns, and shall be binding upon and inure to the benefit of BKC and its successors and assigns upon delivery to and execution by BKC in Miami, Florida. In the event any case or controversy, in law or in equity, arises either directly or indirectly, under or in connection with the Franchise Agreement, the venue and exclusive proper forum in which to

/lvz
#5244
FTF/IATI/DTL
04/20/93                                    3

FILMED

**APP. EX. "D"**

 

adjudicate such case or controversy shall be in the United States District Court for the Southern District of Florida or, if such court lacks jurisdiction, the 11th Judicial Circuit (or its successor) in and for Dade County, Florida.

9.   BKC hereby consents to the above assignment of the Franchise Agreement to ASSIGNEE based on the foregoing terms.

The parties hereby execute this Agreement effective as of the date indicated on the first page of this Agreement.

_____          _____
Witnesses for ASSIGNOR                    Eddie Yuan

                                                              ASSIGNOR

_____          _____
Witnesses for ASSIGNEE                    Mumtaz Hashim

                                                              ASSIGNEE


**BURGER KING CORPORATION**

_____          By: _____
                                                    Vice President

_____          Attest: _____
Witnesses for BKC                                  Assistant Secretary

                                                       (Corporate Seal)
                                                            BKC


/lvz
#5244
FTF/IATI/DTL
04/20/93                              4

APP. EX. "D"                     FILMED

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### MIAMI DIVISION

BURGER KING CORPORATION,

       Plaintiff,

vs.

RESTAURANT CORPORATION OF
AMERICA, INC., a California Corporation and
MUMTAZ HASHIM a/k/a MIKE HASHIM,

       Defendants.

_____/

CASE NO.: 02-23309-CIV-MORENO
Magistrate Judge Garber

## <u>DECLARATION OF THOMAS G. ARCHER</u>

I, Thomas G. Archer, declare as follows:

1.    I am employed by Burger King Corporation ("BKC") as a Senior Attorney. The statements made in this declaration are based upon my personal knowledge and upon a review of files I maintain.

2.    As part of the course and scope of my duties, I am the in-house attorney responsible for franchises in the Western United States. As such, I have personal knowledge of whether certain individuals and/or entities are franchisees within the Burger King System, whether those franchisees have complied with their payment and other obligations to BKC, whether enforcement actions have been taken, and whether such franchisees have been terminated, renewed, or approved for expansion.

3.    Restaurant Corporation of America, Inc. (the "Company") owned and operated seven restaurants as franchised Burger King® restaurants (together, the "Restaurants") in accordance with the terms and conditions of seven separate Burger King® Restaurant Franchise Agreements

## APP. EX. "E"

(together, the "Franchise Agreements").    A copy of one of the Franchise Agreements is contained in App. Ex. "A," filed concurrently.    The Restaurant numbers, locations, and dates of the Franchise Agreements are set forth below:

| Restaurant Number | Location | Date of Franchise Agreement | Date of Lease, if any |
|---|---|---|---|
| BK #608 | 9475 East Firestone Blvd. Downey, California 90241 | Dec. 1,1988 | |
| BK #690 | 1520 West Valley Blvd. Alhambra, California 91803 | May 1, 1988 | |
| BK #3744 | 14305 Lakewood Blvd. Downey, California 90242 | Sept. 27, 1993 | Sept. 24, 1993 |
| BK #4577 | 5401 East Washington Blvd. Commerce, California 90040 | June 12, 1985 | |
| BK #5244 | 8063 Alondra Blvd. Paramount, California 90723 | December 29, 1986 | |
| BK #7320 | 290 Fox Hill Mall Culver City, California | December 12, 1994 | |
| BK #10463 | 6820 Reseda Blvd. Reseda, California 91335 | April 7, 1997 | |

4.     Franchisees may negotiate with BKC regarding the terms of the Franchise Agreements.

5.     Pursuant to written assignments, Mike Hashim ("Hashim"), the Guarantor, unconditionally and irrevocably personally guarantied to BKC the performance of each and every obligation of the Company under the Franchise Agreements and other agreements with BKC (the "Assignments"). (App. Ex. "C"; App. Ex. "B" ¶3). A copy of one of the Assignments is contained in App, Ex. "C." Mike Hashim has also been the franchisee of at least forty-two other Burger King® restaurants located throughout Texas.

6.     According to the terms of the Franchise Agreements with BKC, Defendants expressly

**APP. EX. "E"**

agreed "to pay to BKC a royalty of 3.5% of gross sales for the use of the Burger King System and the Burger King Marks" and to "pay to BKC an amount equal to 4% of [their] monthly gross sales [. . . to be . . .] used for advertising, sales promotion and public relations." (See, e.g., App. Ex. "A" ¶8). These sums were due to BKC monthly on or before the tenth day of the month. Id. The Franchise Agreements provide that the failure to timely pay any royalty or advertising and sales promotion contribution constitutes an act of material default under the Franchise Agreements. (App. Ex. "A" ¶17). All such royalty and advertising payments are required to be made to BKC in Miami, Florida or at such addresses as BKC may designate. (App. Ex. "A" ¶8E). Likewise, under the Guarantees, Hashim guaranteed to BKC the Company's payment and performance under the Franchise Agreements and all other obligations to BKC. (See App. Ex. "B" at ¶3).

7.      Each Franchise Agreement also provides that it "may only be modified or amended by a written document executed by BKC and FRANCHISEE." (App. Ex. "A" at ¶19G). They also contain non-waiver clauses which provide:

> **B.      Non-Waiver**
> The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by FRANCHISEE with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of the Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement.

(App. Ex. "A" at ¶19B). To further enforce that BKC's actions do not constitute a waiver, the Franchise Agreements also provide that

> [t]he failure of BKC to terminate this Agreement upon the occurrence of one or more events of default will not constitute a waiver or otherwise affect the right of BKC to terminate this Agreement because of a continuing or subsequent failure to cure

**APP. EX. "E"**

one or more of the aforesaid events of default or any other default.

(App. Ex. "A" at ¶17A).

8.      The document Defendants rely upon as having modified their Franchise Agreements is a memorandum to all United States franchisees from the Director of Franchise Financial Analysis, dated September 1, 1994, and titled "Worldwide Credit Policy."  This Credit Policy Memorandum does not purport to modify due dates for royalty, advertising or other payments under franchise agreements.  Rather, the Credit Policy deals exclusively with the issue of whether a franchisee who breaches a franchise agreement by failing to make payments in a timely fashion will automatically become ineligible to apply for additional franchises ("expansion") or for renewal of his/her existing franchise agreement upon its expiration ("successor").

9.      The Credit Policy was preceded and followed by other Credit Policies, all of which present the same information, contain the same cautionary language, and preclude franchisees from relying upon them as modifying the payment due dates set forth in their franchise agreements. (See 1990 & 1997 Credit Policies, Composite App. Ex. "F" hereto).

10.     Despite these clear and unequivocal obligations, Defendants failed to timely pay royalties and advertising contributions.  Defendants failed to timely pay royalty and advertising payments for August through December 2002 as well as January 2003.

11.     As a result of Defendants' failure to timely pay BKC, BKC provided Defendants with notice of their defaults and the opportunity to cure the defaults in accordance with Defendants' right to cure under the Franchise Agreements.  Pursuant to the Notice of Default issued on October 25, 2002, Defendants have been on notice from at least that date that BKC required strict compliance with the payment provisions of the Franchise Agreements.  (App. Exs. "I").

**APP. EX. "E"**

Defendants failed to pay BKC the amounts due before the expiration of the ten-day cure period. The Franchise Agreements therefore terminated effective February 25, 2001. (App. Ex. "J").

12.     When BKC issued the default notice on February 11, 2003, BKC's legal department confirmed that payments had not been received by BKC with its finance department and obtained a statement of past due accounts receivable from the finance department. At that time, Defendants were already 32 days late on their December payment, in addition to being late on their January payment (due on February 10). The default notice, as permitted by the Franchise Agreements, required full payment to be received by BKC headquarters no later than 11:59 p.m., February 24, 2003 to avoid immediate automatic termination of the Franchise Agreements, and included wiring instructions for payment. (App. Ex. "I").

13.     After Hashim received the February 11, 2003 Notice of Default, BKC and Hashim had a number of conversations regarding the Notice of Default. Specifically, on at least three separate occasions, BKC told Defendants that they would need to comply with the Notice of Default within the cure period. Defendants failed to make the February payments within the next 13 days (by February 24) as required. Defendants did not make their January payments until March 14, 18 days after the cure period had expired and the Franchise Agreements had automatically terminated, and a full 28 days after payment was due under the Franchise Agreements.

14.     In addition, Defendants failed to pay their August 2002 royalty and advertising payments until November 26, 2002 and failed to make their September 2002 payment until November 26, 2002. Moreover, despite BKC's instruction in the default notices that payment must be sent to BKC headquarters to my attention, Defendants sent their untimely payments to BKC's lock box.

15.     Defendants did not apply to the Burger King Financial Restructuring Program (the "Program"). In addition, each of the memorandum regarding the Program makes clear that

APP. EX. "E"

franchisees must continue to comply with the terms of their franchise agreements.  Defendants were not eligible to participate in the Program, as set forth in the information attached to the January 30, 2003 memorandum, because they were in litigation with BKC.  (App. Ex. "K").

16.     BKC has not accepted Defendants untimely royalty and advertising payments, which were improperly sent to the lockbox, as curing Defendants' defaults.  Indeed, Defendants were advised, as set forth in both the November 12, 2002 and March 7, 2003 Confirmations of Termination and Demands for Compliance, that if BKC received any post-termination payments from Defendants, BKC would hold such payments for application in accordance with the final disposition of BKC's damage claims arising from Defendants breach of the Agreements and any continued operation of the Restaurants in violation of BKC's rights.  (App. Ex. "M" & "J").  Further, the confirmation letters provided that Defendants should not construe BKC's receipt of said funds as a waiver of Defendants' default, BKC's termination of the Agreements, or BKC's claim for damages.  (Id.).  Defendants were on notice of this policy.  As for the purported March and April payments which were forwarded to BKC in Miami, while those checks have been received, they have not been accepted or cashed.

17.     In addition to this matter, Defendant Mike Hashim has engaged in at least two other lawsuits with BKC, which both involved his failure to make payments pursuant to the very same provisions of the Franchise Agreements as are at issue in this case.  In BKC v. H&H Restaurants, LLC et. al, Case No. 99-2855 -CIV-JORDAN (May 21, 2002), BKC obtained a Final Judgment against the defendants in that case, including Mike Hashim, in the amount of $306,504.13 for their failure to make payments pursuant to the Franchise Agreements.  Similarly,  in BKC v. H&H Restaurants, LLC et. al, Case No. 02-20907-CIV-JORDAN, BKC sued Mike Hashim, among others, for $750,219.04 again for their failure to make royalty and advertising payments

**APP. EX. "E"**

pursuant to the Franchise Agreements. That case is still pending.

18.     In an attempt to settle these cases, amongst other things, Defendants, Mike Hashim, Herbert Hakimianpour, Robert Hakimianpour and H&H Restaurants, LLC, were required to execute promissory notes in the amount of $200,000. Mike Hashim signed a promissory note in the amount of $100,000.00, which he immediately defaulted under by failing to make payments. As a result, BKC issued another notice of default to Mr. Hashim. (App. Ex. "P"). Mr. Hashim and the other H&H Defendants have yet to comply with all of the terms of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct this 2nd day of June, 2003.


_____

THOMAS G. ARCHER

**APP. EX. "E"**



# MEMO

TO:        All USA Franchisees

FROM:      Will Gooden, Director, Franchise Financial Analysis   *Will Gooden*

DATE:      September 1, 1994

RE:        **Worldwide Credit Policy**

The following represents Burger King Corporation's (BKC) revised Worldwide Credit Policy which will become effective on September 30, 1994:

I.     **Payments are due and payable according to the terms outlined in your franchise agreement, lease agreement, note and any other agreement between you and Burger King Corporation.**

II.    The fifteen (15) day grace period for royalty, advertising and percentage rent payments, will remain in effect. The intent of the grace period is to provide some flexibility in the credit approval process (for expansion and successor requests), and not to sanction late payments. Repeated late payments within the grace period may result in credit disapproval at the discretion of BKC.

III.   All franchise groups in which a franchisee has an interest must be credit approved for the individual franchisee to be credit approved within this policy.

IV.    Once a payment is made outside the terms of the new policy, the franchisee shall be credit disapproved. The credit approved status shall be reinstated after the franchisee has paid within the policy terms for six (6) consecutive months.

To simplify the implementation of the Worldwide Credit Policy, a one time amnesty for credit approval shall be in effect for all franchisees who are current as of September 30, 1994. Franchisees that are paid current as of September 30, 1994 shall be credit approved and remain credit approved as long as payments are made in accordance with this policy.

## APP. EX. "F"

All USA Franchisees
Page Two
September 1, 1994

Typically, payments are due as set forth below and on the attached schedule. You should, however, consult your own agreements for specific payment terms.

