UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 02-23309-CIV-MORENO
Magistrate Judge Garber

BURGER KING CORPORATION,

    Plaintiff,

vs.

RESTAURANT CORPORATION OF
AMERICA, INC., a California corporation, and
MUMTAZ HASHIM a/k/a/ MIKE HASHIM,

    Defendants.

_____/



## REPLY MEMORANDUM OF DEFENDANTS RESTAURANT CORPORATION OF AMERICA AND MUMTAZ HASHIM <u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Defendants, Restaurant Corporation of America and Mumtaz "Mike" Hashim ("Defendants"), pursuant to S.D. Fla. L.R. 7.1(C), file this their Reply Memorandum in Support of Motion for Summary Judgment (D.E. # 38), and states as follows:

### A.    The Non-Waiver Provisions of the Franchise Agreements Are Inapplicable to the Defense of Equitable Estoppel.

In its Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opposing Memorandum")(D.E. # 53), Plaintiff Burger King Corporation ("BKC") argues that the Defendants' Motion for Summary Judgment fails as a matter of law because of the existence of non-waiver provisions in the Franchise Agreements. Opposing Memorandum, 13. BKC's argument is based on a flawed premise. A thorough analysis of the distinctions between the concepts of waiver and equitable estoppel, as well as an examination of the cases on which BKC's argument is founded, shows BKC has misinterpreted Florida law.

**1. Waiver and equitable estoppel are distinct rules of law.**

Florida law recognizes that waiver and estoppel, although related concepts, are nevertheless distinct and separate legal rules. *See Mark v. Hahn,* 177 So.2d 5, 8 (Fla. 1965). *See also Thomas N. Carlton Estate, Inc. v. Keller,* 52 So.2d 131, 132-133 (Fla. 1951) (observing that "[t]he doctrines of waiver and estoppel are frequently confused and sometimes are incorrectly regarded as synonymous.")  In the case of *Myers v. Ross,* 10 F.Supp. 409, 411 (S.D. Fla. 1935), the court explained the distinction as follows:  "Estoppel depends upon what a party causes his adversary to do.  Waiver...depends upon what the party himself intends to do, and has done."  Thus, where a party acts unilaterally, waiver is at issue.  Where a party acts in such a manner as to make his adversary believe in a certain state of affairs, estoppel is at issue.  It is therefore correct to say that waiver is a unilateral concept whereas estoppel is a bilateral one.[1]

The distinction between waiver and estoppel is further explained in 22 Fla. Jur. 2d ESTOPPEL AND WAIVER § 31:

> [W]aiver, although it is not technically speaking an estoppel, may be affected by various acts and different courses of conduct which operate in the final analysis as an estoppel or at least a quasi-estoppel. *Waiver does not necessarily imply that the person asserting it has been misled to his or her prejudice or into an altered position.* The act or conduct of only one of the parties is involved. On the other hand, *the conduct of both parties is involved in an equitable estoppel, and an equitable estoppel may arise in the absence of any intention on the part of the person estopped to relinquish or change any existing right*, and need not be supported by any consideration, agreement, or legal obligation.  An equitable estoppel frequently carries the implication of fraud, but waiver does not.

(emphasis added).  *See also Enfinger v. Order of United Commercial Travelers of America,* 156 So.2d 38, 42 (Fla. 1st Dist. Ct. App. 1963) (explaining that waiver operates to estop one from

---

[1] *See also* David V. Snyder, *The Law of Contract and the Concept of Change:  Public and Private Attempts to Regulate Modification, Waiver and Estoppel,* 1999 WIS. L. REV.  607, 624-629 (1999).    Professor Snyder explains that "waiver results from a unilateral act dispensing with a contractual condition," and that "estoppel results when the conduct of one party induces cognizable reliance by the other party so that in justice the first party is precluded from contradicting its earlier conduct." *Id.* at 626.

asserting right he might otherwise have relied on but is not true estoppel; waiver which consists merely in renouncing some right, or in ratifying what one might repudiate, is not estoppel.)

As the cases and other authority establish, a waiver is not an estoppel, and an estoppel is not a waiver.  Thus, the two rules of law should not be confused or considered identical, as they are based on different sets of facts and raise different considerations for the court.  Consequently, a non-waiver provision cannot automatically be deemed to override the long-established common law rule of equitable estoppel.

**2. The non-waiver provisions do not overcome the defense of equitable estoppel.**

The Franchise Agreements contain non-waiver provisions.  Paragraph 19B states in pertinent part:

> The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by FRANCHISEE with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement.

Paragraph 17A contains a similar provision.  *See* Deposition Exhibits filed in Support of Defendants' Motion for Summary Judgment, Exhibit 8, ¶¶ 17A, 19B.  These non-waiver provisions suggest that the defense of waiver is precluded by the Franchise Agreements.  However, even if Paragraphs 17A and 19B are adequate to overcome the defense of waiver, they are nevertheless insufficient, as a matter of law, to overcome the defense of equitable estoppel.

Although the Florida authority is clear that estoppel and waiver are distinct theories, some cases have conjoined the two and, often without any discussion whatsoever of the differences between the two concepts, concluded that a non-waiver provision is effective as to both waiver and estoppel. *See MCA Television, Ltd. v. Public Interest Corporation,* 171 F.3d 1265, 1270 (11th

Rafferty, Hart, Stolzenberg, Gelles & Tenenholtz, P.A.
1101 Brickell Avenue, Suite 1400, Miami, Florida 33131  ·  Tel: (305) 373-0330 Fax: (305) 373-2735

Cir. 1999); *Burger King Corp. v. Hinton,* 203 F.Supp.2d 1357, 1365 (S.D. Fla. 2002).[2]  Such a conclusion is contrary to Florida case law.

A non-waiver provision is not an automatic "anti-estoppel" provision.  *See Ford Motor Credit v. Waters,* 273 So.2d 96 (Fla. 3d Dist. Ct. App. 1973)(applying doctrine of estoppel despite presence of non-waiver provision), *Protean Investors, Inc. v. Travel, Etc., Inc.,* 499 So.2d 49 (Fla. 3d Dist. Ct. App. 1986) (finding estoppel notwithstanding presence of non-waiver provision in lease where lessor accepted late payments without protest and never notified lessee of defaults); *Kelly Tractor Co. v. R.J. Canfield Contracting, Inc.,* 579 So.2d 261, 264 (Fla. 4th Dist. Ct. App. 1991) (distinguishing between waiver and estoppel when considering application of non-waiver provision in late payment case).  Thus, a non-waiver provision does not automatically preclude the defense of equitable estoppel.  It is also clear that the non-waiver provisions in the Franchise Agreements do not contain language sufficient to overcome the defense of equitable estoppel.

### 3. The mischief and real meaning of *Philpot v. Bouchelle.*

Both *MCA Television* and *Hinton* (as well as the majority of cases cited by BKC) relied upon the Florida District Court case of *Philpot v. Bouchelle,* 411 So.2d 1341 (Fla. 1st Dist. Ct.