Rent is due on the 1st of each month payable in advance. Royalty, advertising and monthly percentage rent is due on the 10th of each month based upon the gross sales of the preceding month. Quarterly percentage rent is due on the 10th of the month following the end of the lease quarter based upon the gross sales for the quarter. Escrowed common area maintenance assessments and real estate taxes are due on the 1st of the month in advance. All other common area maintenance assessments and real estate taxes are due thirty (30) days from the invoice date.

Investment spending is due according to contract terms.

Promotional items and other charges are due thirty (30) days from the invoice date.

Payments on notes are due according to the contract terms which generally require payment on the 1st of the month unless the note specifies otherwise.

This policy can be revised at any time by BKC and does not serve to amend or modify any franchise, lease or other agreements to which BKC is a party.

**APP. EX. "F"**

## BURGER KING CORPORATION
## WORLDWIDE PAYMENT TERMS

| Category | Contractor Terms | Payment Criteria for Credit Approval for Expansion or Successor |
|---|---|---|
| Royalty | Due on the 10th of the following month | No later than 15th of the following month. |
| Advertising | Due on the 10th of the following month | No later than 25th of the following month. |
| Percentage Rent - Monthly | Due on the 10th of the following month | No later than 25th of the following month. |
| Percentage Rent - Quarterly | Due on the 10th of the month following the lease quarter | No later than 25th of the month following the lease quarter. |
| Base Rent | Due on the 1st day of the month in advance | Same as contractual terms |
| Equipment Rent | Due on the 1st day of the month in advance | Same as contractual terms |
| Escrowed Common Area Maintenance | Due on the 1st day of the month in advance | Same as contractual terms |
| Escrowed Real Estate Taxes | Due on the 1st day of the month in advance | Same as contractual terms |
| Real Estate Taxes | Due 30 days from invoice date | Same as contractual terms |
| Common Area Maintenance | Due 30 days from invoice date | Same as contractual terms |
| Investment Spending | Due per investment spending contract schedule | Same as contractual terms |
| Promotional Items | Due 30 days from invoice date | Same as contractual terms |
| Other charges | Due 30 days from invoice date | Same as contractual terms |
| Note Payments | Due per Note terms/Amortization Schedule | Same as contractual terms |

o The above payment terms are the typical terms in use.
o Payments are due and payable according to the terms outlined in your franchise, lease, note and other agreements executed with Burger King Corporation.
o Payments made outside the terms outlined in the specific agreements executed with BKC are late.
o The fifteen (15) day grace period for royalty, advertising and percentage rents, has been established for credit approval purposes only. Franchisees who chronically pay late within the grace period are subject to credit disapproval at the discretion of BKC.

# APP. EX. "F"



**MEMO**

April 9, 1990

To:     All Franchisees

From:   Bob Stetson

Re:     **Credit Approval for Expansion**

In a letter dated July 28, 1988 to all franchisees, Burger King
Corporation stated that the expansion approval grace period date for
Royalty, Advertising and Percentage Rent payments would be changed from
the 25th of the month to the 10th of the month on March 1, 1989.  The
date for implementation was subsequently delayed for one year to March
1, 1990.

We have decided to delay any change in the expansion approval grace
period date at this time.

We will continue to use the 25th of the month for the expansion approval
grace period date for Royalty, Advertising and Percentage Rent payments.
The change from the 25th to the 10th of the month will be delayed to
May 1, 1991.

Please continue to follow the payment terms on the attached schedule.

CB-4/9/90-A:039.WG3-1

CB-4/9/90-A:039.WG3-2

ADD. EX. "G"

**BURGER KING CORPORATION**
**TERMS IN EFFECT SINCE SEPTEMBER 1, 1988**

| CATEGORY | CONTRACTUAL TERMS OF PAYMENTS | GRACE PERIOD DATE* |
|---|---|---|
| Advertising/Investment Spending | Payment due on the 10th day of the month based upon Gross Sales for the preceding month. | Payment to be received by the 25th day of the month. |
| Royalty | Payment due on the 10th day of the month based upon Gross Sales for the preceding month. | Payment to be received by the 25th day of the month. |
| Base Rent | Payment due in advance on the first day of the month. | Same as contractual terms. |
| Percentage Rent | | |
| Quarterly | Payment due on the 10th day of the month following the end of the lease quarter. | Payment to be received by the 25th day of the month. |
| Monthly | Payment due on the 10th day of the month based upon Gross Sales for the preceding month. | Payment to be received by the 25th day of the month. |
| Real Estate Taxes/ Common Area Maintenance | Due 30 days from the invoice date. | Same as contractual terms. |
| Promissory Notes | As set forth in promissory note - generally P&I on 1st of month. | Same as contractual terms. |

*   Must have consistently paid before the end of the grace period for the prior 6 months to receive credit approval for expansion.

CB-4/9/90-A:039.WG3-2

# APP. EX. "G"

# MEMO

**BURGER KING**

| | |
|---|---|
| **TO:** | All USA Franchisees |
| **FROM:** | Will Gooden, Director, Corporate Franchise Analysis |
| **DATE:** | March 25, 1997 |
| **SUBJECT:** | **Financial Standards and Policy Revisions** |

A detailed review of the format and content of the old Management Commitment and Capitalization Plan was recently completed and it is now called the Capitalization Plan. As a result of this review, certain changes were made in the Capitalization Plan format and related financial standards and policies. Financial standards and policies which were previously included in the body of the Capitalization Plan are now attachments to the Capitalization Plan.

The key financial standards and policy changes are outlined below:

1. Franchisees are no longer required to submit Capitalization Plans and gain financial approval to obtain a successor franchise agreement. Credit, Operations and Legal approval are still required.

2. Franchisees can request approval for multiple sites in one Capitalization Plan.

3. The Policy on Submission of Financial Statements has been modified to only request submission of statements with all requests for expansion or change of ownership. BKC, at its sole discretion, may still require individual franchisees to submit statements according to the terms of the franchise agreements upon request.

4. The new Financial Approval Policy contains financial standards and definitions of the key ratios applied in the approval process. The revised Fixed Charge Coverage Ratio and Debt to Equity Ratio standards, shown below, apply to both individual and entity forms of ownership.

| | |
|---|---|
| Fixed Charge Coverage Ratio | 1.10 : 1.00 |
| Debt to Equity Ratio<br>(less than 2 years relevant fast food experience) | 1.86 : 1.00<br>(35% equity) |
| Debt to Equity Ratio<br>(more than 2 years relevant fast food experience) | 4.00 : 1.00<br>(20% equity) |

The new Capitalization Plan, supporting schedules and related financial policies will be made available shortly to franchisees on a diskette upon request.

Copies of the Financial Approval, Credit, Submission of Financial Statements and Financial Record Keeping Policies are attached for your information.

## APP. EX. "G"



**BURGER KING CORPORATION
FINANCIAL APPROVAL POLICY**

## I.   INTRODUCTION

New franchisees who are opening their first Burger King® restaurant must receive "Financial Approval" as one of the requirements of becoming a Burger King franchisee. As part of its U.S. Expansion Policy, Burger King Corporation ("BKC") also requires that each existing franchisee must satisfy certain expansion criteria before it can expand. One of these criteria is "Financial Approval".

## II.   TYPES OF APPLICATION

### 1.   Forms of Ownership

BKC offers two (2) basic forms of franchise agreement: the "Individual Franchise Agreement" for use by a limited number of investors, all of whom are assuming full personal financial liability to BKC, and the "Entity Franchise Agreement" for use by a large number of investors, some of whom will be passive investors without personal financial liability to BKC. A full description of these two (2) forms of ownership is beyond the scope of this Policy, but the relevant provisions are summarized below.

### A.   Individual Form of Franchise

1.   Each investor must sign the franchise agreement in his/her individual capacity and assume full, personal liability to BKC on a "joint and several" basis with the other investors. This means that each investor is responsible for 100% of the obligations to BKC, even if that investor owns only a 1% interest in the business.

2.   The investors may not sell or otherwise transfer their partnership interests without the prior written consent of BKC.

3.   The franchise agreement may be assigned to a corporation if all conditions imposed by BKC are met. These conditions will include

**APP. EX. "G"**

the condition that each investor must personally guaranty and assume full, personal liability to BKC on a "joint and several" basis for all obligations of the corporation to BKC. This means that each investor remains responsible for 100% of the obligations to BKC, even if that investor owns only a 1% interest in the corporation.

4. There must at all times be one investor designated and approved by BKC as the "Operating Partner." This investor must own at least 50% of the business and its profits, and control at least 50% of the general partnership interests or 50% of the voting stock, as the case may be.

B. Entity Form of Franchise

1. The franchisee may be a limited partnership ("LP"), limited liability company ("LLC") or a corporation (collectively, an "Entity").

2. Each Entity must have one (1) individual (the "Managing Owner") who has legal and practical control over the business of the Entity. The Managing Owner must be the president, general partner or chief executive officer, as the case may be, and have the authority to bind the Entity in its dealings with BKC.

3. The Managing Owner and, if necessary from a credit standpoint, other investors (collectively with the Managing Owner, the "Guarantors") must be personally liable to BKC on a "joint and several" basis for all of the obligations of the Entity to BKC.

4. The Managing Owner must at all times own at least 5% of the outstanding partnership interests, share of stock or membership interests (collectively, "Equity Interests").

March 1997

2

APP. EX. "G"

5.   The Equity Interests owned by the Managing Owner and the other Guarantors may not be transferred without the prior written consent of BKC.

6.   Each Entity must also have one (1) individual (the "Managing Director") who must be approved by BKC and is responsible for the day to day operations of the Entity's Burger King Restaurants.

## III.   FINANCIAL ANALYSIS

Financial Approval of applications for new franchisees or existing franchisees to expand within the Burger King system are granted or denied by BKC in its sole business judgment.   BKC does, however, currently review each application with reference to certain financial ratios. The ratios are general standards that BKC uses to determine the financial strength of the franchisee. This is done for BKC's own analysis and is not a guaranty or assurance of adequacy for success at your particular site.

When applying for Financial Approval, all franchisees must provide a capitalization plan, based on reasonable assumptions, which shows the projected cash flow for the business and how the new business will be financed. The capitalization plan must comply with the applicable BKC standards described below. For existing franchisees, the new restaurant capitalization must not cause the consolidated business (existing and new restaurants) to fall outside the applicable standards.

1.   New Applications.  Applications by persons or entities who are not already in the Burger King system must satisfy the following minimum criteria.

A.   Cash Flow - Fixed Charge Coverage Ratio ("F.C.C.R."). This ratio measures the franchisee's ability to generate sufficient cash flow to cover operating costs, ongoing capital needs, and debt service payments.   All new applicants must have an F.C.C.R. of at least 1.10 to 1.  The F.C.C.R. standard of 1.10:1 provides a short term safety net that should allow the business to continue to operate in the event of a modest decline in sales or the occurrence of other unforeseen negative economic impacts.

The F.C.C.R. is computed by dividing the sum of "Fixed Charges" and "Excess Cash Flow" by the "Fixed Charges". "Fixed Charges" are defined as: Rent (including equipment rent), Royalty, Advertising, Debt Service (Principal and Interest), Capital Lease Payments, and Capital

## APP. EX. "G"

## V.   SUBORDINATED DEBT

Under certain circumstances, BKC may, in its sole discretion, treat subordinated debt as the functional equivalent of equity for the purposes of calculating the Debt to Equity Ratio described in Sections 1.C and 2.C above. In order to be considered for treatment in this manner, the subordinated debt must, at a minimum, meet the following conditions:

A.   **Full Subordination.** The debt must be fully subordinated to all of the franchisee's creditors, including BKC and all trade creditors.

B.   **No Mandatory Installments.** Payment of principal and interest on the debt can only be paid out of Excess Cash Flow. Excess Cash Flow for this purpose will be defined as Net Profit before Tax plus Depreciation and Amortization minus Capital Reinvestment (1% of Gross Sales), scheduled Principal Payments and Capital Lease Payments. Payments on the Stockholder loan must not reduce Equity below the BKC standard.

C.   **No Prepayment.** There can be no prepayment of the debt without BKC's consent, which may be withheld by BKC in its sole business judgment. BKC will not normally consent unless the debt is repaid out of excess cash, refinanced with new debt which meets BKC's then current policy regarding treatment of subordinated debt as equity, or replaced with new equity. In any case the prepayment must not reduce equity.

D.   **No Balloon.** There can be no balloon or final maturity date for payment of the debt. It must be paid out only as provided in Section V. - B. above.

E.   **Legal Documents.** The note and subordination agreement memorializing the conditions of the debt must be in a form acceptable to BKC in its sole business judgment. A form of Subordination Agreement is available upon request.

# APP. EX. "G"

## VI.  **COMMON OWNERSHIP**

1.  <u>Effect on Financial Approval</u>

    A.  <u>Philosophy</u>

    It is sometimes the case that new and/or existing franchisees will share common ownership. BKC will not allow franchisees to avoid BKC's financial requirements for expansion by forming new companies, partnerships or Entities, or to divert to such new organizations capital which should be used to adequately capitalize existing franchise operations. Accordingly, the inability of an existing franchisee to meet BKC's criteria for "Financial Approval" to expand may affect the ability of related franchisees or franchise organizations to expand at BKC's discretion under the following circumstances.