---

[2] Although *MCA Television* suggests that waiver and estoppel are indistinguishable, that case is of limited guidance here because the non-waiver provision in that case specifically addressed the issue of untimely payments.  *Hinton* is equally unhelpful because the court there did not address the elements of waiver and estoppel individually.  Neither did it recite the language of the non-waiver provision under review.  The other cases relied on by BKC are also easily distinguished:  *Rybovich Boat Works, Inc. v. Atkins,* 587 So.2d 519 (Fla. 4th Dist. Ct. App. 1991) did not consider estoppel as a separate legal theory; *Dunkin' Donuts v. Liu,* 2000 WL 1868386 (E.D. Pa. Dec. 21, 2000) considered a non-waiver provision that directly addressed late payments; *Gergora v. Flynn,* 486 So.2d 5 (Fla. 3d Dist. Ct. App. 1986)(plurality opinion) did not address estoppel individually, and relied on the earlier case of *Raimondi v. I.T. Chips, Inc.,* 480 So.2d 240 (Fla. 4th Dist. Ct. App. 1985), where that court addressed a non-waiver provision that did speak directly to acceptance of late payment whereas the provision in *Gergora* did not; *Burger King Corp. v. Lee,* 766 F.Supp. 1149 (S.D. Fla. 1991) contained no discussion of the distinct elements of waiver and equitable estoppel, did not recite the language of the non-waiver provision at issue, and involved a case where the franchisees sought to postpone payments indefinitely; *Little Caesar Enterprises, Inc. v. R-J-L Foods, Inc.,* 796 F.Supp. 1026 (E.D. Mich. 1992) did not discuss the elements of estoppel individually and dealt with franchisees who were more than 10 months in arrears in payment of royalty and advertising fees.  Neither *Dunkin' Donuts v. NJS, Inc.,* 889 F.Supp. 1074 (N.D. Ill. 1995) nor *McDonald's Corp. v. C.B. Management Co., Inc.,* 13 F.Supp.2d 705 (N.D. Ill. 1998) dealt with the issue of equitable estoppel at all.

App. 1982) for the proposition that non-waiver provisions apply to the defenses of both waiver and estoppel. *Philpot* is distinguishable, however. The provision under review in *Philpot* arguably was not a "non-waiver" provision at all, but a "non-forfeiture" provision. Indeed, the word "waive" is nowhere mentioned in the provision in *Philpot*. The unique language of the contractual provision in that case was interpreted to also include estoppel. The provision stated:

> The rights of the lessor under the foregoing shall be cumulative and the failure on the part of the lessor to exercise properly any rights given hereunder shall not operate to *forfeit* any of the said rights.

411 So.2d at 1343 (emphasis added).

In *City of Gainesville v. Charter Leasing Corp.*, 483 So.2d 465, 467 (Fla. 1st Dist. Ct. App. 1986), the Florida First District Court of Appeal revisited *Philpot* in a case also construing the scope of a non-waiver provision. The court found that the language in *Philpot* and the language at issue in *City of Gainesville* were significantly different. *Id.* The Florida 1st DCA twice emphasized that the language in *Philpot* included the word "forfeit," which did not appear in the provision it was reviewing in *City of Gainesville* and does not appear in the language of Paragraphs 17A or 19B of the Franchise Agreements. Thus, because the court found that the language in *City of Gainesville* did not clearly and unambiguously express the parties' intention to modify the common law rules of waiver and estoppel (as did the "forfeit" language in *Philpot*), the non-waiver provision was not enforced. *Id. See also Western World, Inc. v. Dansby*, 603 So.2d 597, 601-601 (Fla. 1st Dist. Ct. App. 1992) (refusing to enforce non-waiver agreement where contract language did not specify what type of behavior did not constitute waiver).

It is easy to misapply the rule of law in *Philpot*, but the court's rationale is merely a lesson in contract interpretation. As applied to this case, the word "forfeit" used in *Philpot* has a much broader meaning than the word "waive," the term employed in Paragraphs 17A and 19B of the Franchise Agreements. Indeed, one accepted definition of "waiver" expressly states that the terms

"waiver" and "estoppel" are not synonymous. *See* BLACK'S LAW DICTIONARY 1417 (5th ed.)  A

"waiver" does not mean an "estoppel."  "Forfeit" on the other hand, is the root word of

"forfeiture," which is the end product of either a waiver or an estoppel, and explains the Florida

First District Court's decisions in both *Philpot* and *City of Gainesville*.[3]  Thus, a waiver may work

a forfeiture.  And an estoppel may work a forfeiture.  But a waiver is not an estoppel, even if the

person against whom waiver is claimed is, in the end, "estopped" from asserting some supposed

right.  That is because a waiver results from a unilateral act while estoppel results from a bilateral

state of affairs.  A forfeiture, in contrast, can occur under either circumstance.

In sum, a non-waiver provision does not automatically defeat equitable estoppel.  Because

the language in Paragraphs 17A and 19B does not clearly and unambiguously express the parties'

intention to modify the common law rule of equitable estoppel, or even mention the word

"estoppel" or its component elements, these provisions have no application to the defense of

equitable estoppel in this case.

**B.      The Course of Dealings and the Terms of the Franchise Agreements are not Unreasonably Inconsistent.**

BKC relies on *Flagship National Bank v. Gray Distribution Systems, Inc.,* 485 So.2d 1336

(Fla. 3d Dist. Ct. App. 1986), and its progeny for the conclusion that "express terms of a contract

override any inconsistent course of conduct by the parties."  Opposing Memorandum, 17.

However, BKC omits a significant caveat from that case: "when a course of dealings and the

express terms of an agreement appear to conflict, the practice of the parties and the agreement

---

[3] The words forfeit and waive do not have the same meaning. *See* BLACK'S LAW DICTIONARY 584 (5th ed.) (defining "forfeit" as "to lose, or to lose the right to, by some error, fault, offense, or crime.") "Waive," on the other hand, is defined as "the intentional or voluntary relinquishment of a known right." *Id.* at 1417.  Significantly, neither definition cross-references the other.  However, as the Florida authority shows, "an equitable estoppel may arise in the absence of any intention on the part of the person estopped to relinquish or change any existing right."  22 Fla. Jur. 2d ESTOPPEL AND WAIVER § 31.  Consequently, even where a party expressly seeks to prevent the happening of a waiver, an estoppel may still arise.

must be construed, wherever reasonable, as consistent with each other." *Id.* at 1340. Such a reasonable construction exists in this case.[4]

First, the course of dealings did not modify the formula for the amounts of the Royalty and Advertising ("R&A") payments to be sent to BKC. The payment amount is unchanged by the course of dealings. Secondly, unlike *Flagship,* where the borrowers argued that the bank was obligated to continue lending money to them over the debt ceiling specified in the relevant agreements, the course of dealings that arose between Defendants and BKC with respect to the payment of R&A fees does not require BKC to take any affirmative action. The same holds true of *Indian Harbor Citrus, Inc. v. Poppell,* 658 So.2d 605 (Fla. 4th Dist. Ct. App. 1995). In that case, an aggrieved citrus grove owner sued a picker who had refused the owner's repeated demands to pick the oranges in his groves in advance of the date specified in the contract. The court held that the picker was not required to pick the orange grove any sooner than the date specified in the contract. Again, the course of dealings between Defendants and BKC does not require BKC to do anything above and beyond the terms of the Franchise Agreements. Rather, it recognizes that payments of R&A fees, when made between 0 and 33 days from the tenth day of the following month, will not constitute a breach, such payments being in grace.[5] Such a construction is neither inconsistent nor unreasonable with the terms of those agreements.

---

[4] Defendants observe that *Flagship* relied on Section 1-205(4) of Florida's Uniform Commercial Code. *See* Fla. Stat. § 671.205(4). Although the UCC rule may be considered by analogy, this is obviously not a case involving the sale of goods between merchants.

[5] BKC suggests that the course of dealings and the Worldwide Credit Policy memorandum are one in the same, and that Defendants cannot claim estoppel based on this Policy because they did not pay within its terms. Opposing Memorandum, 6-10. Defendants have not made this claim. They rely on the parties' course of dealings, which is broader than the terms of the memorandum. The memorandum (as well as the information on the Trinity Capital program) is presented as proof of the fluidic nature of the relationship between BKC and its franchisees, including Defendants. BKC has a history of offering assistance, changing terms, and making other modifications to the Franchise Agreements, and then, when the changes and modifications no longer suit their purpose, demanding strict compliance. *See* Motion for Summary Judgment, 6.