    B.  <u>Disapproval</u>

    If an existing franchisee, whether organized as a partnership, corporation, trust or limited liability company, does not meet BKC's standards for Financial Approval (the "Disapproved Organization"), then BKC may, in its sole discretion, also deny Financial Approval to any existing or proposed franchisee, whether organized as a partnership, corporation, trust or limited liability company, having 50% or more of its "Restricted Ownership Interests" owned by the same individuals who own 50% or more of the Restricted Ownership Interests of the Disapproved Organization.

    C.  <u>Restricted Ownership Interests</u>

    "Restricted Ownership Interests" means all interests in an Individual form franchise and the interests of the Managing Owner and each Guarantor in an Entity form franchise. The Restricted Ownership Interest does not need to be held in the same percentages in each legal entity for those entities to be considered together for approval purposes.

March 1997

8

**APP. EX. "G"**

D.   <u>Example</u>
(See attached chart)

Company A   operates under an Individual Franchise Agreement with the following ownership: Owner/Operator Smith - 50%, Owner Jones - 25%, Owner Gonzalez - 25%. Company A meets BKC's standards for financial approval.

Company B   operates under an Entity Franchise Agreement with the following ownership: Managing Owner Jones - 5%, Guarantor Patel - 5%, Guarantor Brown - 5%, Unrestricted Investors - 85%. Company B meets BKC's standards for financial approval.

Company C   operates under an Entity Franchise Agreement with the following ownership: Managing Owner Gonzalez - 5%, Guarantor Smith - 5%, Guarantor Patel 5%, Unrestricted Investors - 85%. Company C does not meet BKC's standards for financial approval.

Company D   operates under an Individual Franchise Agreement with the following ownership: Owner/Operator Patel - 50%, Guarantor Smith - 30%, Guarantor Jones 20%. Company D meets BKC's standards for financial approval.

Company A applies for financial approval. BKC will not consider Company B, for approval purposes, because the owners of Company A hold less than a 50% interest in the Restricted Ownership Interests of Company B. BKC may consider Companies C and D with Company A, for approval purposes, because the owners of Company A hold 50% or more of the Restricted Ownership Interests of each company. BKC may, at its sole discretion, deny financial approval to Company A because of Company C's financial condition.

**Note: This Policy is subject to revocation or change at any time and does not serve to modify or amend any franchise or other agreement to which BKC is a party.**

# APP. EX. "G"

## COMMON OWNERSHIP EXAMPLE

| Company A (Individual Form) | | Company B (Entity Form) | | Company C (Entity Form) | | Company D (Individual Form) | |
|---|---|---|---|---|---|---|---|
| Smith (O/O) | 50% | Restricted Owners: | | Restricted Owners: | | Patel (O/O) | 50% |
| Jones | 25% | Jones(MO) | 5% | Gonzalez (MO) | 5% | Smith | 30% |
| Gonzalez | 25% | Patel (G) | 5% | Smith (G) | 5% | Jones | 20% |
| | | Brown (G) | 5% | Patel (G) | 5% | | |
| | | Unrestricted | | Unrestricted | | | |
| | | Passive Investors 85% | | Passive Investors | 85% | | |
| **Approvable on a Stand Alone Basis** | | **Approvable on a Stand Alone Basis** | | **Unapprovable on a Stand Alone Basis** | | **Approvable on a Stand Alone Basis** | |

Abbreviations:
O/O - Owner/Operator
MO - Managing Owner
G  - Guarantor

Company A applies for financial approval. BKC will not consider Company B, for approval purposes, because the owners of Company A hold less than a 50% interest in the Restricted Ownership Interests of Company B.

BKC may consider Companies C and D with Company A, for approval purposes, because the owners of Company A hold 50% or more of the Restricted Ownership Interests of each company.

BKC may, at its sole discretion, deny financial approval to Company A because of Company C's financial condition.

APP. EX. "G"

**BURGER KING**
**KING**

# BURGER KING CORPORATION-USA
## POLICY ON SUBMISSION OF FINANCIAL STATEMENTS

Franchisee(s) shall be required to submit a fiscal year-end financial statement package along with all requests for expansion or change of ownership. The statement package must contain:

    (1) consolidated detailed restaurant profit and loss statements in a format acceptable to BKC;

    (2) a consolidated balance sheet;

    (3) a statement of cash flows; and

    (4) full disclosure notes to the financial statements as required under GAAP.

In addition, if the fiscal year-end financial statements are older than six months, franchisee(s) must submit interim profit and loss statements and a balance sheet along with all requests for expansion, successor or change of ownership. Statements certified or reviewed by a CPA or a CA are also acceptable and may be required if specifically requested by BKC. The franchisee(s) must also attach the **signed** statement below to the statement package:

    **"I(we) hereby represent that the enclosed statement package accurately represents the operating results and the financial position of the business".**

The statement package should be mailed to:

        Burger King Corporation
        Operations Finance Department
        P. O. Box 020783
        Miami, Florida 33102-0783

BKC may, in its sole discretion, require individual franchisees to submit monthly profit and loss statements and quarterly balance sheets and, if required, will notify the franchisee accordingly.

*NOTE: This policy can be revised at any time by BKC and does not serve to amend or modify any franchise agreement or other agreement to which BKC is a party.*

# APP. EX. "G"



# BURGER KING CORPORATION-USA
# FINANCIAL RECORD KEEPING POLICY

Franchisees must retain the following financial records or such other records as requested by BKC, for each restaurant, and the records must be readily accessible for a 24 month period:

General ledger must be kept, as well as a record of cash receipts and disbursements, which should be supported by:

1.  Daily sales register tapes
2.  Daily product mix tapes/reports
3.  Suppliers invoices
4.  Monthly bank statements
5.  Sales tax returns
6.  Daily cash reconciliations
7.  Daily/Monthly inventory records
8.  Payroll registers
9.  Deposit slips
10. Cancelled checks
11. Balance sheets
12. Profit and loss statements
13. Redeemed coupons

Federal, state and local requirements may vary from BKC policy. Franchisees should check with their financial advisors for those requirements.

*NOTE: This policy can be revised at any time by BKC and does not serve to amend or modify any franchise agreement or other agreement to which BKC is a party.*

# APP. EX. "G"



# BURGER KING CORPORATION-USA
# CREDIT POLICY

Payments are due and payable according to the terms outlined in your franchise agreement, lease agreement, note and any other agreement between you and Burger King Corporation.

The fifteen (15) day grace period for royalty, advertising, and percentage rent payments, will remain in effect. The intent of the grace period is to provide some flexibility in the credit approval process (for expansion and successor requests), and not to sanction late payments. Repeated late payments within the grace period may result in credit disapproval at the discretion of BKC.

All franchise groups in which a franchisee has an interest must be credit approved for the individual franchisee to be credit approved within this policy.

Once a payment is made outside the terms of this new policy, the franchisee shall be credit disapproved. The credit approved status shall be reinstated after the franchisee has paid within the policy terms for six (6) consecutive months.

Typically, payments are due as set forth below. You should, however, consult your own agreements for specific payment terms.

* Rent is due on the 1st of each month payable in advance.
* Royalty, advertising and monthly percentage rent is due on the 10th of each month based upon the gross sales of the preceding month.
* Quarterly percentage rent is due on the 10th of the month following the end of the lease quarter based upon the gross sales for the quarter.
* Escrowed common area maintenance assessments and real estate taxes are due on the 1st of the month in advance.
* All other common area maintenance assessments and real estate taxes are generally due thirty (30) days from the invoice date.
* Investment spending is due according to contract terms.
* Promotional items and other charges are generally due thirty (30) days from the invoice date.
* Payments on notes are due according to the contract terms which generally require payment on the 1st of the month unless the note specifies otherwise.

***NOTE:*** *This policy can be revised at any time by BKC and does not serve to amend or modify any franchise, lease or other agreements to which BKC is a party.*

March 1997                                    13

# APP. EX. "G"





Direct (305) 378-3238
Facsimile (305) 378-3191

October 25, 2002

**VIA FEDERAL EXPRESS and
CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

**PERSONAL AND CONFIDENTIAL**

Mr. Mumtaz Hashim
Restaurant Corp. of America
19098 Brasilia Drive
Northridge, CA 91326

Re:     **NOTICE OF FINANCIAL DEFAULT - BKC Receivables and
         DEMAND for AmeriServe Post Petition Receivables**

Dear Mr. Hashim:

Burger King Corporation ("BKC") hereby notifies Restaurant Corp. of America and you individually (collectively, "you") that you are in default under your obligations relating to the Burger King® restaurants listed on Schedule 1 attached hereto (the "Restaurants").

Reference is hereby made to each of the Franchise Agreements (the "Franchise Agreements"), the applicable Lease or Sublease Agreement (the "Lease"), and the Conditional Consent to Assignment of Franchise Agreements and Leases (the "Assignments") as enumerated on Schedule 1 hereto. The Franchise Agreements, the Lease, and the Assignments are hereinafter collectively referred to as the "Burger King Agreements."

BKC hereby declares you to be in default under the Burger King Agreements as a result of your failure to pay a total of $61,273.48 in past due charges under the Burger King Agreements as detailed on the attached Exhibit A.

Unless all of these past due amounts with respect to each Restaurant are paid in full within ten (10) days after your receipt of this letter, or thirteen (13) days from the date of this letter, whichever is earlier, the applicable Burger King Agreements shall automatically terminate without further notice and BKC will pursue any and all remedies available to it. In such event, all post-termination covenants of the Burger King Agreements shall apply. Failure to comply with these covenants will result in additional liability. In addition, BKC will continue to hold you responsible for all obligations and damages arising out of the Burger King Agreements and under applicable law, including its attorneys' fees and costs.

In addition, as of October 15, 2002, you are further indebted to Burger King Corporation ("BKC") in the amount of $9,169.25 as indicated on Exhibit B. This sum represents past due and owing payments pursuant to the "direct pay" arrangement established by order of the United States Bankruptcy Court for the District of Delaware as a result of AmeriServe Food Distribution, Inc.'s bankruptcy filing on January 31, 2000 (the "AmeriServe Post Petition Receivables").

Demand is hereby made by BKC for full payment of the total AmeriServe Post Petition Receivables. If you fail to pay all of those past due monies within ten (10) days from the date of this letter, BKC will take legal action to collect this amount. Please pay the past due charges promptly so that further action will not be necessary.

Any and all payments should be made payable to Burger King Corporation and sent to my attention at the above address. Payment should not be sent to any other individual or department. If partial payment is received by me or any other department, it will be held in partial

APP. EX. "H"

 

Mr. Mumtaz Hashim and Restaurant Corp. of America
October 25, 2002
Page 2

satisfaction of the amounts past due, but will not release you from your obligation to pay the balance due or constitute a waiver by BKC of any of its rights under the Burger King Agreements.

BKC has not authorized any of its employees, attorneys or agents to verbally modify any terms of this letter. This letter may be modified only by a written modification under my signature or the signature of another BKC attorney. You cannot rely on oral communications.

BKC reserves all rights and remedies available to it under the Burger King Agreements and under applicable law.

**Payment must be in the form of a wire transfer of funds or a certified or cashier's check.** For your convenience, BKC's wiring instructions are attached as <u>Exhibit C</u>.

Very truly yours,

BURGER KING CORPORATION

Thomas G. Archer
Senior Attorney

H:\val\def\hashim fin-def 10-24-02.doc:vmy

Enclosures

# APP. EX. "H"



## EXHIBIT "A"

Statement of Account – BKC Receivables

APP. EX. "H"

Run Date: 10/15/2002
Run Time: 15:46:52

BURGER KING CORPORATION
Statement of Past Due Accounts Receivable
As of October 15, 2002

HASHIM, MUMTAZ
GRP# 9000557

| Group # / Rest. # | Charge Period | Advertising | Investment Spending | Base Rent | Percent Rent | Royalty | Property Tax | C.A.M | Other | Notes | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **BK 608** | | | | | | | | | | | |
| CK9211 | DEC 01 | | (333.65) | | | | | | - | - | (333.65) |
| P049182-6670 | AUG 02 | 2,670.76 | - | - | - | 2,336.92 | - | - | - | - | 5,007.68 |
| | AUG 02 | - | - | - | - | - | - | - | 14.08 | - | 14.08 |
| | SEP 02 | 2,363.00 | - | - | - | 2,067.63 | - | - | - | - | 4,430.63 |
| **Total Past Due: BK 608** | | | | | | | | | 14.08 | | 9,118.74 |
| **BK 690** | | | | | | | | | | | |
| P049183-6670 | AUG 02 | 2,718.88 | - | - | - | 2,379.02 | - | - | - | - | 5,097.90 |
| | AUG 02 | - | - | - | - | - | - | - | 14.08 | - | 14.08 |
| P049534-3702 | SEP 02 | 2,505.24 | - | - | - | 2,192.09 | - | - | - | - | 4,697.33 |
| | SEP 02 | - | - | - | - | - | - | - | 12.63 | - | 12.63 |
| **Total Past Due: BK 690** | | | | | | | | | 26.71 | | 9,821.94 |
| **BK 3744** | | | | | | | | | | | |
| P044154-6429 | MAY 02 | - | - | - | - | - | - | - | 54.63 | - | 54.63 |
| | AUG 02 | 2,431.88 | - | - | - | 2,127.90 | - | - | - | - | 4,559.78 |
| P049188-6670 | AUG 02 | - | - | - | - | - | - | - | 14.08 | - | 14.08 |
| | SEP 02 | 2,184.36 | - | - | 1,142.15 | 1,911.32 | - | - | - | - | 5,237.83 |
| **Total Past Due: BK 3744** | | | | | 1,142.15 | | | | 68.71 | | 9,866.32 |
| **BK 4577** | | | | | | | | | | | |
| P049189-6670 | AUG 02 | 1,997.08 | - | - | - | 1,747.45 | - | - | - | - | 3,744.53 |
| | AUG 02 | - | - | - | - | - | - | - | 14.08 | - | 14.08 |
| | SEP 02 | 1,881.84 | - | - | - | 1,646.61 | - | - | - | - | 3,528.45 |
| CK10003 | SEP 02 | - | (649.95) | - | - | - | - | - | - | - | (649.95) |
| **Total Past Due: BK 4577** | | | | | | | | | 14.08 | | 6,637.11 |
| **BK 5244** | | | | | | | | | | | |
| P049190-6670 | AUG 02 | 2,461.40 | - | - | - | 2,153.73 | - | - | - | - | 4,615.13 |
| | AUG 02 | - | - | - | - | - | - | - | 14.08 | - | 14.08 |
| | SEP 02 | 2,387.84 | - | - | - | 2,089.36 | - | - | - | - | 4,477.20 |