Moreover, there is no conflict between the course of dealings and the date payments are due under the Franchise Agreements. The course of dealings does not "overwrite" the Franchise Agreements, but supplies a missing term not specified anywhere in the agreements: a grace period for payment. BKC has misunderstood the Defendants argument. The Franchise Agreements were not modified as to the "due date" for payments, but modified by the course of dealings to include a grace period. Furthermore, Defendants have not suggested that the course of dealings has amended the Franchise Agreements for all time. Rather, the grace period *could* have been revoked, but only on sufficient advance notice of same. BKC never provided that notice.

### C. Defendants Did Not Have Equal Opportunity to Discover the True Facts as Would Prevent Application of Equitable Estoppel.

BKC argues that the Defendants had equal access to the true facts because they knew about the payment terms in the Franchise Agreements and, thus, cannot claim the benefits of equitable estoppel. Opposing Memorandum, 20. This argument is off the mark. The knowledge Defendants did not have (which BKC did have) was BKC's intent to revoke the accepted course of dealings between the parties with respect to the grace period for payment of R&A fees.

The H&H litigation did not provide Defendants with that knowledge.[6] None of the purported default and termination letters provided Defendants with that knowledge. All that each of these "form letters" states is that "Reference is hereby made to each of the Franchise Agreements..." and that Defendants were in default. *See* Composite Exhibit "B." Nowhere in those letters are Defendants advised that (1) the prior course of dealings establishing the grace period is revoked, (2) what provisions of the Franchise Agreements BKC is making "reference" to, or (3) that strict compliance would be demanded in the future as to the specified provisions (which

---

[6] BKC's reference to the H&H litigation is replete with errors not material to the disposition of the pending motion. By BKC's own pleading in that case, Mike Hashim did not "control" the H&H franchises but was

BKC did not bother to specify). Such a vague claim of default does not rise to the level of sufficient advance notice that a change in the course of dealings is occurring, such as would provide a meaningful opportunity for Defendants to alter their conduct accordingly. *See Ford Motor Credit v. Waters,* 273 So.2d 96, 100 (Fla. 3d Dist. Ct. App. 1973); *LaGuardia Assoc. v. Holiday Hospitality Franchising, Inc.,* 92 F.Supp.2d 119, 130 (E.D. N.Y. 2000). Because Defendants never had a meaningful opportunity to return to the strict terms of the Franchise Agreements, equitable estoppel applies, and BKC's purported termination was wrongful.

**D.   BKC's Attempt to Disclaim That It Has Accepted the Benefits of the Franchise Agreements is Unavailing.**

BKC contends that it has not accepted the benefits of the Franchise Agreements, even though Defendants have paid all R&A fees to BKC that have come due while this lawsuit has been pending. Opposing Memorandum, 21. The argument that BKC has "held" such payments, as an offset for anticipated breach damages or otherwise, is laughable at best.

First, there is no provision in the Franchise Agreements entitling BKC to "hold" these payments. Even if there were, BKC has not "held" all of the payments anyway, having deposited at least some of the checks sent by Defendants after the purported termination into commingled general accounts, as opposed to segregated or trust accounts. *See* Defendants' Motion for Summary Judgment, D.E. # 38, at 18-21. Moreover, the case authority BKC cites in support of this position is not as clear-cut as BKC suggests.

In *Dunkin' Donuts v. Liu,* 2000 WL 1868386*3 (E.D. Pa. Dec. 21, 2000), the franchise agreement under review "expressly state[d] that Dunkin's acceptance of late payments does not constitute a waiver of Dunkin's rights under the agreement." No such provision exists in the

---

a guarantor only. *See* Complaint for Injunctive Relief and Damages (D.E. # 1), *BKC v. H&H Restaurants, LLC,* Case No. 99-2855-CIV-JORDAN (S.D. Fla.), attached hereto as Exhibit "A."

Franchise Agreements between BKC and Defendants.  The case of *Truglia v. KFC Corp.*, 692 F.Supp. 271, 276-277 (S.D. N.Y. 1988) did not consider the acceptance of contractual benefits rule as it exists under Florida law.[7]  Finally, *Gergora v. Flynn*, 486 So.2d 5 (Fla. 3d Dist. Ct. App. 1986) (plurality opinion) is of limited precedential value because it relied on the earlier case of *Raimondi v. I.T. Chips, Inc.*, 480 So.2d 240 (Fla. 4th Dist. Ct. App. 1985), where that court addressed a non-waiver provision that <u>did</u> speak directly to acceptance of late payment whereas the provision in *Gergora* did not.

In addition to the foregoing, BKC argues that the Defendants' payments were improper because "tender was not made to the appropriate person."  Opposing Memorandum at 22, n. 11. In support of this BKC relies on *Maryland Casualty Co. v. Hanson Dredging, Inc.*, 393 So.2d 595, 596 (Fla. 4th Dist. Ct. App. 1981).  However, *Maryland Casualty* is patently inapposite because in that case a check payment in satisfaction of a judgment was made payable jointly to the appellant and to a third party.  No such error has been committed by Defendants in this case.  Whether payments were directed to the attention of Tom Archer in Miami, or to the BKC lock box, they were still made to BKC and BKC alone.  Thus, there is no genuine issue that BKC has not, in fact, accepted and retained the fruits of the Franchise Agreements after BKC claims the agreements terminated.

## CONCLUSION

WHEREFORE, Defendants Restaurant Corporation of America and Mumtaz "Mike" Hashim respectfully request that this court enter Summary Judgment against Burger King Corporation on all counts of its Amended Complaint.

---

[7] BKC argues that the cases cited by Defendants in their Motion for Summary Judgment which support this point of law are "inapposite because they are non-franchise cases."  Opposing Memorandum at 22, n. 12. This argument is somewhat farcical given that BKC relies on its fair share of "non-franchise cases" in its Opposing Memorandum as well.

Rafferty, Hart, Stolzenberg, Gelles & Tenenholtz, P.A.
1101 Brickell Avenue, Suite 1400, Miami, Florida 33131   ·  Tel: (305) 373-0330 Fax: (305) 373-2735

Respectfully submitted,

**RAFFERTY, HART, STOLZENBERG,**
**GELLES & TENENHOLTZ, P.A.**
1101 Brickell Avenue, Suite 1400
Miami, Florida 33131
Telephone No.:  (305) 373-0330
Facsimile No.:  (305) 373-2735
*Counsel for Defendants*

By: _____
        Jared Gelles, Esq.
        Florida Bar No. 991181
        Christopher T. McKay, Esq.
        Florida Bar No. 484164

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via Hand Delivery on this ___9___ day of June, 2003, to:  Michael D. Joblove, Esq., and Nina Greene Kersh, Esq., Genovese, Joblove & Battista, Bank of America Tower, 36th Floor, 100 S.E. 2nd Street, Miami, Florida 33131.

By: _____
        Jared Gelles, Esq.
        Christopher T. McKay, Esq.