Page 2 of 3

EXHIBIT A

APP. EX. "H"



Run Date: 10/15/2002
Run Time: 15:46:52

BURGER KING CORPORATION
Statement of Past Due Accounts Receivable
As of October 15, 2002

| Group # / Rest. # | Charge Period | Advertising | Investment Spending | Base Rent | Percent Rent | Royalty | Property Tax | C.A.M | Other | Notes | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HASHIM, MUMTAZ | | | | | | | | | | | |
| Total Past Due: BK   5244 | | 4,849.24 | - | - | - | 4,243.09 | - | - | 14.08 | - | 9,106.41 |
| BK   7320 | | | | | | | | | | | |
| | AUG 02 | 1,723.96 | - | - | - | 1,508.47 | - | - | - | - | 3,232.43 |
| | SEP 02 | 1,440.00 | - | - | - | 1,260.00 | - | - | - | - | 2,700.00 |
| Total Past Due: BK   7320 | | 3,163.96 | - | - | - | 2,768.47 | - | - | - | - | 5,932.43 |
| BK   10463 | | | | | | | | | | | |
| P049199-6670 | AUG 02 | 3,009.84 | - | - | - | 2,633.61 | - | - | - | - | 5,643.45 |
| | AUG 02 | - | - | - | - | - | - | - | 14.08 | - | 14.08 |
| | SEP 02 | 2,737.60 | - | - | - | 2,395.40 | - | - | - | - | 5,133.00 |
| Total Past Due: BK   10463 | | 5,747.44 | - | - | - | 5,029.01 | - | - | 14.08 | - | 10,790.53 |
| Total Past Due: GRP#   9000557 | | 32,513.68 | (983.60) | - | 1,142.15 | 28,449.51 | - | - | 151.74 | - | 61,273.48 |
| Total Past Due: ALL GROUPS | | 32,513.68 | (983.60) | - | 1,142.15 | 28,449.51 | - | - | 151.74 | - | 61,273.48 |

Note:
'E' indicates that invoices are based on estimated sales.

Page 3 of 3

EXHIBIT A

APP. EX. "H"



### EXHIBIT "B"

**Statement of Account – AmeriServe Post Petition Receivables**

As of October 15, 2002

| Group # /<br>Rest. # | Charge<br>Period | Advertising | Investment<br>Spending | Base Rent | Percent<br>Rent | Royalty | Property<br>Tax | C.A.M | Other | Notes | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HASHIM, MUMTAZ |  |  |  |  |  |  |  |  |  |  |  |
| GRP#    8000557    AMERISERVE BA | Jul-01 | - | - | - | - | - | - | - | 9,169.25 | - | 9,169.25 |
| Total Past Due: GRP#    8000557 |  |  |  |  |  |  |  |  | 9,169.25 | - | 9,169.25 |
| Total Past Due: ALL GROUPS |  |  |  |  |  |  |  | - | 9,169.25 | - | 9,169.25 |

Note:
'E' Indicates that invoices are based on estimated sales.

# EXHIBIT B

Page 1 of 3

**APP. EX. "H"**

 

## EXHIBIT "C"

**BKC'S Wiring Instructions**

| | |
|---|---|
| Name of Bank: | Citibank, N.A.<br>399 Park Avenue, New York, NY |
| ABA #: | 021 000 089 |
| Account #: | 4066 0767 |
| Beneficiary: | Burger King Corporation |
| Reference: | (Insert BK #_____, and description of wire (e.g., royalties, advertising, etc.) |

# APP. EX. "H"

 

## SCHEDULE 1

### The Restaurants

| Burger King Restaurant No. | Address | Franchise Agreement Dated | Lease/Sublease Agreement Dated, if any | Assignment Dated |
|---|---|---|---|---|
| 608 | 9475 East Firestone Boulevard Downey, CA 90241 | 12/01/88 | N/A | 12/02/91 |
| 690 | 1520 West Valley Boulevard Alhambra, CA 91803 | 5/01/88 | N/A | 1/01/82 |
| 3744 | 14305 Lakewood Boulevard Downey, CA 90242 | 9/27/93 | 9/24/93 | 1/12/00 |
| 4577 | 5401 East Washington Blvd. Commerce, CA 90040 | 6/12/85 | N/A | 1/12/00 |
| 5244 | 8063 Alondra Boulevard Paramount, CA 90723 | 12/29/86 | N/A | 1/12/00 |
| 7320 | 290 Fox Hill Mall Culver City, CA 90230 | 12/12/94 | N/A | 1/12/00 |
| 10463 | 6820 Reseda Boulevard Reseda, CA 91335 | 4/07/97 | N/A | 1/12/00 |

# APP. EX. "H"

 

Mr. Mumtaz Hashim and Restaurant Corp. of America
October 25, 2002
Page 7

bcc (via e-mail):

Barry Blum
Craig Prusher
Frank Taylor
Lauren Young
Kevin Fernandez
Fabio Baquero
Ilene Kobert
Lauren Licata
Jody Armstrong
Stuart Shanklin
Pat Jones
Mary Ann Henderson
Christine Leblond
Joe Soraci
Ann Striker
Sam Afandi
Rick Burket
Joyce Dery
Nannette Richardson
Paul Macaluso
Jeff Russell
Gary Rogers
Tom Glick
Gwen Arbuckle
Mark Schneider
Russell Sawler
Scott Friedman
Perry Thompson

# APP. EX. "H"



Direct (305) 378-3238
Facsimile (305) 378-3191

February 11, 2003

<u>VIA FEDERAL EXPRESS and</u>
<u>CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>

PERSONAL AND CONFIDENTIAL

Mr. Mumtaz Hashim
Restaurant Corp. of America
19098 Brasilia Drive
Northridge, CA 91326

Re:     <u>NOTICE OF FINANCIAL DEFAULT - BKC Receivables</u>

Dear Mr. Hashim:

Burger King Corporation ("BKC") hereby notifies Restaurant Corp. of America and you individually (collectively, "you") that you are in default under your obligations relating to the Burger King® restaurants listed on <u>Schedule 1</u> attached hereto (the "Restaurants").

Reference is hereby made to each of the Franchise Agreements (the "Franchise Agreements"), the applicable Lease or Sublease Agreement (the "Lease"), and the Conditional Consent to Assignment of Franchise Agreements and Leases (the "Assignments") as enumerated on <u>Schedule 1</u> hereto. The Franchise Agreements, the Lease, and the Assignments are hereinafter collectively referred to as the "Burger King Agreements."

BKC hereby declares you to be in default under the Burger King Agreements as a result of your failure to pay a total of $67,742.97 in past due charges under the Burger King Agreements as detailed on the attached <u>Exhibit A.</u>

Unless all of these past due amounts with respect to each Restaurant are paid in full within ten (10) days after your receipt of this letter, or thirteen (13) days from the date of this letter, whichever is earlier, the applicable Burger King Agreements shall automatically terminate without further notice and BKC will pursue any and all remedies available to it. In such event, all post-termination covenants of the Burger King Agreements shall apply. Failure to comply with these covenants will result in additional liability. In addition, BKC will continue to hold you responsible for all obligations and damages arising out of the Burger King Agreements and under applicable law, including its attorneys' fees and costs.

Any and all payments should be made payable to Burger King Corporation and sent to my attention at the above address. Payment should not be sent to any other individual or department. If partial payment is received by me or any other department, it will be held in partial satisfaction of the amounts past due, but will not release you from your obligation to pay the balance due or constitute a waiver by BKC of any of its rights under the Burger King Agreements.

BKC has not authorized any of its employees, attorneys or agents to verbally modify any terms of this letter. This letter may be modified only by a written modification under my signature or the signature of another BKC attorney. You cannot rely on oral communications.

BKC reserves all rights and remedies available to it under the Burger King Agreements and under applicable law.

## APP. EX. "I"

**BURGER KING CORPORATION**
5505 Blue Lagoon Drive • Miami, Florida 33126 • (305) 378-7011

EXHIBIT

1

Mr. Mumtaz Hashim and Restaurant Corp. of America
February 11, 2003
Page 2

Payment must be in the form of a wire transfer of funds or a certified or cashier's check.
For your convenience, BKC's wiring instructions are attached as Exhibit B.

Very truly yours,

BURGER KING CORPORATION

Thomas C. Archer
Senior Attorney

h:\re0de\hashim fin-oef 2-11-03.doc

Enclosures

**APP. EX. "I"**

EXHIBIT "A"

Statement of Account – BKC Receivables

RYDER SYSTEM CORPORATION
SUMMARY OF BASE THE ACCRUED REVENUES
As of February 11, 2003

APP. EX. "J"

RYDER FIRM CORPORATION
STATEMENT OF WRITTEN ROYALTY BREAKDOWN
As Of February 21, 2001

| Group # / Book # | Charge Period | Advertising | Advertising Sales Tax | Investment Spending | Base Book | Base Book Sales Tax | Permit Fund | Permit Book Sales Tax | Royalty | Royalty Sales Tax | Property Tax | C.A.M | Other | Prime |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DEC 00 | 1,255.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,948.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | JAN 01 | 1,136.77 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,715.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Book Item # 10463 | | 6,382.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,594.12 | 0.00 | 0.00 | 0.00 | 14.08 | 0.00 |
| Total Book Item GRP 900087 | | 16,554.75 | 0.00 | 963.69- | 0.00 | 0.00 | 1,907.74 | 0.00 | 21,111.11 | 0.00 | 0.00 | 0.00 | 151.74 | 0.00 |
| Total Book Item All GROUPS | | 26,554.74 | 0.00 | 963.69- | 0.00 | 0.00 | 1,907.74 | 0.00 | 21,111.13 | 0.00 | 0.00 | 0.00 | 151.74 | 0.00 |

* indicates that invoices are based on estimated sales.

**APP. EX. "I"**

EXHIBIT "B"

BKC'S Wiring Instructions

| | |
|---|---|
| Name of Bank: | Citibank, N.A.<br>399 Park Avenue, New York, NY |
| ABA #: | 021 000 089 |
| Account #: | 4066 0767 |
| Beneficiary: | Burger King Corporation |
| Reference: | (insert BK #_____, and description of wire (e.g., royalties, advertising, etc.) |

**APP. EX. "I"**

SCHEDULE 1

The Restaurants

| Burger King Restaurant No. | Address | Franchise Agreement Dated | Lease/Sublease Agreement Dated, if any | Assignment Dated |
|---|---|---|---|---|
| 608 | 9475 East Firestone Boulevard Downey, CA 90241 | 12/01/88 | N/A | 12/02/91 |
| 690 | 1520 West Valley Boulevard Alhambra, CA 91803 | 5/01/88 | N/A | 1/01/82 |
| 3744 | 14305 Lakewood Boulevard Downey, CA 90242 | 9/27/93 | 9/24/93 | 1/12/00 |
| 4577 | 5401 East Washington Blvd. Commerce, CA 90040 | 6/12/85 | N/A | 1/12/00 |
| 5244 | 8063 Alondra Boulevard Paramount, CA 90723 | 12/29/86 | N/A | 1/12/00 |
| 7320 | 290 Fox Hill Mall Culver City, CA 90230 | 12/12/94 | N/A | 1/12/00 |
| 10463 | 6820 Reseda Boulevard Reseda, CA 91335 | 4/07/97 | N/A | 1/12/00 |

# APP. EX. "I"



Direct (305) 378-3236
Facsimile (305) 378-3191

March 7, 2003

VIA FACSIMILE 818-368-0927 and U.S. MAIL

PERSONAL AND CONFIDENTIAL

Mr. Mumtaz Hashim
Restaurant Corp. of America
19098 Brasilia Drive
Northridge, CA 91326

RE:     CONFIRMATION OF TERMINATION AND DEMAND FOR
        COMPLIANCE

Dear Mr. Hashim:

Reference is made to the letter to you dated February 11, 2003 ("Notice of Default"),
pursuant to which Burger King Corporation ("BKC") notified you that Restaurant Corp. of
America and you were in default under the Franchise and Assignment Agreements
referenced therein (the "Agreements").