**EXHIBIT "A"**

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

CIV-JORDAN

MAGISTRATE JUDGE
BANDSTRA

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| BURGER KING CORPORATION | H&H RESTAURANTS, LLC, HERBERT HAKIMIANPOUR, ROBERT HAKIMIANPOUR, and MIKE HASHIM |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

AOADE990U2855/AJ TEB

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
DENNIS LEONE, Genovese Lichtman et al.
100 SE 2nd St., 36th Floor, Miami, Fl
33131, (305) 349-2300

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

| II. BASIS OF JURISDICTION | III. CITIZENSHIP OF PRINCIPAL PARTIES | |
|---|---|---|
| (PLACE AN X ONE BOX ONLY) | (For Diversity Case Only) | (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) |

| II. BASIS OF JURISDICTION (PLACE AN X ONE BOX ONLY) | | III. CITIZENSHIP OF PRINCIPAL PARTIES (For Diversity Case Only) | | | |
|---|---|---|---|---|---|
| | | | PTF | DEF | |
| ☐ 1. U.S Government Plaintiff | ☐ 3. Federal Question (U.S. Government Not a Party) | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place 1999 ☐ 4  ☐ 4 of Business in This State |
| ☐ 2. U.S Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of ☐ 5  ☐ 5 Business in Another State |
| | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation ☐ 6  ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

**IVa.** _____ days estimated (for both sides) to try entire case

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| A CONTACT | A TORTS | B FORFEITURE PENALTY | A BANKRUPTCY | A OTHER STATUS |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 States Reappocement |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **A PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instruments | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. B |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) B | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending B | ☐ 660 Occupational Safety/Health | **B SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits B | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **A LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12USC3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor Management Relations B | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **B PRISONER PETITIONS** | ☐ 730 Labor Management Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **A FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure B | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General * | ☐ 791 Employee Ret Inc Security Act B | ☐ 871 IRS-Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other * | | | ☐ 890 Other Statutory Actions * * A or B |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights * A or B | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

| ☐ 1 Original Proceeding | ☐ 2 Removed From State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (Specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

| VII. REQUESTED IN COMPLAINT | CHECK IF THIS IS A ☐ UNDER F.R.C.P. 23 | CLASS ACTION | DEMAND $ | CHECK YES only if demanded in complaint JURY DEMAND: ☐ YES ☐ NO |
|---|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | (See Instructions): | JUDGE | DOCKET NUMBER |
|---|---|---|---|

DATE 10/22/99

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT
S/F I-2
REV. 9/94

FOR OFFICE USE ONLY: Receipt No. 811009
Date Paid: 10/25/99

Amount: 150.00
M/ftp: _____

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

MIAMI DIVISION       **CIV-JORDAN**

CASE NUMBER:
Magistrate Judge
**MAGISTRATE JUDGE**
**BANDSTRA**

BURGER KING CORPORATION,

     Plaintiff,

vs.

H&H RESTAURANTS, LLC, HERBERT
HAKIMIANPOUR, ROBERT
HAKIMIANPOUR, and MIKE HASHIM,

     Defendants.

_____/



## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Burger King Corporation ("Burger King") sues defendants H&H Restaurants, LLC (the "Company"), Herbert Hakimianpour ("H. Hakimianpour"), Robert Hakimianpour ("R. Hakimianpour"), and Mike Hashim ("Hashim") (collectively, "Defendants"), and states:

1.    This is an action for damages and to enjoin the Company's unauthorized use of Burger King's valuable trademarks and service marks in connection with the unlawful operation of 13 restaurants as authorized Burger King® restaurants, and for damages resulting from Defendants' breaches of various contracts between the parties, including Defendants' failure to pay Burger King $131,726.60 as obligated.

## THE PARTIES

2.    Plaintiff Burger King is a Florida corporation with its principal place of business in Miami, Florida.

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.
NATIONSBANK TOWER • 100 SOUTHEAST SECOND STREET, 36TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE (305) 349-2300 • FACSIMILE (305) 349-2310

3.      Upon information and belief, defendant Company is a Texas limited liability company with its principal place of business in the State of Texas.

4.      Upon information and belief, defendant H. Hakimianpour is a citizen of the State of California.

5.      Upon information and belief, defendant R. Hakimianpour is a citizen of the State of California.

6.      Upon information and belief, defendant Hashim is a citizen of the State of California.

### JURISDICTION AND VENUE

7.      Burger King operates and franchises restaurants throughout the United States. Burger King's franchise operations are conducted and supervised from its world headquarters located in Miami, Florida.

8.      The parties have carried on a continuous course of direct communications by mail and by telephone through Burger King's World Headquarters in Miami, Florida.

9.      The course of dealing between Burger King and its franchisees, including Company, shows that decision-making authority is vested in Burger King's World Headquarters in Miami, Florida.

10.     Defendants negotiated with Burger King in Miami, Florida for the acquisition of long-term franchise and guaranty agreements with the knowledge that they would benefit from their affiliation with Burger King.

11.     Defendants voluntarily entered into franchise and guaranty relationships with Burger King which envisioned continuing and wide-reaching contacts with Burger King in Florida,

2

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.

NationsBank Tower • 100 Southeast Second Street, 36th Floor • Miami, Florida 33131 • Telephone (305) 349-2300 • Facsimile (305) 349-2310

including regulation of Company's franchised businesses from Burger King's World Headquarters in Miami, Florida.

12.     Defendants have purposefully availed themselves of the benefits and protection of Florida law by entering into agreements with Burger King which expressly provide that Florida law will govern any disputes.

13.     This Court has jurisdiction over this action based upon:

(a)     Section 39 of the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1337, and 1338 (a), for the claims arising out of Company's violations of Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a); and

(b)     28 U.S.C. § 1338(b), and the doctrine of supplemental jurisdiction as codified in 28 U.S.C. § 1367, for the claims of breach of contract and common law unfair competition.

14.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(a) and forum selection clauses agreed to by the parties.

15.     Defendants have agreed in writing that this Court has jurisdiction over them in any litigation to enforce the terms of the agreements between the parties, and that they will neither contest nor challenge the jurisdiction of this court or the venue of this proceeding.

16.     Defendants have further agreed in writing that in any litigation to enforce the terms of the agreements between the parties that, Burger King, as the prevailing party, shall be paid by Defendants all costs, including attorneys' fees, incurred as a result.

17.     Burger King has engaged undersigned counsel and has agreed to pay counsel reasonable attorneys' fees for all services rendered in this action and otherwise in connection with enforcing the agreements between Burger King and Defendants.

3

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.

NATIONSBANK TOWER • 100 SOUTHEAST SECOND STREET, 36TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE (305) 349-2300 • FACSIMILE (305) 349-2310

18.    All conditions precedent to the institution of this action have been satisfied, discharged, excused, and/or waived.

## THE BURGER KING MARKS

19.    To identify the source, origin, and sponsorship of Burger King's facilities, products, and services, Burger King has extensively employed, caused to be advertised, and publicized throughout the United States certain distinctive symbols as trademarks and service marks (the "Burger King Marks").  Burger King was the first to adopt and use the Burger King Marks as trademarks and service marks, and all right, title, and interest to the Burger King Marks and the design, decor, and image of Burger King® restaurants remain vested solely in Burger King and its wholly-owned subsidiary, Burger King Brands, Inc. ("Burger King Brands").

20.    Burger King operates and franchises Burger King® restaurants using the Burger King Marks on signs, menu boards, posters, translights, uniforms, plates, cups, tray liners, and other items, and in advertising to the public through television, radio, and print media.

21.    Set forth below is an abbreviated listing of the Burger King Marks registered in the United States Patent and Trademark Office:

| Registration No. | Trademark | Registration Date |
|---|---|---|
| 722,375 | BURGER KING | 1961 (renewed through 2001) |
| 782,990 | HOME OF THE WHOPPER | 1965 (renewed through 2005) |
| 869,775 | BURGER KING | 1969 (renewed through 2009) |
| 899,775 | WHOPPER | 1970 (renewed through 2000) |
| 901,311 | BURGER KING logo | 1970 (renewed through 2000) |
| 961,014 | BURGER KING logo | 1973 (renewed through 2003) |
| 1,057,250 | BURGER KING logo | 1977 (renewed through 2007) |
| 1,062,368 | WHOPPER JR. | 1977 (renewed through 2007) |
| 1,076,177 | BURGER KING | 1977 (renewed through 2007) |
| 1,451,533 | A.M. EXPRESS | 1987 |
| 1,550,398 | CROISSAN'WICH | 1989 |

4

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.