This letter confirms that the Agreements were terminated effective at 12:01a.m. on
February 25, 2003. Accordingly, you have no further right to use BKC's Marks and the
Burger King system at the above referenced Burger King® Restaurant ("Restaurant").
The termination of the Agreements results from your failure to cure the monetary default
under the Agreements set forth in the Notice of Default within the time specified therein
and in the Agreements.

BKC hereby demands that you comply with all post-termination covenants contained in
the Agreements, including but not limited to, immediately ceasing operation of the
Restaurant and the use of BKC's Marks, and returning to BKC the Manual Operating
Data loaned to you, together with all other material containing trade secrets, restaurant
operating instructions or business practices at BKC.

Any continued use of BKC's Marks and the Burger King system, or your continued
operation of the Restaurant, constitutes a violation of, among other things, the
Agreements and applicable laws.

The termination of the Agreements is without prejudice to any other rights or remedies
BKC may have. If BKC receives any post-termination payments from you, BKC shall
hold such payments for application in accordance with the final disposition of BKC's
damage claims arising from your breach of the Agreements and any continued operation
of the Restaurant in violation BKC's rights. You should not construe BKC's receipt of
these funds as a waiver of your default, BKC's termination of the Agreements, or BKC's
claim for damages. Any such payments should be sent only to my attention at the above
address and not to any other individual or department.

# APP. EX. "J"

BURGER KING CORPORATION
5505 Blue Lagoon Drive • Miami, Florida 33126 • (305) 378-7011

EXHIBIT

3

SD  4/23/03

APR. 23. 2003  9:00AM

Mr. Mumtaz Hashim and Restaurant Corp. of America
Confirmation of Termination
March 7, 2003
Page 2

Please appreciate that BKC has not authorized any of its employees, attorneys or agents to verbally modify any terms of this letter. This letter may only be modified by a written modification under my signature. Any reliance by you on alleged oral communications accordingly is unwarranted.

Very truly yours,

BURGER KING CORPORATION

Thomas G. Archer
Senior Attorney

H:\wander\Hashim confirm-term 03-07-03.doc

# APP. EX. "J"



## MEMO

To:       BURGER KING® Franchisees

From:    Brad Blum, CEO

Date:    1/30/2003

Subject:  BURGER KING® Franchisee Financial Restructuring Program

The following is the text of a broadcast voice mail sent to the BURGER KING® system earlier today regarding the BURGER KING® Franchisee Financial Restructuring Program. Program details are also attached.

*Voice Mail Text:*

Hello everyone.

I have been on the job now for a little over three weeks and delving into all the things that need to be addressed at Burger King.  Having just come from Olive Garden where I led a team who achieved a very successful turn around ... posting 33 consecutive quarters of same restaurant sales increases and improving profits at the restaurant level by over 600% ... I am very aware of where we are right now in the BURGER KING® system ... and what needs to be done to make this brand successful.  We have a lot of work to do ... and I will be giving you updates on our progress as we finalize our plans.

Today, I want to spend a few minutes to talk about four areas that are particularly important to achieving our collective success ... one, operations excellence, two, marketing excellence, three bringing financial stability to our franchisees and four, our culture and how we work together.  All of which must center on our customers ... both current customers and our potential future customers ... as we all work together to build a brand that is stronger than ever.

First, excellence in restaurant operations is a basic and absolutely critical element for any restaurant business to succeed ... and Burger King is no exception.  We must have quality in everything we do in our restaurants.  From piping hot food, to smiling crews to clean restrooms, to speed of service, every time we have to do it right.  Achieving this does not take a lot of money.  It takes leadership, focus and discipline at the restaurant level.  While many of our restaurants are passionate about getting everything right for our customers, unfortunately, our customers are telling us that we are not always doing things right.  Our customers are looking for consistent operations from one BURGER KING restaurant to another and from one visit to another.

1

> EXHIBIT
>
> 4
>
> S6  4/23/03

## APP. EX. "K"

We will address restaurant operations and to help do so, we have hired Bob Nilsen as president. I am really pleased about this. He is a terrific leader, and a great addition to our team and I'll be working very closely with him. Bob, who is coming to us from Taco Bell where he served as chief operating officer, has a sterling track record working with franchisees and in turning around quick service restaurants on four continents, including, most recently in over 7000 Taco Bell restaurants in North America. His leadership at Taco Bell has been critical to the outstanding success achieved there in the past three years. As president, Bob will drive our operations efforts and he will be focused on setting the highest standards and treating everyone with the utmost of respect. He will be starting this coming Monday, February 3rd.

Second, we need marketing excellence to leverage strong restaurant operations and to drive more people to visit our restaurants. And, then, we must deliver ... deliver on our promise to our customers. This area is so important to me that I am personally getting involved with our marketing efforts. As you may know, I have a passion for marketing and had a role in turning around some well-known brands, including Cheerios, Betty Crocker, Wheaties and, most recently, Olive Garden.

I am taking a hard look at our programs, including looking for a new sustainable advertising campaign that will resonate with consumers and a pricing policy that makes sense ... prices that take into account what's right for the customer ... and take into account what's right for your profits. I'll have more to report to you on this later.

The foundation for success in any restaurant company, which was certainly the case at my most recent employer, is operations excellence. If you have operations excellence but a marketing approach that is not working, the enterprise will survive. On the other hand, if you have the most outstanding marketing and poor operations, the company will ultimately fail. We need both ... excellent restaurant operations ... and to see that highly leveraged by outstanding marketing. That is our goal at Burger King.

To get there, we need to spend more time in our restaurants ... and demonstrate pride ... more than we ever have in the past for our customers and for our employees ... everyone talks about this. But only a few get it done. Bob and I know how to get it done in large restaurant organizations ... and it will take a total team effort to accomplish this.

To that end, I am targeting the May Convention to deliver my plan on brand positioning, advertising, and the 12-month marketing calendar as well as operations standards and how to hold ourselves to the highest standards in the field.

The third area of critical and immediate focus is financial stability of our franchisees. This is very important. I fully realize that a number of our franchisees are facing difficult financial challenges. This is not good for the system because these franchisees have not been able to focus on their business and reinvest in their restaurants to remain competitive. We must significantly improve the quality and the consistency of what we offer the consumer, as well as the appearance of our restaurants in order to be successful.

2

# APP. EX. "K"

Today, I am pleased ... truly pleased ... to announce the launch of the Burger King Franchisee Financial Restructuring Program. To help us accelerate this process, we are increasing the amount of resources we have dedicated to addressing this challenge. In cooperation with the NFA, we have hired Trinity Capital, a neutral third party to work with our franchisees, their creditors and Burger King Corporation.

The aim of this program is to help franchisees with financial restructuring so they can meet their obligations and become profitable once again.

Trinity Capital has helped many other distressed franchisees in several systems restructure into profitable businesses. That is our goal here. Their track record is excellent and their involvement will allow us to speed up the restructuring process ... working with dozens of franchisees simultaneously ... and enable us to move forward and execute our long-term strategy.

Burger King Corporation will manage the program and pay all of Trinity's professional fees helping franchisees to restructure their financial obligations and return to profitability. With this program ... and working together ... we could restructure more than $2 billion of debt within the system ... $2 billion dollars ... providing substantial financial relief to our franchisees. Every franchisee who participated in the Trinity program at another major company was able to realize positive cash flow immediately.

Now, I want to be clear at the beginning on what this program is and what it is not. It is a program to enable franchisees to realize an effective solution to the excess financial leverage in the system today. As part of this program, Burger King Corporation, as well as the creditors and franchisees, will be called upon to make significant financial contributions and concessions to specific restructuring transactions as appropriate, via a negotiated process that Trinity Capital will facilitate. These contributions and concessions will be the result of careful analysis, fairness and need.

This program is a hand up, not a hand out. It is not a subsidy program or an excuse to become unnecessarily delinquent on any financial obligations. Moreover, it is not an amnesty program from obligations under the Burger King Franchise Agreement.

This afternoon, you will receive a Fast Fax with more information about this workout program, including an explanation of how the program will work, answers to frequently asked questions and a questionnaire that will help franchisees who are in distress to summarize their current financial situation. Also, I am arranging a series of local meetings across the country where Burger King Corporation, along with representatives from Trinity Capital will talk with you about the details of this program.

If you are having difficulty meeting your financial obligations, we strongly encourage you to take a serious look at this program as a potential solution. Again, we are making this workout program available to address the excess financial leverage, which is plaguing the franchise community.

3

# APP. EX. "K"

This is an exciting program and I trust you will embrace it and support its mission of bringing financial stability to our system. And, then ... to ensure financial stability ... it will require what I've already talked about ... all of us must be relentless in achieving consistent excellent operations in each of our restaurants ... and we ... the Burger King Corporation ... must provide consistent, excellent marketing support.

Fourth and finally, I want to talk about our culture and how we work together. To be successful, we have to work together as one ... as a unified ... aligned and energized system. We have a limited window of opportunity to fix the obstacles that have held us back and implement the creative solutions that will make us strong and successful.

Our turnaround will begin with how we approach our business and the kind of culture we develop to nurture and support what needs to be done. We need to base our culture on integrity, fairness, respect, caring and trust. We have no time for politics, blame or finger pointing. We only have time for solutions ... solutions that lead to results ... results that take into account the consumer ... results that lead to profits. That's all we have time for. We will win only if we use our time ... our focus ... and our energies on the things that really matter ... and the things that really matter are all centered on consistently delivering a great customer experience.

My fervent desire is to lead this company as your CEO for a long time. I cannot do this unless we are all aligned around one ... singular ... common purpose and that I have your complete and unqualified support. I need your heartfelt commitment.

My pledge to you ... is that I fiercely want this brand to be successful ... for this brand to be famous ... for this brand to be revered and for each and every one of you to be successful in making BURGER KING ... GREAT!

If you truly believe in the power and potential of this brand, I invite you to join me on that journey.

Thank you all for what you are doing to deliver a great experience to our customers. And I look forward to meeting you in the very near future.

4

# APP. EX. "K"



1840 Century Park East
Suite 1210
Los Angeles, CA 90067

# BURGER KING CORPORATION

# RESPONSES TO FREQUENTLY ASKED QUESTIONS

## Franchisee Financial Restructuring Program

LOS ANGELES • CHICAGO • NEW YORK

## APP. EX. "K"

1. What is the objective of the Program?

   *The Program objective is to work with franchisees in resolving their short term liquidity issues and to enable franchisees to implement a restructuring and recapitalization plan that will be a permanent solution to the excess financial leverage in their businesses and allow them to focus on operating their restaurants.*

2. Who is eligible to participate?

   *Any franchisee who is experiencing financial difficulties is eligible to apply to the Program, except those in litigation with BKC, or who are currently operating under Chapter 11 bankruptcy protection.*

3. What if I am already involved with BKC in the existing workout Program?

   *The Program will work in conjunction with BKC's existing workout Program. The Program is not designed to replace the existing Program, but rather to supplement and augment it. Some franchisees currently involved in the existing program may benefit from participating in the Program.*

4. Are non-NFA members eligible to participate?

   *This Program is open to all BKC franchisees. Non-NFA members are welcome to review the Program and determine if they would like to participate.*

5. How do I get started?

   *Included as part of this package is a Confidential Preliminary Questionnaire which the franchisee needs to complete and return. The Program staff will review the Questionnaire with the franchisee and explain to the franchisee how the Program works. The Program staff will thoroughly review the Pros and Cons of the Program with the franchisee and they will jointly determine whether it is advisable to proceed. Once the decision to proceed is made, the franchisee will work with the Program staff to put together a comprehensive Information Memorandum on the company and begin negotiations with the lenders and other constituents.*

6. What will it cost me?

   *BKC will pay the cost of the Trinity Capital financial consultants assigned to the workout. The franchisee will be responsible for his own legal fees and whatever fees his lenders or other creditors may charge to effectuate the restructure.*

7. Will I get royalty relief?

   *The Program will not provide for any future royalty relief. In certain cases past due royalties maybe converted to an interest bearing loan which will be paid over time.*

8. Will BKC bail me out with my lenders?

   *The Program is not a bailout program. The Program staff will work with the franchisee and its lenders to restructure the franchisees financial obligations to a level that makes sense based on the sustainable cash flow generating capacity of the franchisee's business.*

9. Who is Trinity Capital and what is their role?

   *Trinity Capital is a financial advisory firm specializing in the quick service restaurant industry. Trinity recently completed a very similar program that was highly successful for another major QSR chain. Trinity's primary role will be to assist financially distressed franchisees with the restructuring of their debt and the development of a plan for funding necessary capital investments. Trinity will spend the majority of its time helping the franchisee develop a debt service relief plan and facilitating negotiations with lenders and other constituents in the process.*

# APP. EX. "K"

10. Will I be required to provide a big pile of information on my company?

*Lenders typically require a comprehensive understanding of the situation to be in a position to grant permanent debt service relief and consequently the demands for financial disclosure by the franchisee are usually very significant. Trinity will work with the franchisee to compile this information into a standardized booklet.*