NATIONSBANK TOWER • 100 SOUTHEAST SECOND STREET, 36TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE (305) 349-2300 • FACSIMILE (305) 349-2310

| Registration No. | Trademark | Registration Date |
|---|---|---|
| 1,699,280 | BK BROILER | 1992 |
| 1,785,694 | CHICKEN TENDERS | 1993 |
| 2,186,883 | BIG KING | 1998 |

22.     The registrations of the Burger King Marks are currently in full force and effect, and Burger King has given notice to the public of the registration of the Burger King Marks as provided in 15 U.S.C. § 1111.  Burger King Brands owns, by assignment from Burger King, each of the registrations for the Burger King Marks listed above with the exception of CHICKEN TENDERS® (which is owned by Burger King).  Burger King Brands has granted to Burger King the exclusive right to use and license the Burger King Marks.

23.     Pursuant to Burger King® Restaurant Franchise Agreements between Burger King and its franchisees, Burger King grants its franchisees a limited license and authority to use and display the Burger King Marks, but only in such manner and at such locations and times as are expressly authorized by Burger King.  In no event is a franchisee authorized to use the Burger King Marks after the expiration or termination of its franchise.  Such unauthorized use is expressly prohibited under the terms of all Burger King® Restaurant Franchise Agreements, including Company's Burger King® Restaurant Franchise Agreements with Burger King.

24.     Burger King's products bearing the Burger King Marks are offered and sold in interstate commerce.

25.     Burger King and its franchisees have spent many millions of dollars in the United States and abroad advertising and promoting Burger King's restaurants, services, and products.

26.     The substantial investment made in the Burger King Marks has resulted in valuable good will for the Burger King Marks and for the restaurants, products, and services bearing those

5

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.

NATIONSBANK TOWER • 100 SOUTHEAST SECOND STREET, 36TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE (305) 349-2300 • FACSIMILE (305) 349-2310

marks. Burger King products and services have met with popular approval and, as a result of Burger King's extensive sales, advertising, promotion, and publicity, the public is familiar with the Burger King Marks. The products and services associated with the Burger King Marks are understood by the public to be produced, marketed, sponsored, supplied by, and/or affiliated with Burger King.

## THE BURGER KING SYSTEM

27.     Burger King has developed a comprehensive restaurant operating system for all Burger King franchisees in order to protect the image of Burger King® restaurants and to ensure uniform, high quality standards.  The detailed specifications and procedures of the "Burger King System" are set forth in Burger King's Manual of Operating Data (the "OPS Manual").

28.     Every Burger King franchisee is required by its franchise agreement to operate its franchise in accordance with the specifications and procedures contained in the OPS Manual.  The OPS Manual sets forth in detail the mandatory Burger King restaurant operating standards, specifications, and procedures, including rules governing food preparation and handling, cleanliness, health, sanitation, quality, and speed of service.  In addition to these strict quality, service, and cleanliness requirements, the OPS Manual prescribes specified training procedures to ensure that these requirements are met. The OPS Manual is a confidential and trade secret protected Burger King document which a franchisee is permitted to have only during the term of its franchise agreement with Burger King.

29.     Burger King offers a broad range of services to its franchisees to monitor and assist a franchisee's compliance with these standards.  This enables Burger King to safeguard the integrity of Burger King® restaurants, the Burger King System, and the Burger King Marks.  Training for

6

various levels of personnel is made available at "Burger King University" in Miami, Florida. Burger King also conducts regional and local training and instructional programs.

30.     Integral to Burger King's compliance and assistance program are periodic inspections and consultations undertaken by Burger King personnel specially trained to observe and advise in all areas of restaurant operating procedure. Pursuant to Burger King's restaurant visitation process, action plans are issued after a restaurant inspection is conducted. These action plans serve as a training opportunity for the franchisee and as a quality assurance process for Burger King to ensure that critical quality, service, and cleanliness standards are being met. Each Burger King® Restaurant Franchise Agreement confers upon Burger King the right to enter the restaurant premises to perform this vital function.

31.     As a result of its substantial expenditures of money and effort in developing and implementing the Burger King System, Burger King has established a high reputation and a positive image with the public as to the quality of products and services available at Burger King® restaurants. This reputation and image have been, and continue to be, valuable assets of Burger King. Burger King strives to maintain that reputation through its careful selection of authorized franchise owners, facilities, and locations and its careful supervision over the manner and quality of its restaurant service.

## BURGER KING'S AGREEMENTS WITH DEFENDANTS

### The Franchise Agreements

32.     The Company owned and operated 13 restaurants as authorized Burger King® restaurants using Burger King's systems and names, including service marks and trademarks (the

7

"Restaurants") pursuant to 13 separate Burger King® Restaurant Franchise Agreements (the

"Franchise Agreements") more particularly described as follows:

| Restaurant Number | Restaurant Location | Date of Franchise Agreement |
|---|---|---|
| BK #5904 | 1215 Sidney Baker<br>Kerrville, Texas 78028 | June 21, 1996 |
| BK #7990 | 3100 Broadway<br>San Antonio, Texas 78209 | June 21, 1996 |
| BK #8349 | 4318 Vance Jackson<br>San Antonio, Texas 78230 | June 21, 1996 |
| BK #8488 | 2206 East Southcross<br>San Antonio, Texas 78223 | June 21, 1996 |
| BK #8489 | 5007 North West Loop 410<br>San Antonio, Texas 78229 | June 21, 1996 |
| BK #8912 | 6596 Fm 78 Road<br>San Antonio, Texas 78244 | June 21, 1996 |
| BK #8913 | 1002 North East Loop 410<br>San Antonio, Texas 78209 | June 21, 1996 |
| BK #8975 | 16711 Nacagdoches Road<br>San Antonio, Texas 78266 | June 21, 1996 |
| BK #8999 | 5562 Tezel Road<br>San Antonio, Texas 78250 | June 21, 1996 |
| BK #9061 | 5218 Dezavala Road<br>San Antonio, Texas 78249 | June 21, 1996 |
| BK #9721 | 3400 Fredericksburg<br>San Antonio, Texas 78201 | November 26, 1996 |
| BK #9722 | 1327 South Main<br>Boerne, Texas 78006 | November 11, 1996 |

8

| Restaurant Number | Restaurant Location | Date of Franchise Agreement |
|---|---|---|
| BK #10546 | 1000 North West Loop 410 San Antonio, Texas 78213 | May 7, 1997 |

### The Guaranties

33.     Pursuant to thirteen separate written guaranties, defendants H. Hakimianpour, R. Hakimianpour, and Hashim (collectively, the "Guarantors") have personally guarantied to Burger King the performance of each and every term, condition, and obligation of the franchisee, Company, under the Franchise Agreements (the "Guaranties").

### DEFENDANTS' OBLIGATIONS

34.     Under the terms of the Franchise Agreements, the franchisee, Company, is obligated to make monthly payments to Burger King for royalties, advertising, and other fees in return for the right to use and display the Burger King Marks at the Restaurants.  Specifically, the Franchise Agreements require Company to pay Burger King a royalty of 3.5% of gross sales for the preceding calendar month in return for the use of the Burger King System and the Burger King Marks. Additionally, Company is obligated to pay Burger King an amount equal to 4% of its monthly gross sales for the preceding calendar month in return for advertising, sales promotion, and public relations expenditures made by Burger King on behalf of the entire Burger King System. All such royalty and advertising payments are required to be made to Burger King in Miami, Florida on or before the tenth of each month.