11. How is the Program different than the existing BKC workout effort?

*The primary difference is the involvement of Trinity. As a dedicated independent party to the negotiation process, Trinity's job is to accelerate and enhance the success of the financial restructuring process.*

12. Will I be relieved of my In-Term Remodel or Successor obligations?

*The physical appearance of the restaurants is absolutely critical to the recovery of the brand. Resetting the timelines to address the economic reality of an individual franchisees situation may be considered on a case by case basis, but BKC will continue to enforce contractual obligations for franchisees to upgrade restaurants.*

13. How long will my workout take?

*How long it takes to complete a workout varies greatly and is dependent on a number of factors including the quality and timeliness of the data provided by the franchisee, the number and attitude of the lenders, the level of distress and the size and complexity of the franchisee's company. The average time to complete a workout is 4 to 6 months, but it can last longer depending on circumstances.*

14. Can a franchisee be too big or too little to participate?

*The Program will be available to franchisees of any size. Although there will be different strategies developed and tactics deployed depending on the size of the operator, the number of restaurants the franchisee operates will not be a factor in determining who will participate in the Program.*

15. How can the Program help me?

*Leveraging off Trinity's experience dealing with franchise lenders will expedite the recapitalization process. Trinity's involvement will allow the franchisee to spend less time working through issues with their lenders and more time devoted to running their business.*

16. What is the downside/ draw-backs to the Program?

*The disclosure requirements placed on the franchisee both during the restructure process and on a going forward basis after the restructure is completed are very significant. The franchisee will also be required to make significant contributions to the restructuring effort typically in the form of additional equity investment, expense controls, overhead and compensation restrictions, financial covenants, enhanced reporting requirements, etc.*

17. What are the major obstacles to a successful workout?

*The typical obstacles are unmotivated or angry lenders, unprepared or unresponsive franchisees, franchisees waiting too long to address the problem and too many lenders. Failure to comply with your franchise agreement requirements can also be a barrier.*

18. What am I going to be required to do?

*Franchisees need to recognize they have a problem, commit to the process, provide accurate, complete and timely data, be patient with their lenders, maintain their professionalism, be prepared to contribute to the fix, believe in the Program and have faith in the Burger King brand.*

# APP. EX. "K"

19. Will the franchisee be stigmatized within BKC for participating in the Program?
   *BKC is encouraging its franchisees to carefully analyze their situation and, if they have a problem, fully utilize the resources it is making available to address the problem.*

20. How do I know my confidential financial information will not be spread all over town?
   *The Program requires that every participant execute a comprehensive Confidentiality Agreement before work begins. All the participants in the Program must adhere to the privacy and confidentiality of the process.*

21. Should I get involved now or wait to see if things will get better?
   *Waiting and hoping the problem fixes itself is very unlikely to lead to a positive outcome. As past due amounts build, the probability of a successful out of court restructure declines dramatically.*

22. Are my lenders ok with this?
   *While lenders are not eager to restructure their loans, most recognize the problem is real and must be dealt with. In general, the lenders typically appreciate the systematic and professional approach offered by the Program.*

23. Will I be forced to participate if I am past due on royalties?
   *The Program is not only completely optional, but can never work well if the franchisee is not a willing and active participant.*

If you have any further questions, please submit them via e-mail to: bkcfrp@trinitycapitallc.com

# APP. EX. "K"



1840 Century Park East
Suite 1010
Los Angeles, CA 90067

Burger King Corporation ("BKC") is sponsoring, in cooperation with the National Franchise Association ("NFA"), a workout Program, to be known as the Burger King Franchisee Financial Restructuring Program ("Program"). The Program is designed to provide specialized dedicated resources to work with franchisees that are experiencing financial difficulties. The Program will enable franchisees to work toward an effective solution to the excess financial leverage and allow them to focus on operating their restaurants.

The Program will be directed by BKC with input from the NFA and administered by Trinity Capital, LLC ("Trinity"). Trinity is a Los Angeles based financial services firm that specializes in restructuring financially troubled franchise companies. Trinity was selected by BKC and endorsed by the NFA after a thorough selection process. Trinity administered a similar Program for another major franchisor that successfully restructured nearly 2,000 restaurants and approximately $1.8 billion of franchisee capitalization.

## The Program

If you are currently experiencing or are anticipating financial difficulties, such as the inability to fulfill financial and capital obligations, you may be a candidate for this Program. In order to determine the scope and nature of the problem, please complete the attached questionnaire, include all requested financial and business information and mail it to:

Trinity Capital, LLC
 c/o:  Burger King Franchisee Financial Restructuring Program
1840 Century Park East, Ste. 1010
Los Angeles, CA 90067

or fax it to:  (310) 203-8957

A Trinity representative will confirm receipt of your questionnaire within 5 business days of receipt.

The questionnaire will be reviewed by the Program staff members and kept in the strictest confidence. Trinity will assess the degree of financial distress and determine whether you can potentially benefit from the Program.

LOS  ANGELES     •     CHICAGO     •     NEW  YORK

# APP. EX. "K"

Before any further data collection, the franchisee, BKC, Trinity and the franchisee's respective lenders must execute a multi-party confidentiality agreement. This agreement will essentially protect the privacy of franchisees and preserve the rights of the franchisee and other parties to the restructuring.

Once these administrative issues are concluded, Trinity will request general, financial and operating data from the franchisee. This information should be generated electronically (EDT) and sent to Trinity. The information will be analyzed and compiled in a detailed "Information Memorandum" for distribution to the various transaction parties (franchisee, BKC, lenders, landlords and other business stakeholders). This compilation generally takes between three to six weeks to complete depending on the complexity of the situation and assuming active participation of the franchisee. After review with the franchisee, the Information Memorandum will be distributed to all of the transaction parties for their review.

This process informs all transaction parties as to the gap between the franchisees' obligations (debt service, balloon notes, property leases, equipment leases, Interim remodel, Successor obligations, system initiatives, ordinary and deferred capital expenditures necessary to remain competitive) and the franchisees' ability to generate free cash flow. After the review, all parties to the transaction will have a professionally assembled, unbiased view of the franchisee's financial picture from which to make restructuring decisions.

After the transaction parties have examined the Information Memorandum, a meeting or conference call is arranged to discuss the franchisee's financial condition and possible solutions. From this meeting a term sheet is generated by Trinity, which allocates financial concessions from the various creditors, franchisor and franchisee sufficient to render the company capable of meeting its revised financial obligations at a debt service coverage ratio of approximately 1.10x including recommended capital expenditures.

The transaction parties then review and negotiate the term sheet and make suggested (give and take) changes. When a resolution is reached, all parties will execute the term sheet and the agreed transaction is documented. The process can take anywhere from several weeks to several months, depending on the company's level of distress, number of lenders and the complexities.

While each case will have a different solution, franchisees can expect to make financial concessions in this process. This may include additional cash investment, commitments to do so in the future, covenant packages including G&A and compensation restrictions, distribution restrictions and additional debt prohibitions.

# APP. EX. "K"



16401 Century Park East
Suite 1010
Los Angeles, CA 90067

# Franchisee Financial Restructuring Program

## Confidential

### Preliminary Questionnaire

The primary purpose of this questionnaire is to provide the critical information necessary to allow for a preliminary assessment of the franchisee's level of distress. Once in receipt of the requested information, we can determine whether you can benefit from the Program, the magnitude of the financial problems and the level of urgency. We can then begin to develop a strategy for addressing your financial restructuring needs. The questionnaire should be completed as thoroughly and accurately as possible. Incomplete questionnaires will be returned to the franchisee and participation in the Program may be delayed until an acceptable questionnaire has been submitted. A Trinity representative will confirm receipt of your questionnaire within five business days of receipt. Once completed, please fax to:

Trinity Capital, LLC
Attention: Program Administration
(310) 203-8957

## APP. EX. "K"

If you need more space to answer any of the questions, please attach an additional sheet.

A.   **General Information:**
* Franchisee Name(s).
* Company Name(s):
* Address:
* Telephone Number:
* E-Mail Address:
* No. of Restaurants:
  * No. of Fee Properties:
  * No. of Leasehold Properties:
  * No. of BKC Leasehold locations:

* 2002 Average Restaurant Sales ("ARS"):
* No. of Restaurants with sales of less than $800,000 in 2002:
* % Change in ARS in 2002:
* No. of Years as Franchisee in the BKC system:

B.   **Lender Information:**
* Lenders/ Approximate Outstanding Loan Balance
  * Lender 1:                          $
  * Lender 2:                          $
  * Lender 3:                          $
  * Lender 4:                          $
  * Lender 5:                          $

* Are you delinquent with any of your Lenders (Yes/ No)?

  If Yes, please list below how many months past due/ How large is the past due amount?

| | Lender | Months Past Due | Approximate Past Due Amount |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |

* Have you received a default notice from any of your Lenders (Yes/ No)?

  If Yes, which ones and when?
* Have any of your Lenders commenced Legal action against you (Yes/ No)?

  If Yes, which ones and when?

* Did you personally guarantee any of the loans (Yes/No)?

  If Yes, which ones?

# APP. EX. "K"

## C.    Landlord Information:

- How many leased sites do you operate?

- Are you delinquent with any landlords (Yes/No)?

  If Yes, please list below.

| | BKC Restaurant # | # of Months Delinquent | Total Delinquent Rent |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |

- Have any landlords commenced any Legal action against you regarding past due rent (Yes/No)?

  If Yes, when?

- Do any of your leases expire in the next five years (Yes/No)?

  If Yes, please provide the dates and restaurant numbers.

- Have you had any conversations with any of your landlords about rent relief (Yes/No)?

  If Yes, when?

- Is BKC your landlord at any restaurant (Yes/No)?

  If Yes, please list the unit numbers.

- Did you personally guarantee any of the leases (Yes/No)?

  If Yes, which ones?  [As a matter of course, all BKLs are personally guaranteed]

## D.    Franchisor Information:

- Are you current on your royalty payments to BKC (Yes/No)?

  If No, please estimate the total delinquent amount.

- Are your current with your advertising contributions (Yes/No)?

  If No, please estimate the total delinquent amount.

- Are you behind on any other amounts owed to BKC (Yes/No)?

  If Yes, please indicate what type of obligation and your estimate of these total delinquent amounts.

- Are you currently behind on any of your Remodel or Successor requirements (Yes/No)?

  If Yes, which ones?

# APP. EX. "K"

• Do you have any franchise agreements expiring in the next five years (Yes/No)?

If Yes, please list below.

| BKC Restaurant # | Franchise Expiry Date | 2002 Sales | Estimated Successor/Jennifer Cost |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

• Do you need/ want to close any of your restaurants (Yes/No)?

If Yes, which restaurant #?

## E. Trade Creditors/ Taxing Authorities:

• Please list your largest/ primary vendors, what are your current trade terms with your major vendors and are you paying within the agreed upon terms?

| Vendor Name | Agreed Upon Terms | Past Due Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

• Have any past due trade balances been converted into a note (Yes/No)?

If Yes, which ones?

• Have any vendors commenced Legal action to recover unpaid amounts?

If Yes, who, when and what is the dollar amount involved?

• Do you generate an accounts payable aging report (Yes/No)?

• Are you on COD with any significant vendors (Yes/No)?

If Yes, which ones?

• Are you current with your payroll taxes (Yes/No)?

If No, how large is the delinquency?

• Are you current with your sales taxes (Yes/No)?

If No, how large is the delinquency?

# APP. EX. "K"

• Are you current with your property taxes (Yes/No)?

If No, how many properties are delinquent and how large is the delinquency?

• Are your liability and worker compensation insurance premiums current (Yes/No)?

The information provided in the above questionnaire will be utilized by the Program staff strictly for the purpose of assessing the franchisee's level of distress. The information provided will not be distributed to anyone outside of the Program staff. The franchisee's lenders, landlords and vendors will not be contacted until the franchisee officially enrolls in the Program and executes the required documents authorizing the Program staff to begin working on its behalf. There is currently no deadline for submission of the questionnaire, but franchisees are encouraged to complete and return them as soon as is practical. Submission of a completed questionnaire does not guarantee immediate participation in the Program. Within five business day of receipt of the questionnaire, the franchisee should expect a call from a Program representative to review the questionnaire and discuss next steps.

To the best of my knowledge the above information is true and accurate.

By: _____              Date: _____
Signature

_____
Print Name

Of: _____
Company Name

Its: _____
Title

# APP. EX. "K"



## MEMO

**To:**   BURGER KING® Franchisees

**From:**   Ben Hirst, executive vice president, general counsel

**Date:**   3/17/2003

**Subject:**   Trinity Capital & Royalty Payments

As we have announced, Trinity Capital, an outside firm experienced in franchisee workouts, has begun working with BURGER KING® franchisees who are experiencing cash flow problems. A number of franchisees have asked whether they are allowed to suspend royalty payments when they enter the Trinity Program, and whether franchisees who are not in the program are still obligated to remain current on royalty payments. The purpose of this communication is to set forth clearly the ground rules that relate to participation in the Trinity Program.

Burger King Corporation (BKC) expects every franchisee to pay the full amount of all royalties, advertising fund contributions, and BKL rents and taxes when they are due, unless the franchisee has reached an agreement with BKC on a different payment schedule.