### DEFAULT AND TERMINATION OF THE FRANCHISE AGREEMENTS

35.     The Franchise Agreements also contain provisions regarding default and establishing the parties' rights and obligations in the event of a default by the franchisee.  For example, a failure

9

to pay, when due, royalty and advertising contributions to Burger King in accordance with the Franchise Agreements is a default. The Franchise Agreements further provide that the agreements will terminate if the franchisee fails to timely pay the past due amounts after written notification and an opportunity to cure such failure.

36. As of September 24, 1999, Burger King notified Company that its failure to pay when due royalty and advertising charges totaling $131,726.60 was a default of the Franchise Agreements (the "Notice of Default"). In the Notice of Default, Burger King demanded that Company cure the default, by paying all past due royalty and advertising charges, within the appropriate cure period, or the Franchise Agreements would automatically terminate by their terms. The Franchise Agreements specifically provide that Company is required to cure the default by paying all past due amounts within the earlier of 10 days from its receipt of the Notice of Default or 13 days from the date of the Notice of Default. As such, Burger King demanded that Company cure the default on or before October 7, 1999.

37. Burger King timely provided Guarantors with a copy of the Notice of Default although it had no obligation to do so.

38. Despite providing Company with the Notice of Default, Company has failed to pay these past due amounts.

39. Despite providing Guarantors with the Notice of Default, Guarantors have failed to pay these past due amounts.

40. As such, Company failed to timely cure the defaults as required by the Franchise Agreements.

10

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.

NATIONSBANK TOWER • 100 SOUTHEAST SECOND STREET, 36TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE (305) 349-2300 • FACSIMILE (305) 349-2310

41.    As a result of this failure to timely cure these defaults, the Franchise Agreements terminated by their terms effective 12:01 a.m. October 8, 1999.

### POST-TERMINATION OBLIGATIONS

42.    The Franchise Agreements also contain provisions which set forth the parties' rights and obligations in the event the Franchise Agreements terminate.  The Franchise Agreements provide, in pertinent part, that a terminated franchisee, such as Company, has no right to use the Burger King Marks or the Burger King System.  Additionally, terminated franchisees are prohibited from identifying themselves as a either a current or former Burger King® franchisee, from using any of Burger King's trade secrets, promotional materials, the Burger King Marks, or any mark confusingly similar.  Terminated franchisees are further required upon termination or expiration of their Burger King® Restaurant Franchise Agreement, to immediately make such removals or changes in signs and the building as Burger King shall request so as to effectively distinguish the building and premises from its former appearance and from any other Burger King® restaurant.

43.    Company has not returned its OPS Manual and other operational manuals to Burger King as required by the Franchise Agreements.

44.    In violation of the Franchise Agreements, Company has continued to hold itself out to the public as operating genuine and authorized Burger King® restaurants by continuing to use the Burger King Marks at the Restaurants subsequent to the termination of the Franchise Agreements. In so doing, Company is infringing upon the Burger King Marks and breaching its explicit obligations under the Franchise Agreements.

11

45.     Additionally, Guarantors have failed to ensure that Company complies with each of the above obligations of the Franchise Agreements, and, as such, are in breach of their explicit obligations of the Guaranties.

## LIKELIHOOD OF CONSUMER
## CONFUSION AND DECEPTION

46.     Company has not tendered to Burger King or removed all Burger King® signs, logos, menu boards, posters, translights, uniforms, plates, cups, tray liners, and other items bearing the Burger King Marks, name, symbols, or slogans, or which are otherwise identified with Burger King® and are located at the Restaurants.

47.     Company's continued use and display of the Burger King Marks or any items associated with the Burger King® name, symbols, or slogans at the Restaurants is without Burger King's license or consent, and has caused or is likely to cause mistake, confusion, or deception in the minds of the public as to source, affiliation, and sponsorship.  Upon seeing the familiar Burger King Marks, through Company's unauthorized use thereof, consumers will be deceived into concluding that the products and services sold at the Restaurants are made or supplied by Burger King, are prepared in the prescribed Burger King manner and subject to Burger King's supervision, are sponsored or endorsed by Burger King, and bear the Burger King Marks pursuant to Burger King's authority and permission.  Such impressions are calculated to and will have a material influence on customers' purchasing decisions, inducing them to patronize Company's restaurants in reliance on the goodwill, reputation, and appeal of Burger King.

48.     By reason of the foregoing, Burger King has suffered damages, in an amount presently unknown yet substantial.  Burger King no longer is the source or sponsor of the

12

Restaurants and does not endorse said Restaurants, or the products and services provided therein, has not authorized Company to use the Burger King Marks to identify its terminated franchise facilities, products, or services, and has protested expressly against such use.

49.     Burger King has notified Company that the continued use of the Burger King Marks is unauthorized, but it has refused to comply with the termination covenants of the Franchise Agreements.

50.     By virtue of Company's termination as a Burger King franchisee, Burger King is unable to control the nature and quality of the goods and services that Company provides at the Restaurants.

51.     Burger King will suffer serious, immediate, and irreparable harm if Company's willful infringement of the Burger King Marks is not immediately enjoined.  In fact, Company has agreed in writing that monetary damages are inadequate to remedy the damages Burger King will suffer as a result of this uncured default.  Burger King's goodwill and reputation will suffer drastically by virtue of the public's identification of Burger King with Company's management and operation of the Restaurants outside of Burger King's control and supervision.  Burger King exercises strict quality control over every phase in the marketing of Burger King® products and services, from specification of ingredients, to the supervision of food preparation and handling, to the maintenance of strict standards as to cleanliness, health, sanitation, and quality of service. The carefully nurtured image which Burger King now enjoys will be irretrievably injured by any association with Company's terminated franchises, which no longer are subject to Burger King's control and supervision.

13

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.

NATIONSBANK TOWER • 100 SOUTHEAST SECOND STREET, 36TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE (305) 349-2300 • FACSIMILE (305) 349-2310

52.     Company's sale of products and services under the Burger King Marks at the terminated franchises poses an immediate threat to the distinct, exclusive image Burger King has created at great expense for its franchisees.  Burger King® restaurants, services, and products are known by the Burger King Marks which are emblematic of their distinctive source.  Burger King® restaurants enjoy a special appeal to consumers which will be diluted by the existence of infringing restaurants with products and services bearing the distinctive Burger King Marks.  The intangible, but commercially indispensable, value that the Burger King® restaurants now enjoy will be severely undermined by the operation of Company's Restaurants which make unauthorized use of the Burger King Marks.

53.     Consumer confusion as to the source or sponsorship of restaurants bearing the Burger King Marks will be attended not only by an inevitable loss of product distinctiveness, image, and goodwill, but will also cause a diversion of sales from Burger King.  The economic injury to Burger King resulting from such diversion is incalculable and, as such, is an additional source of irreparable harm.

### COUNT I
### LANHAM ACT INFRINGEMENT AGAINST COMPANY

54.     Burger King realleges paragraphs 1 through 53 above as if fully set forth herein.

55.     Company's acts constitute infringements of Burger King's registered trademarks and service marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, and those acts have directly and proximately caused loss and damage to Burger King.

### COUNT II
### LANHAM ACT FALSE DESIGNATIONS AGAINST COMPANY

56.     Burger King realleges paragraphs 1 through 53 above as if fully set forth herein.

14

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.

NATIONSBANK TOWER • 100 SOUTHEAST SECOND STREET, 36TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE (305) 349-2300 • FACSIMILE (305) 349-2310

57.     Company's acts constitute false designations of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and those acts have directly and proximately caused loss and damage to Burger King.