This applies to franchisees entering the Trinity Program as well as all other franchisees. If a franchisee entering the Trinity Program believes it does not have sufficient cash flow to meet its obligations to BKC, it is up to the franchisee to work with Trinity to try to reach agreement with BKC on a payment schedule. Until that agreement is reached, the franchisee is still obligated under the franchise agreement to meet its BKC obligations when due, and is potentially in default of the franchise agreement if timely payment is not made.

We encourage any franchisee who is unable, or who may become unable, to meet its royalty obligations to BKC to enter the Trinity Program promptly. Trinity will then work with the franchisee, BKC, and the franchisee's lenders to reach a temporary agreement addressing the franchisee's short-term cash flow problem. Trinity has developed a short certificate that must be completed by the franchisee in order to start this process. Until the necessary information has been submitted by the franchisee and until BKC has agreed to any proposal to alter the royalty payment obligation, the franchisee remains obligated to pay all its obligations due under the franchise agreement. If a franchisee chooses to take an alternative course of action, BKC may be forced to pursue its legal remedies under the franchise agreement, although we certainly don't want to be put in this position or to have to follow that course.

BURGER KING BRANDS, INC.
a subsidiary of BURGER KING CORPORATION
5505 Blue Lagoon Drive, Miami, FL, 33126

**APP. EX. "L"**

4.  Once the franchisee's situation has been reviewed and, if necessary, temporarily stabilized, Trinity will work with the franchisee, with BKC and with the franchisee's lenders to try to reach a long-term restructuring of the franchisee's obligations and capital structure.

We recognize that the current competitive environment is very challenging for everyone.  We want to be as supportive as possible of our franchisees during this period.  If a franchisee is not able to meet its obligations to BKC, we want to understand why.  If the franchisee is committed to working with us responsibly to address these problems, we are certainly prepared to work with the franchisee.  At the end of the day, however, there can only be three options:  either the franchisee must remain current in payments to BKC; must enter into a workout and reach a mutually acceptable interim payment plan with us, or must decide to exit the system.

We look forward to working supportively and cooperatively with franchisees who are willing to work with us.

BURGER KING BRANDS, INC.
a subsidiary of BURGER KING CORPORATION
5505 Blue Lagoon Drive, Miami, FL, 33126

APP. EX. "L"



Direct (305) 378-3238
Facsimile (305) 378-3191

November 12, 2002

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

**PERSONAL AND CONFIDENTIAL**

Mr. Mumtaz Hashim
Restaurant Corp. of America
19098 Brasilia Drive
Northridge, CA 91326

RE:   **CONFIRMATION OF TERMINATION AND DEMAND FOR**
      **COMPLIANCE**

Dear Mr. Hashim:

Reference is made to the letter to you dated October 25, 2002 ("Notice of Default"), pursuant to which Burger King Corporation ("BKC") notified you that Restaurant Corp. of America and you were in default under the Franchise and Assignment Agreements referenced therein (the "Agreements").

This letter confirms that the Agreements were terminated effective at 12:01a.m. on November 8, 2002. Accordingly, you have no further right to use BKC's Marks and the Burger King system at the above referenced Burger King® Restaurant ("Restaurant"). The termination of the Agreements results from your failure to cure the monetary default under the Agreements set forth in the Notice of Default within the time specified therein and in the Agreements.

BKC hereby demands that you comply with all post-termination covenants contained in the Agreements, including but not limited to, immediately ceasing operation of the Restaurant and the use of BKC's Marks, and returning to BKC the Manual Operating Data loaned to you, together with all other material containing trade secrets, restaurant operating instructions or business practices at BKC.

Any continued use of BKC's Marks and the Burger King system, or your continued operation of the Restaurant, constitutes a violation of, among other things, the Agreements and applicable laws.

The termination of the Agreements is without prejudice to any other rights or remedies BKC may have. If BKC receives any post-termination payments from you, BKC shall hold such payments for application in accordance with the final disposition of BKC's damage claims arising from your breach of the Agreements and any continued operation of the Restaurant in violation BKC's rights. You should not construe BKC's receipt of these funds as a waiver of your default, BKC's termination of the Agreements, or BKC's claim for damages. Any such payments should be sent only to my attention at the above address and not to any other individual or department.

# APP. EX. "M"

**BURGER KING CORPORATION**
5505 Blue Lagoon Drive • Miami, Florida 33126 • (305) 378-7011

Mr. Mumtaz Hashim and Restaurant Corp. of America
Confirmation of Termination
November 12, 2002
Page 2

Please appreciate that BKC has not authorized any of its employees, attorneys or agents to verbally modify any terms of this letter. This letter may only be modified by a written modification under my signature. Any reliance by you on alleged oral communications accordingly is unwarranted.

Very truly yours,

BURGER KING CORPORATION

Thomas G. Archer
Senior Attorney

H:\vahder\Hashim confirm-term 11-12-02.doc.vmy

# APP. EX. "M"



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

7000 1670 0002 5524 6429

| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total | |

Postmark Here

Sent To: Mr. Mumtaz Hashim
Street: Restaurant Corp. of America
19098 Brasilia Drive
City: Northridge, CA 91326

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Mumtaz Hashim
Restaurant Corp. of America
19098 Brasilia Drive
Northridge, CA 91326

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly) | B. Date of Delivery

C. Signature
X _____  ☐ Agent  ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

TAZIM  HASHIM
19098  BRASILIA DR
NR CA 91326  11/04/02

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered       ☑ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)
   7000 1670 0002 5524 6429

PS Form 3811, July 1999          Domestic Return Receipt          102595-00-M-0952

# APP. EX. "M"

FILED by _____ D.C.

MAY 21 2002

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FL...

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

BURGER KING CORPORATION                    CASE NO: 99-2855-CIV-JORDAN

        Plaintiff,

vs.                                        **CLOSED**

H&H RESTAURANTS, LLC, HERBERT              **CIVIL**
HAKIMIANPOUR, ROBERT
HAKIMIANPOUR, and MIKE HASHIM,             **CASE**

        Defendants.

_____/

### AGREED FINAL JUDGMENT

This case is set for trial on Burger King Corporation's Complaint during the Court's two-week trial calendar beginning on May 20, 2002.  The Court has now been advised by the parties that they have agreed to the entry of an Agreed Final Judgment in favor of Burger King Corporation, which resolves all of the claims of all of the parties. Accordingly, it is

ORDERED and ADJUDGED that Final Judgment in the amount of $306,504.13 be entered in favor of Plaintiff Burger King Corporation, and against Defendants H&H Restaurants, LLC, Herbert Hakimianpour, Robert Hakimianpour and Mike Hashim, for which let execution issue.

ORDERED and ADJUDGED that this Court retains jurisdiction to award fees and costs, if any are sought.

DONE AND ORDERED at Miami, Miami-Dade County, Florida, this _21st_ day of May, 2002.

_____
UNITED STATES DISTRICT COURT JUDGE

cc: All counsel of record

# APP. EX. "N"

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NUMBER:
Magistrate Judge

BURGER KING CORPORATION,

       Plaintiff,

vs.

H&H RESTAURANTS, LLC, HERBERT
HAKIMIANPOUR, ROBERT
HAKIMIANPOUR, and MIKE HASHIM,

       Defendants.

_____/

## COMPLAINT FOR DAMAGES

Plaintiff Burger King Corporation ("BKC") sues Defendants H&H Restaurants, LLC (the "Company"), Herbert Hakimianpour ("H. Hakimianpour"), Robert Hakimianpour ("R. Hakimianpour"), and Mike Hashim ("Hashim") (collectively, "Defendants"), and states:

1.     This is an action to collect amounts due BKC from Defendants pursuant to franchise agreements, leases and guaranties. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because BKC and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

## THE PARTIES

2.     Plaintiff Burger King is a Florida corporation with its principal place of business in Miami, Florida.

3.     Upon information and belief, Defendant H&H Restaurants, LLC is a Texas limited liability company with its principal place of business in the State of Texas.

APP. EX. "O"

4.    Upon information and belief, Defendant H. Hakimianpour is a citizen of the State of California.

5.    Upon information and belief, Defendant R. Hakimianpour is a citizen of the State of California.

6.    Upon information and belief, Defendant Hashim is a citizen of the State of California.

<u>**JURISDICTION AND VENUE**</u>

7.    BKC operates and franchises restaurants throughout the United States. BKC's franchise operations are conducted and supervised from its world headquarters located in Miami, Florida.

8.    The parties have carried on a continuous course of direct communications by mail and by telephone through BKC's World Headquarters in Miami, Florida.

9.    The course of dealing between BKC and its franchisees, including Company, shows that decision-making authority is vested in BKC's World Headquarters in Miami, Florida.

10.    Defendants negotiated with BKC in Miami, Florida for the acquisition of long-term franchise, lease and guaranty agreements with the knowledge that they would benefit from their affiliation with BKC.

11.    Defendants voluntarily entered into franchise, lease and guaranty relationships with BKC which envisioned continuing and wide-reaching contacts with BKC in Florida, including regulation of Company's franchised businesses from BKC's World Headquarters in Miami, Florida.

12.    Defendants have purposefully availed themselves of the benefits and protection of Florida law by entering into agreements with Burger King which expressly provide that Florida law will govern any disputes.

2

**APP. EX. "O"**

13. Defendants breached contracts which were to be performed in Florida by failing to make payments to BKC in Florida pursuant to franchise, lease and guaranty agreements.

14. This Court has jurisdiction over this action based upon 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000.

15. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(a) and forum selection clauses agreed to by the parties.

16. Defendants have agreed in writing that this Court has jurisdiction over them in any litigation to enforce the terms of the agreements between the parties, and that they will neither contest nor challenge the jurisdiction of this court or the venue of this proceeding.

17. Defendants have further agreed in writing that in any litigation to enforce the terms of the agreements between the parties that, BKC, as the prevailing party, shall be paid by Defendants all costs, including attorneys' fees, incurred as a result.

18. BKC has engaged undersigned counsel and has agreed to pay counsel reasonable attorneys' fees for all services rendered in this action and otherwise in connection with enforcing the agreements between BKC and Defendants.

19. All conditions precedent to the institution of this action have been satisfied, discharged, excused, and/or waived.

## BKC'S AGREEMENTS WITH DEFENDANTS

20. The Company owned and operated sixteen restaurants as franchised Burger King® restaurants (together, the "Restaurants") in accordance with the terms and conditions of sixteen separate Burger King® Restaurant Franchise Agreements (together, the "Franchise Agreements").

21. Additionally, the Company agreed to lease the premises at all the Restaurants pursuant to lease/sublease agreements with BKC (the "Leases").

3

APP. EX. "O"

22.    The Restaurant numbers, locations, and dates of the Franchise Agreements are set

forth below:

| Restaurant Number | Restaurant Location | Date of Franchise Agreement |
|---|---|---|
| BK #2714 | 4618 Rittiman Road<br>San Antonio, Texas 78218 | June 21, 1996 |
| BK #4658 | 6881 Military Drive West<br>San Antonio, Texas 78227 | June 21, 1996 |
| BK #4791 | 5895 Babcock Road<br>San Antonio, Texas 78240 | June 21, 1996 |
| BK #4941 | 203 N. Highway 123 BYP<br>Seguin, Texas 78155 | June 21, 1996 |
| BK #4995 | 8296 Marbach Road<br>San Antonio, Texas 78227 | June 21, 1996 |
| BK #4996 | 211 S.W. Military Drive<br>San Antonio, Texas 78221 | June 21, 1996 |
| BK #4997 | 110401 - 10 West<br>San Antonio, Texas 78230 | June 21, 1996 |
| BK #4998 | 903 San Pedro Avenue<br>San Antonio, Texas 78212 | June 21, 1996 |
| BK #5000 | 6802 Bandera Road<br>San Antonio, Texas 78238 | June 21, 1996 |
| BK #5001 | 2320 Babcock Road<br>San Antonio, Texas 78229 | June 21, 1996 |
| BK #5002 | 4351 Thousands Oaks<br>San Antonio, Texas 78217 | June 21, 1996 |
| BK #5003 | 11618 West Avenue<br>San Antonio, Texas 78213 | June 21, 1996 |
| BK #5004 | 3030 Goliad Road | |

4

## APP. EX. "O"

|          | San Antonio, Texas 78223 | June 21, 1996 |
| BK #5005 | 236 Interstate 35<br>New Braunfels, Texas 78130 | June 21, 1996 |
| BK #5006 | 4901 Walzem Road<br>Windcrest, Texas  78218 | June 21, 1996 |
| BK #5679 | 6903 Ingram Road<br>San Antonio, Texas | June 21, 1996 |

## DEFENDANTS' OBLIGATIONS

### Franchise and Lease Obligations

23.     Under the terms of the Franchise Agreements, the franchisee, Company, is obligated to make monthly payments to BKC for royalties, advertising, and other fees.  Specifically, the Franchise Agreements require Company to pay BKC a royalty of 3.5% of gross sales for the preceding calendar month in return for the use of the Burger King System and the Burger King Marks. Additionally, Company is obligated to pay BKC an amount equal to 4% of its monthly gross sales for the preceding calendar month in return for advertising, sales promotion, and public relations expenditures made by BKC on behalf of the entire Burger King System.  All such royalty and advertising payments are required to be made to BKC in Miami, Florida on or before the tenth of each month.