**COUNT III**
**COMMON LAW TRADEMARK INFRINGEMENT AGAINST COMPANY**

58.     Burger King realleges paragraphs 1 through 53 above as if fully set forth herein.

59.     Company's acts constitute unlawful trademark and service mark infringements under the common law, and those acts have directly and proximately caused loss and damage to Burger King.

**COUNT IV**
**COMMON LAW UNFAIR COMPETITION AGAINST COMPANY**

60.     Burger King realleges paragraphs 1 through 53 above as if fully set forth herein.

61.     Defendants' acts constitute unfair competition under the common law, and those acts have directly and proximately caused loss and damage to Burger King.

**COUNT V**
**BREACH OF THE FRANCHISE AGREEMENTS AGAINST COMPANY**

62.     Burger King realleges paragraphs 1 through 53 above as if fully set forth herein.

63.     The failures of Company to pay Burger King $131,726.60 in amounts due are breaches of the Franchise Agreements, and those breaches have directly and proximately damaged Burger King.

64.     Further, Company's, operation of the Restaurants after 12:01 a.m. October 8, 1999 is also a breach of the Franchise Agreements, and those breaches have directly and proximately caused loss and damage to Burger King.

15

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.

NationsBank Tower • 100 Southeast Second Street, 36th Floor • Miami, Florida 33131 • Telephone (305) 349-2300 • Facsimile (305) 349-2310

## COUNT VI
## BREACH OF THE GUARANTIES AGAINST GUARANTORS

65.     Burger King realleges paragraphs 1 through 53 above as if fully set forth herein.

66.     Pursuant to the Guaranties, Guarantors guarantied performance of each and every term, condition, and restriction of the Franchise Agreements, including the obligation to pay Burger King amounts due under the Franchise Agreements should Company fail to make such payment.

67.     The failures of the Guarantors to pay Burger King $131,726.60 in amounts due by Company under the Franchise Agreements are breaches of the Guaranties, and those breaches have directly and proximately damaged Burger King.

68.     Further, Company's operation of the Restaurants after 12:01 a.m. October 8, 1999 is a breach of the Franchise Agreements and the Lanham Act, and those breaches have directly and proximately caused loss and damage to Burger King.  Pursuant to the Guaranties, Guarantors are responsible for all damages incurred by BKC.

WHEREFORE, Burger King Corporation demands judgment against defendants as follows:

1.     For preliminary and permanent injunctions enjoining Company, and all persons acting on its behalf, in concert with it, or under its control, from engaging and/or participating in the following acts within a two mile radius of each of the Restaurants:

(a)     manufacturing, packaging, distributing, selling, advertising, displaying, or promoting any product or service bearing any of the Burger King Marks, or any colorable imitation thereof;

(b)     displaying or using any of the Burger King Marks to advertise or promote the sale of, or to identify, the Restaurants, or any product or service provided therein; and

16

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.

NATIONSBANK TOWER • 100 SOUTHEAST SECOND STREET, 36TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE (305) 349-2300 • FACSIMILE (305) 349-2310

(c)      making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that Company, the Restaurants, and the products and services provided therein, are in any manner, directly or indirectly, associated, affiliated, or connected with, or licensed, sponsored, authorized, or approved by Burger King Corporation;

2.      For preliminary and permanent injunctions directing Company, and all persons acting on its behalf, in concert with it, or under its control, to do the following within a two mile radius of each of the Restaurants:

(a)      recall and deliver up to Burger King Corporation all signs, banners, labeling, packaging, advertising, promotional, display, and point-of-purchase materials which bear, or make reference to, any of the Burger King Marks, or any colorable imitation of the Burger King Marks;

(b)      recall and deliver up to Burger King Corporation all copies and editions of the OPS Manuals that are in their actual or constructive, direct or indirect, possession, custody, or control, including all supplements and addenda thereto, and all other materials containing restaurant operating instructions, restaurant business practices, or plans of Burger King Corporation;

(c)      allow Burger King Corporation, at a reasonable time, to enter the premises of the Restaurants and make whatever changes, including removal of tangible assets, that are necessary to distinguish the premises from their appearances as Burger King® restaurants;

(d)      account and pay over to Burger King Corporation all gains, profits, and advantages derived by Company from its trademark and service mark infringement, breach of contract, and unfair competition to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117, and by the controlling principles of common law;

17

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.

NATIONSBANK TOWER • 100 SOUTHEAST SECOND STREET, 36TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE (305) 349-2300 • FACSIMILE (305) 349-2310

3.     For money damages plus three times additional actual damages Burger King Corporation has sustained by reason of Company's trademark and service mark infringement, breach of contract, and unfair competition, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117;

4.     For punitive damages because of the willful nature of Company's actions;

5.     For prejudgment interest and Burger King Corporation's reasonable attorneys' fees incurred in protecting its rights in this action in accordance with the terms of the Burger King® Restaurant Franchise Agreements and, because of the willful nature of the infringement, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117;

6.     For an order directing Company to file with the Court, and to serve on Burger King Corporation's counsel within ten days after service of any injunction or order issued herein, or within such a reasonable time as the Court shall direct, a report, in writing and under oath, setting forth in detail the manner in which Company has complied with such injunction or order;

7.     For all amounts past due pursuant to the Franchise Agreements from Company;

8.     For all amounts owed to BKC by Guarantors pursuant to the Guaranties;

9.     For all costs, disbursements, and expenses of this action; and

10.    For all such other relief as this Court may deem just and proper.

18

GENOVESE LICHTMAN JOBLOVE & BATTISTA, P.A.

NATIONSBANK TOWER • 100 SOUTHEAST SECOND STREET, 36TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE (305) 349-2300 • FACSIMILE (305) 349-2310

GENOVESE LICHTMAN JOBLOVE & BATISTA
Attorneys for Burger King Corporation
NationsBank Tower
100 Southeast Second Street
36th Floor
Miami, Florida  33131
Telephone (305) 349-2300
Facsimile (305) 349-2310

By: _____
    Michael D. Joblove
    Florida Bar Number 354147
    Dennis Leone
    Florida Bar Number 069401

X:\Documents\WORK\BK\H&H Restaurants\complaint dtl wpd

19

**COMPOSITE EXHIBIT "B"**



Direct (305) 378-3238
Facsimile (305) 378-3191

October 25, 2002

<u>VIA FEDERAL EXPRESS and</u>
<u>CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>

PERSONAL AND CONFIDENTIAL

Mr. Mumtaz Hashim
Restaurant Corp. of America
19098 Brasilia Drive
Northridge, CA 91326

Re:  <u>NOTICE OF FINANCIAL DEFAULT - BKC Receivables and</u>
     <u>DEMAND for AmeriServe Post Petition Receivables</u>

Dear Mr. Hashim:

Burger King Corporation ("BKC") hereby notifies Restaurant Corp. of America and you individually (collectively, "you") that you are in default under your obligations relating to the Burger King® restaurants listed on <u>Schedule 1</u> attached hereto (the "Restaurants").

Reference is hereby made to each of the Franchise Agreements (the "Franchise Agreements"), the applicable Lease or Sublease Agreement (the "Lease"), and the Conditional Consent to Assignment of Franchise Agreements and Leases (the "Assignments") as enumerated on <u>Schedule 1</u> hereto. The Franchise Agreements, the Lease, and the Assignments are hereinafter collectively referred to as the "Burger King Agreements."