24.     Also, under the leases, rent was due and payable monthly to BKC in Miami, Florida.

25.     Defendants defaulted under the Franchise Agreements and Leases by failing to perform certain repair and maintenance items as well as failing to fill the Managing Director position.  The Franchise Agreements and Leases were terminated as a result.

5

# APP. EX. "O"

## The Guaranties

26.     Pursuant to separate written guaranties, Defendants H. Hakimianpour, R. Hakimianpour, and Hashim (collectively, the "Guarantors") have personally guarantied to BKC the performance of each and every term, condition, and obligation of the franchisee, Company, under the Franchise Agreements and Leases (the "Guaranties").

### COUNT I

### BREACH OF THE FRANCHISE AGREEMENTS AND LEASES AGAINST COMPANY

27.     BKC realleges paragraphs 1 through 25 above as if fully set forth herein.

28.     The Company has not paid when due amounts owed to BKC under the Franchise Agreements and Leases.

29.     BKC has made demand for payment of these past due receivables.

30.     The Company's failure to pay BKC as obligated are breaches of the Franchise Agreements and Leases, and those breaches have directly and proximately damaged BKC.

31.     As of February 1, 2000, the Company owes BKC $ 750,219.04 which is now past due and owing pursuant to the Franchise Agreements and Leases.

### COUNT II

### BREACH OF THE GUARANTIES AGAINST GUARANTORS

32.     Burger King realleges paragraphs 1 through 31 above as if fully set forth herein.

33.     Pursuant to the Guaranties, Guarantors guarantied performance of each and every term, condition, and restriction of the Franchise Agreements and Leases, including the obligation to pay BKC amounts due under the Franchise Agreements and Leases should Company fail to make such payment.

6

# APP. EX. "O"

34.   The failures of the Guarantors to pay to BKC $ 750,219.04 in amounts due by the Company as obligated by the Franchise Agreements and Leases is a breach of the Guaranties, and those breaches have directly and proximately damaged BKC.

## DEMAND FOR ATTORNEYS' FEES

35.   The agreements at issue in this litigation provide that the prevailing party is entitled to its attorneys' fees and costs.  Pursuant to those provisions, BKC hereby demands that it be reimbursed by Defendants for all costs and expenses (including attorneys' fees) relating to prosecution of this Complaint.

WHEREFORE, Burger King Corporation demands judgment against Defendants H&H Restaurants, LLC, Herbert Hakimianpour, Robert Hakimianpour and Mike Hashim, jointly and severally, for $ 750,219.04, such additional sums as have accrued and may accrue after February 1, 2000, lost profits, prejudgment interest, costs, attorneys' fees, and all such other relief as this Court deems just and proper.

Dated: 3/22/02

GENOVESE JOBLOVE & BATTISTA
Attorneys for Burger King Corporation
Bank of America Tower
100 Southeast Second Street
36th Floor
Miami, Florida  33131
Telephone: (305) 349-2300
Facsimile:  (305) 349-2310

By: _____
Michael D. Joblove
Florida Bar Number 354147
Nina Greene Kersh
Florida Bar Number 072079

X:\Documents\WORK\BK\H&H Restaurants\H&H--BKL\Complaint.wpd

7

# APP. EX. "O"



VIA FEDERAL EXPRESS and FACSIMILE

February 21, 2003

Mr. Mumtaz Hashim
Restaurant Corp. of America
19098 Brasilia Drive
Northridge, CA 91326

Re:   H&H Litigation Settlement – Notice of Default Under the Promissory Note
      dated November 15, 2002

Dear Mr. Hashim:

On October 25, 2002 Burger King Corporation ("BKC") sent you a Settlement Agreement
and Notice of Default and Demand for AmeriServe Post Petition Receivables.   You
refused to sign these documents and counter offered by returning the Promissory Note
with certain information regarding your bank.   Please understand that signing the
Promissory Note alone does not resolve the H&H Litigation.

In order to resolve the H&H Litigation the following items need to be resolved:

1.     You did not send an executed "ACH Agreement." Therefore you are obligated to
       send BKC the payments due under the Promissory Note. BKC cannot debit your
       accounts without an executed ACH Agreement.   The first payment was due
       December 15, 2002.   You have missed every payment due under the Promissory
       Note.   Currently, you owe BKC $17,879.31, plus late fees, under the Promissory
       Note.   BKC demands that you pay this amount by Tuesday, February 25, 2003 or
       it will invoke Section 19 of the Promissory Note effective 6:00pm EST on
       February 25, 2003 (this is the cross default provision).   Payment must be made by
       cashiers check and sent to me at the following address:

                      Burger King Corporation
                      5505 Blue Lagoon Drive
                      Miami, FL 33126
                      Attn: Thomas G. Archer

       If you desire to enter into an "ACH" arrangement with BKC, you will need to
       execute the ACH Agreement enclosed with this letter.   **This Agreement will
       apply towards future payments only.   PLEASE NOTE THAT BKC IS NOT
       OBLIGATED TO GIVE THIS CURE PERIOD.**

APP. EX. "P"

EXHIBIT

2

SB   4/25/03

Mr. Mumtaz Hashim
February 21, 2003
Page 2

2.      You owe BKC $350.00 for Florida Documentary Stamp Tax (See Section 21 of
the Promissory Note). You must pay this amount by February 25, 2003.

3.      ADR Releases:  You must execute an ADR Release for your development
disputes. Attached is an ADR Limited Release and Settlement Of Encroachment
Claim for your execution, BKC will return your ADR Deposit.

Please understand that your compliance with the above does not waive or alter BKC's rights to
pursue its remedies for as set forth in the Notice of Defaults dated October 25, 2002 and
February 11, 2003 (the "Default Notices"). Nothing in this letter modifies your obligations to
comply with the deadlines set forth in the Default Notices.

Very truly yours,

Thomas G. Archer
Senior Attorney

**APP. EX. "P"**



# B U R G E R   K I N G   C O R P O R A T I O N
## AUTHORIZATION AGREEMENT FOR AUTOMATIC DEBITS FOR PAYMENTS
### UNDER PROMISSORY NOTE

Franchisee:_____ Restaurant Corporation of America and Mumtaz Hashim _____

Franchisee Group Number:_____557_____

The Franchisee hereby authorizes Burger King Corporation (hereinafter "BKC"), any financial institution acting on behalf of BKC (hereinafter "BKC's Bank"), and Franchisee's financial institution which is identified below (hereinafter "Franchisee's Bank") to process debit entries on Franchisee's bank account identified below on a monthly basis for payment which is or will become due by Franchisee (or any entity or individual affiliated or related to Franchisee) to BKC under Promissory Note dated November 15, 2002.

The Franchisee acknowledges that BKC, BKC's Bank and Franchisee's Bank must comply with the National Automated Clearing House Association rules. BKC, BKC's Bank and Franchisee's Bank are authorized to make any necessary debits or credits to correct duplicate or erroneous entries. The Franchisee hereby agrees to hold BKC, BKC's Bank, Franchisee's Bank and their agents, successors and assigns harmless from all direct, indirect, special or consequential damages and/or all losses, costs, claims or expenses arising out of or related to the use of this automatic payment service.

The Franchisee represents that the account identified below is and shall be maintained at the Franchisee's Bank and will contain sufficient funds to cover the automatic debit entries authorized hereunder. The Franchisee hereby agrees that in the event BKC, BKC's Bank or Franchisee's Bank is unable to process any debit entry authorized hereunder, the Franchisee shall forward payment in the form of a check to BKC at: Burger King Corporation, P.O. Box 025259, Miami, Florida 33102-5259. The Franchisee understands that this automatic payment process shall not operate to extend the payment deadlines under the promissory note with BKC.

This authorization is effective as of the date indicated below and shall remain in full force until the Franchisee has provided BKC with 30 day prior written notice of its termination. The automatic payment process is subject to modification or cancellation at any time by BKC without notice to the Franchisee. This agreement shall be governed by the laws of the State of Florida.

### Franchisee's Bank

Bank Name:_____  Branch:_____
City:_____  State:_____  Zip Code:_____

Account Name (as shown on bank's records):_____
Account Number:_____-___
ABA/Transit Routing Number:_____(9 Digits)
Check One: _____Savings Account  _____Checking Account

### Franchisee Authorization

Name:_____  Name:_____
    (Please type or print)       (Please type or print)

Sign:_____  Sign:_____
Date:_____  Date:_____

NOTE:   A separate Authorization Agreement is required for each bank account, even if all accounts are within the same banking institution. Please attach a voided check or deposit slip to this authorization.

# APP. EX. "P"

# LIMITED RELEASE
## AND
## SETTLEMENT OF ENCROACHMENT CLAIM
### (No ADR)

WHEREAS, **MUMTAZ HASHIM** and **RESTAURANT CORPORATION OF AMERICA**, a California corporation (collectively, the "Franchisees") directly or indirectly own an interest in a certain Burger King® Restaurant (the "Restaurant") listed on Exhibit "A" attached hereto;

WHEREAS, there is a dispute between the Franchisees and Burger King Corporation ("BKC") regarding the development of a new Burger King® Restaurant within a 1/3 mile straight line radius from the intersection of Imperial Highway and Paramount Boulevard, Downey, California (the "New Restaurant") and the effect that New Restaurant has, will have, or may have, on current and future sales at the Restaurant (the "Dispute");

WHEREAS, Franchisees and BKC have agreed to resolve the Dispute pursuant to the Procedures for Resolving Development Disputes (the "Procedures");

WHEREAS, the Procedures require that, as a condition precedent to withdrawing from the Procedures, the Franchisee release all claims relating to the Dispute and to waive any further rights under the Procedures;

WHEREAS, Franchisees have requested to withdraw from the Procedures;

NOW, THEREFORE, in consideration of the foregoing, the Franchisees agree as follows:

FRANCHISEES, JOINTLY AND FOR THEMSELVES, THEIR SUCCESSORS, ASSIGNS, HEIRS, PERSONAL REPRESENTATIVES AND AFFILIATES (INDIVIDUALLY AND COLLECTIVELY, THE "RELEASING PARTIES"), REMISE, RELEASE, ACQUIT, SATISFY AND FOREVER DISCHARGE BKC, ITS SUCCESSORS, PREDECESSORS, COUNSEL, INSURERS, ASSIGNS, OFFICERS, DIRECTORS, EMPLOYEES, PARENT COMPANY, AFFILIATES, SUBSIDIARIES AND AGENTS, PAST AND PRESENT (INDIVIDUALLY AND COLLECTIVELY, THE "RELEASED PARTIES") FROM AND AGAINST ALL CLAIMS, ACTIONS, CAUSES OF ACTION, DEMANDS, DAMAGES, COSTS, SUITS, DEBTS, COVENANTS, CONTROVERSIES, AND ANY OTHER LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, LIQUIDATED, FIXED, CONTINGENT, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL OR EQUITABLE (HEREINAFTER, "CLAIMS"), WHICH THE RELEASING PARTIES EVER HAD, NOW HAVE, CAN, SHALL OR MAY HAVE, AGAINST THE RELEASED PARTIES FOR, UPON OR BY REASON OF ANY MATTER, CAUSE OR THING WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, THOSE ISSUES RELATING TO THE DISPUTE OR THE PROCEDURES, FROM THE BEGINNING OF THE WORLD TO THE DATE OF THIS

H:\va\adr-west\Hashim Ltd-Release (withdraw ADR).doc.vmy
BK #3744 - 2/21/03
H:\oss\releases\forms\New Limited Release (No ADR).doc

1

**APP. EX. "P"**

AGREEMENT. FRANCHISEES, SPECIFICALLY, AND WITH FULL KNOWLEDGE AND ADVICE OF COUNSEL, DO HEREBY WAIVE THE PROVISIONS AND PROTECTIONS OF THE CALIFORNIA CIVIL CODE SECTION 1542 SET FORTH BELOW.

(b)    THE FOLLOWING SHALL APPLY TO RELEASES FOR THE STATE OF CALIFORNIA TRANSACTIONS.

CALIFORNIA CIVIL CODE SECTION 1542 READS AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

IN WITNESS WHEREOF, the undersigned parties have hereunto set their hands and seals this _____ day of _____, 2003.

WITNESS:

_____          _____
                                   MUMTAZ HASHIM, individually

WITNESSES:                         RESTAURANT CORP. OF AMERICA

_____          By: _____
                                            President

_____          Attest: _____
                                   Title: _____

H:\wa\adr-west\Hashim Ltd-Release (withdraw ADR).doc.vmy
BK #3744 - 2/21/03
H:\vpsa\releases\forms\New Limited Release (No ADR).doc

**APP. EX. "P"**

2

EXHIBIT "A"

BURGER KING® RESTAURANT NO.

3744

ADDRESS

14305 Lakewood Boulevard
Downey, CA  90242

H:\va\adr-west\Hashim Ltd-Release (withdraw ADR).doc.vmy
BK #3744 - 2/21/03
H:\vose\releases\forms\New Limited Release (No ADR).doc

APP. EX. "P"