BKC hereby declares you to be in default under the Burger King Agreements as a result of your failure to pay a total of $61,273.48 in past due charges under the Burger King Agreements as detailed on the attached <u>Exhibit A.</u>

Unless all of these past due amounts with respect to each Restaurant are paid in full within ten (10) days after your receipt of this letter, or thirteen (13) days from the date of this letter, whichever is earlier, the applicable Burger King Agreements shall automatically terminate without further notice and BKC will pursue any and all remedies available to it. In such event, all post-termination covenants of the Burger King Agreements shall apply. Failure to comply with these covenants will result in additional liability. In addition, BKC will continue to hold you responsible for all obligations and damages arising out of the Burger King Agreements and under applicable law, including its attorneys' fees and costs.

In addition, as of October 15, 2002, you are further indebted to Burger King Corporation ("BKC") in the amount of $9,169.25 as indicated on <u>Exhibit B</u>. This sum represents past due and owing payments pursuant to the "direct pay" arrangement established by order of the United States Bankruptcy Court for the District of Delaware as a result of AmeriServe Food Distribution, Inc.'s bankruptcy filing on January 31, 2000 (the "AmeriServe Post Petition Receivables").

Demand is hereby made by BKC for full payment of the total AmeriServe Post Petition Receivables. If you fail to pay all of those past due monies within ten (10) days from the date of this letter, BKC will take legal action to collect this amount. Please pay the past due charges promptly so that further action will not be necessary.

Any and all payments should be made payable to Burger King Corporation and sent to my attention at the above address. Payment should not be sent to any other individual or department. If partial payment is received by me or any other department, it will be held in partial

Mr. Mumtaz Hashim and Restaurant Corp. of America
October 25, 2002
Page 2

satisfaction of the amounts past due, but will not release you from your obligation to pay the balance due or constitute a waiver by BKC of any of its rights under the Burger King Agreements.

BKC has not authorized any of its employees, attorneys or agents to verbally modify any terms of this letter. This letter may be modified only by a written modification under my signature or the signature of another BKC attorney. You cannot rely on oral communications.

BKC reserves all rights and remedies available to it under the Burger King Agreements and under applicable law.

**Payment must be in the form of a wire transfer of funds or a certified or cashier's check.** For your convenience, BKC's wiring instructions are attached as <u>Exhibit C</u>.

Very truly yours,

BURGER KING CORPORATION

Thomas G. Archer
Senior Attorney

H:\val\def\hashim fin-def 10-24-02.doc:vmy

Enclosures



Direct (305) 378-3239
Facsimile (305) 378-3191

February 11, 2003

<u>VIA FEDERAL EXPRESS</u> and
<u>CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>

PERSONAL AND CONFIDENTIAL

Mr. Mumtaz Hashim
Restaurant Corp. of America
19098 Brasilia Drive
Northridge, CA 91326

Re:   <u>NOTICE OF FINANCIAL DEFAULT - BKC Receivables</u>

Dear Mr. Hashim:

Burger King Corporation ("BKC") hereby notifies Restaurant Corp. of America and you individually (collectively, "you") that you are in default under your obligations relating to the Burger King® restaurants listed on <u>Schedule 1</u> attached hereto (the "Restaurants").

Reference is hereby made to each of the Franchise Agreements (the "Franchise Agreements"), the applicable Lease or Sublease Agreement (the "Lease"), and the Conditional Consent to Assignment of Franchise Agreements and Leases (the "Assignments") as enumerated on <u>Schedule 1</u> hereto. The Franchise Agreements, the Lease, and the Assignments are hereinafter collectively referred to as the "Burger King Agreements."

BKC hereby declares you to be in default under the Burger King Agreements as a result of your failure to pay a total of $67,742.97 in past due charges under the Burger King Agreements as detailed on the attached <u>Exhibit A.</u>

Unless all of these past due amounts with respect to each Restaurant are paid in full within ten (10) days after your receipt of this letter, or thirteen (13) days from the date of this letter, whichever is earlier, the applicable Burger King Agreements shall automatically terminate without further notice and BKC will pursue any and all remedies available to it. In such event, all post-termination covenants of the Burger King Agreements shall apply. Failure to comply with these covenants will result in additional liability. In addition, BKC will continue to hold you responsible for all obligations and damages arising out of the Burger King Agreements and under applicable law, including its attorneys' fees and costs.

Any and all payments should be made payable to Burger King Corporation and sent to my attention at the above address. Payment should not be sent to any other individual or department. If partial payment is received by me or any other department, it will be held in partial satisfaction of the amounts past due, but will not release you from your obligation to pay the balance due or constitute a waiver by BKC of any of its rights under the Burger King Agreements.

BKC has not authorized any of its employees, attorneys or agents to verbally modify any terms of this letter. This letter may be modified only by a written modification under my signature or the signature of another BKC attorney. You cannot rely on oral communications.

BKC reserves all rights and remedies available to it under the Burger King Agreements and under applicable law.

Mr. Mumtaz Hashim and Restaurant Corp. of America
February 11, 2003
Page 2


Payment must be in the form of a wire transfer of funds or a certified or cashier's check.
For your convenience, BKC's wiring instructions are attached as Exhibit B.


Very truly yours,

BURGER KING CORPORATION


Thomas C. Archer
Senior Attorney

h:\rea\de\hashim fin-def 2-11-03.doc

Enclosures



Direct (305) 375-3236
Facsimile (305) 378-3191

March 7, 2003

VIA FACSIMILE 818-368-0927 and U.S. MAIL

PERSONAL AND CONFIDENTIAL

Mr. Mumtaz Hashim
Restaurant Corp. of America
19098 Brasilia Drive
Northridge, CA 91326

RE:   CONFIRMATION OF TERMINATION AND DEMAND FOR
      COMPLIANCE

Dear Mr. Hashim:

Reference is made to the letter to you dated February 11, 2003 ("Notice of Default"),
pursuant to which Burger King Corporation ("BKC") notified you that Restaurant Corp. of
America and you were in default under the Franchise and Assignment Agreements
referenced therein (the "Agreements").

This letter confirms that the Agreements were terminated effective at 12:01a.m. on
February 25, 2003. Accordingly, you have no further right to use BKC's Marks and the
Burger King system at the above referenced Burger King® Restaurant ("Restaurant").
The termination of the Agreements results from your failure to cure the monetary default
under the Agreements set forth in the Notice of Default within the time specified therein
and in the Agreements.

BKC hereby demands that you comply with all post-termination covenants contained in
the Agreements, including but not limited to, immediately ceasing operation of the
Restaurant and the use of BKC's Marks, and returning to BKC the Manual Operating
Data loaned to you, together with all other material containing trade secrets, restaurant
operating instructions or business practices at BKC.

Any continued use of BKC's Marks and the Burger King system, or your continued
operation of the Restaurant, constitutes a violation of, among other things, the
Agreements and applicable laws.

The termination of the Agreements is without prejudice to any other rights or remedies
BKC may have. If BKC receives any post-termination payments from you, BKC shall
hold such payments for application in accordance with the final disposition of BKC's
damage claims arising from your breach of the Agreements and any continued operation
of the Restaurant in violation BKC's rights. You should not construe BKC's receipt of
these funds as a waiver of your default, BKC's termination of the Agreements, or BKC's
claim for damages. Any such payments should be sent only to my attention at the above
address and not to any other individual or department.

Mr. Mumtaz Hashim and Restaurant Corp. of America
Confirmation of Termination
March 7, 2003
Page 2

Please appreciate that BKC has not authorized any of its employees, attorneys or agents to verbally modify any terms of this letter. This letter may only be modified by a written modification under my signature. Any reliance by you on alleged oral communications accordingly is unwarranted.

Very truly yours,

BURGER KING CORPORATION

Thomas G. Archer
Senior Attorney

H:\vendor\Hashim confirm-term 03-07-03.doc